Docket Nos. 13-10172, 13-10179, 13-10198
_____

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT
_____

## UNITED STATES OF AMERICA,

### Plaintiff-Appellee,
v.

## JOSEPH CAROZZA, DANIEL JOHNSON, and CHRIS NAPOLI,

### Defendants-Appellants.
_____

On Appeal from the Judgment and Conviction in
District Court Case No. CR 10-642-CRB
United States District Court for
the Northern District of California
(Hon. Charles R. Breyer, U.S.D.J., Presiding)

## BRIEF OF APPELLANTS

ETHAN A. BALOGH
Coleman & Balogh LLP
235 Montgomery St., #1070
San Francisco, CA 94104
 (415) 391-0440

Attorney for Appellant
Joseph A. Carozza

KAREN L. LANDAU, CSB # 128728
Law Office of Karen L. Landau
2626 Harrison Street
Oakland, CA 94612
(510) 839-9230

Attorney for Appellant
Chris Napoli

Martin A. Sabelli
Law Office of Martin A. Sabelli
Four Embarcadero Center, 17th Fl.
San Francisco, CA 94111

Attorney for Appellant
Daniel Johnson

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................. v

I. INTRODUCTION & NATURE OF THE CASE ............................ 1

II. JURISDICTION AND TIMELINESS ........................................ 2

III. CUSTODY STATUS ................................................................ 3

IV. ISSUES PRESENTED FOR REVIEW ..................................... 3

V. STATEMENT OF THE CASE .................................................. 4

   1. Course of Proceedings ............................................................ 4

   2. Statement of Facts ................................................................. 7

   3. The Defense Case.................................................................. 24

VI. SUMMARY OF ARGUMENT.................................................. 31

VII. ARGUMENT........................................................................... 35

A.     The District Court Erred Under The Federal Rules Of
Evidence And Violated Appellants' Right To Present A Defense
Under The Fifth And Sixth Amendments By Excluding Evidence
Supporting Appellants' Good-Faith Belief That The CSA Did Not
Require In-Person Medical Examinations To Support The Issuance
Of *Bona Fide* Prescriptions For Schedule III And IV Controlled
Substances. ................................................................................ 35

   1.    Standard of Review ............................................................ 35

   2.    The Relevant Legal History. ............................................. 36

3.  The District Court Erroneously Excluded Evidence Of Appellants' Good-Faith Belief In The Propriety Of Issuing Prescriptions For Schedule III And IV Controlled Substances Based On A Licensed Physician's Review And Assessment Of On-Line Medical Questionnaires. ...................................................... 41

   a.  The proffered evidence was relevant and necessary to demonstrate the reasonableness of appellants' good-faith belief in that their conduct complied with the CSA............................ 44

   b.  The probative value of the excluded evidence outweighed the possibility of jury confusion. ...................................................... 59

4.  The District Court's Exclusion Of Evidence Supporting The Good-Faith Defense Improperly Abridged Defendants' Rights To Present A Complete Defense Under The Fifth And Sixth Amendments................................................................................. 61

   a.  The excluded evidence was relevant................................. 63

   b.  The evidence was highly probative on the central issue at trial: the defendants' intent....................................................... 63

   c.  The probative value of the evidence was not substantially outweighed by other interests. .................................................. 67

5.  The Government Cannot Establish The Error Was Harmless Beyond A Reasonable Doubt. ...................................................... 69

B.  The Jury Instructions Provided a Truncated Definition of Good Faith, Reducing the Government's Burden of Proof and Allowing Conviction Based upon a Failure to Investigate and Correctly Discern the Law. .......................................................................... 72

   1. Standard of Review and Applicable Law ................................. 72

   2.  Background ........................................................................ 73

3.  The District Court's Definition of Good Faith Undermined the Defense Theory and Allowed the Government to Shift the Burden of Proof. ...................................................................................... 76

   a.  The defendants' belief in the lawfulness of their conduct was the heart of the defense and a legitimate basis of good faith. ... 78

   b.  The defendants' good faith belief in the lawfulness of their conduct was not equivalent to an invalid defense that the existing law was invalid. .......................................................... 80

   c.  The instructions allowed conviction based on malpractice. . 83

4.  The Court's Failure to Instruct on the Ryan Haight Act and/or the Question Whether an In-Person Examination Was Required Allowed Conviction on The Invalid Legal Theory that the Lack of an In-Person Examination Alone Proved Guilt............................ 85

5.  The Jury Instructions Wrongly Excluded from The Definition of Good Faith the Notion That Laypeople May Act in Good Faith By Relying on The Professional Judgment of  Physicians and Pharmacists. ............................................................................... 88

6.  The Instructional Errors Allowed Conviction on Invalid Legal Theories and Were Not Harmless, Requiring Vacatur of the Convictions. ............................................................................... 94

C.  The Interaction of the Good Faith and Deliberate Ignorance Instructions Shifted the Burden of Proof on Good Faith to the Defendants................................................................................100

D.   The District Court Should Have Dismissed The Indictment Based On The Government's Introduction Of Perjured Testimony.................................................................................109

   1.   Introduction And Standard Of Review. ............................... 109

VIII.  CONCLUSION.......................................................................121

STATEMENT OF RELATED CASES.............................................122

CERTIFICATE OF COMPLIANCE.................................................123

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) .. 115, 116

*Chambers v. Mississippi*, 410 U.S. 284 (1973)............................... 62

*Crane v. Kentucky*, 476 U.S. 683 (1986) ....................................... 61

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ............................. 69

*Francis v. Franklin*, 471 U.S. 307 (1985)....................................... 96

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ................................. 61

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ............................... 108

*United States v. Bailey*, 444 U.S. 394 (1980) ................................. 95

*United States v. Cheek*, 498 U.S. 192 (1991) ............... 43, 76, 80, 81

*United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558 (1971) 92

*United States v. Isgro*, 974 F.2d 1091  (9th Cir. 1992) ......... 112, 114

*United States v. Mechanik*, 475 U.S. 66 (1986) ............................ 114

*United States v. Moore*, 423 U.S. 122 (1975).................................. 84

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ................. 95

**Federal Circuit Cases**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ................... 62, 68

*DePetris v. Kuykendall*, 239 F.3d 1057 (9th Cir. 2001)............ 66, 70

*Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027 (9th Cir. 2005) ..................................................................................... 68

*United States v. Knapp*, 120 F.3d 928 (9th Cir.1997) .................... 96

*Suzy's Zoo v. C.I.R.*, 273 F.3d 875 (9th Cir. 2001)......................... 35

*United States v. Anguiano-Morfin*, 713 F.3d 1208 (9th Cir. 2013) ... 72

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012).................... 36

*United States v. Baron*, 94 F.3d 1312 (9th Cir. 1996), *overruled in part by Heredia*, 483 F.3d at 920.............................................. 102

*United States v. Bishop*, 291 F.3d 1100 (9th Cir. 2002)................. 43

*United States v. Boulware*, 384 F.3d 794  (9th Cir. 2004).............. 70

*United States v. Crenshaw*, 698 F.2d 1060 (9th Cir. 1983)............ 64

*United States v. Dellinger*, 472 F.2d 340  (7th Cir. 1973)......... 43, 60

*United States v. DeMuro*, 677 F.3d 550 (3d Cir. 2012)................... 60

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006)......... passim

*United States v. Fierros*, 692 F.2d 1291 (9th Cir. 1983)........... 79, 92

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc) .................................................................. 73, 101, 108

*United States v. Hofus*, 598 F.3d 1171 (9th Cir. 2010) ................. 73

*United States v. Jackson*, 726 F.2d 1466 (9th Cir. 1984)

(per curiam) ............................................................... 72

*United States v. James*, 169 F.3d 1210 (9th Cir. 1999)
 (*en banc*).............................................................. 65, 69

*United States v. Larrazolo*, 869 F.2d 1354 (9th Cir. 1989), *overruled
 on other grounds by Midland Asphalt Corp. v. United States*, 489
 U.S. 794 (1989)..................................................... 116

*United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012) .... 61

*United States v. Lovern,* 590 F.3d 1095 (10th Cir. 2009) ............... 91

*United States v. Mitchell,* 681 F.3d 867 (6th Cir. 2012) ................. 102

*United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) .......... 35

*United States v. Petersen*, 513 F.2d 1133 (9th Cir. 1975) ............. 92

*United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010) ...... 35

*United States v. Quinones*, 635 F.3d 590 (2d Cir. 2011) ............... 89

*United States v. Ramos-Atondo*, 732 F.3d 1113 (9th Cir. 2013) ... 102

*United States v. Rhone*, 864 F.2d 832 (D.C. Cir. 1989) ................. 82

*United States v. Saenz*, 179 F.3d 686 (9th Cir. 1999) ............. 66, 69

*United States v. Samango*, 607 F.2d 877 (9th Cir. 1979) ............. 120

*United States v. Sandoval-Gonzalez*, 642 F.3d 717 (9th Cir. 2011) 108

*United States v. Sears, Roebuck & Co.*, 719 F.2d 1386 (9th Cir.
 1983) .................................................................... 115

*United States v. Smith-Baltiher*, 424 F.3d 913 (9th Cir. 2005) ........ 92

*United States v. Stein*, 37 F.3d 1407 (9th Cir.1994) ................. 95, 96

*United States v. Stever*, 603 F.3d 747 (9th Cir. 2010) ............. passim

*United States v. Svoboda*, 633 F.3d 479 (6th Cir. 2011) ............... 81

*United States v. Thomas*, 612 F.3d 1107 (9th Cir. 2010) ................ 72

*United States v. Todd*, 108 F.3d 1329 (11th Cir. 1997) ................. 43

*United States v. Turman*, 122 F.3d 1167 (9th Cir.1997) ................ 96

*United States v. Urfer*, 287 F.3d 663 (7th Cir. 2002) ................. 60, 82

*United States v. Vamos*, 797 F.2d 1146 (2nd Cir. 1986) ...... 89, 91, 98

*United States v. Washington*, 819 F.2d 221 (9th Cir. 1987) ........... 72

*United States v. Whitman*, 771 F.2d 1348  (9th Cir. 1985) ............. 64

*United States v. Yi,* 704 F.3d 800 (9th Cir. 2013) .......................... 101

*Wood v. Alaska*, 957 F.2d 1544 (9th Cir. 1992) ...................... 62, 63

**District Court Cases**

*United States v. Reyes,* Case No. CR-05-0556 CRB, Docket No. 524-1, at 35 (N.D. Cal. 2007), *aff'd* 660 F.3d 454 (9th Cir. 2012).........87

**Statutes**

21 U.S.C. § 829 ......................................................................... 109

21 U.S.C. § 829(e)(1) ............................................................... 110

21 U.S.C. § 829(e)2(A) ................................................................ 110

28 U.S.C. § 3231 ........................................................................ 3

**Other Authorities**

*Online Pharmacies and the Problem of Internet Drug Abuse: Hearing Before the Subcomm. on Crime, Terrorism and Homeland Security of the House Comm. on the Judiciary*, 110th Cong. 71 (June 24, 2008) ....................................................................................... 111

S.399, 109th Cong. (2005) ........................................................ 38

**Rules**

Fed. R Evid. 403................................................................... 59, 60

Fed. R. App. P. 4(b) ................................................................... 3

Fed. R. Evid. 401........................................................................ 44

**Regulations**

26 C.F.R. § 1306.04 ............................................................. 5, 110

74 Fed. Reg. 15596, 15599 (Apr. 6, 2009) ................................. 111

# I. INTRODUCTION & NATURE OF THE CASE

The defendants in this case were convicted of violating the Controlled Substances Act based on their sales of medication over the internet and pursuant to prescriptions which were written by a doctor who reviewed the online questionnaires of patients and filled by licensed pharmacists.  Their convictions must be reversed: despite a lengthy trial, in which the government was given free rein to present prejudicial evidence, the district court wrongly excluded critical defense evidence which corroborated the reasonableness of the defendants' beliefs.  The excluded evidence strongly supported the defense of good faith, and was neither cumulative nor unduly confusing.

The convictions must be reversed for a second reason: the jury instructions failed to adequately define the good faith defense in the context of a highly regulated business: the sale of medication.  The jury instructions wrongly limited the concept of good faith to the narrow question whether a physician was acting in the usual

course of medical practice – divorced from the legal and regulatory context in place at that time. This error was critical because the government focused at trial on the lack of a face-to-face meeting between a doctor and a patient when, in fact, the legal and regulatory context, at the time of the offense conduct, did not require a face-to-face meeting between a doctor and a patient. The instructions ultimately allowed the government to characterize the defense evidence that the defendants believed they were acting within the law as irrelevant (and thereby shift the burden of proof to the defense) and obtain a conviction based on an invalid legal theory. The errors, taken singly, or together, require vacatur of the judgment.

## II. JURISDICTION AND TIMELINESS

This is an appeal from the judgment and commitment orders issued on March 29, 2013. JER 124-44.[1] Appellant Carozza filed a timely notice of appeal on March 29, 2013. JER 120. Appellant

---

1 Appellants' Excerpts of Record are cited as JER.

Johnson filed a timely notice of appeal on April 3, 2013. JER 121. Appellant Napoli filed a timely notice of appeal on April 10, 2013. JER 123. Fed. R. App. P. 4(b).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court had jurisdiction pursuant to 28 U.S.C. § 3231.

## III. CUSTODY STATUS

Appellants Napoli, Carozza and Johnson are released on bail pending appeal.

## IV. ISSUES PRESENTED FOR REVIEW

1. Did the district court's exclusion of evidence supporting appellants' good-faith belief that the Controlled Substances Act did not require in-person medical examinations to support the issuance of *bona fide* prescriptions for Schedule III and IV controlled substances violate appellants' Fifth and Sixth Amendment rights to present a defense, and also amount to prejudicial non-constitutional error?

2.  Did the district court mistakenly truncate the concept of good faith, depriving the defense of adequate instructions on the defense theory, and allowing the government to shift the burden of proof?

3.  Did the district court shift the burden of proof on good faith by giving a deliberate ignorance instruction?

4.  Should the district court have dismissed the indictment, without prejudice, based on the government's presentation of false testimony that issuance of a prescription without a face-to-face examination established a *per se* violation of the applicable federal regulations when those regulations added the requirement of a face-to-face examination years *after* the conspiracy alleged?

## V.  STATEMENT OF THE CASE

*1. Course of Proceedings*

On  August 31, 2010, a federal grand jury sitting in the Northern District of California returned an indictment against defendants Chris Napoli, Daniel ("D.J.") Johnson, Dr. Joseph

Carozza, and others.  JER 354.  The grand jury returned a First
Superseding Indictment on December 7, 2010.  JER 330.

Count 1 alleged that, between November 2004 and December
2006, the defendants conspired to possess with intent to distribute
Schedule III and IV controlled substances outside the scope of
professional practice and not for a legitimate medical purpose, in
violation of 21 U.S.C. §§ 841 and 846, and 26 C.F.R. § 1306.04.
Count 1 identified the substances allegedly involved as (a)
phendimetrazine, a Schedule III controlled substance; and (b)
diazepam, (c) phentermine, and (d) clonazepam, Schedule IV
controlled substances.  JER 338.

Count 1 charged three conspiracies.  One of these was the
Safescripts Online conspiracy, in which defendants Napoli, Carozza,
Johnson, and others were charged, and which is the subject of this
appeal.

Count 2 alleged that on or about February 24, 2006,
defendants Napoli, Johnson, Carozza, and others possessed with
the intent to distribute phentermine, a Schedule IV controlled

substance, outside the scope of professional practice and not for a legitimate medical purpose. JER 338. Count 3 alleged that defendants Napoli, Johnson, Carozza, and others conspired to knowingly and intentionally transmit monetary instruments and funds from a place in the United States to and through a place outside of the United States with the intent to promote the carrying on of a specified unlawful activity, namely the unlawful distribution of controlled substances, all in violation of 18 U.S.C. § 1956(h). JER 339. Count 3 also contained criminal forfeiture allegations pursuant to 18 U.S.C. § 982. JER 9-10.[2]

Jury selection began on September 25, 2013, and the court heard evidence between October 25, 2012 and November 15, 2012, on which date the jury convicted the defendants as charged. On March 26, 2013, the district court sentenced Mr. Napoli to 48 months' imprisonment. JER 124. The court sentenced D.J.

---

2 The government dismissed the money laundering charges against Dr. Carozza pretrial. *See* Dkt 738, 762.

6

Johnson to 36 months' imprisonment and imposed a sentence of

30 months' imprisonment on Dr. Joseph Carozza.  JER 131, 138.

## 2. Statement of Facts

In late 2004, Chris Napoli approached his friend, Kevin

Mullin, about starting an online pharmacy business to provide

consumers a more convenient way to order medication.[3]  RT 3418.

Mr. Napoli researched this proposed business, including

potential risks, and prepared a business plan.  RT 3421; JER 1099.

His research included an assessment of the legality of the business.

 RT 3423.  Mr. Napoli believed that his business might ultimately

be taken public and sold, and/or that it might expand to the point

where he would purchase a brick and mortar pharmacy.  RT 3421-

23.

_____

3  Chris Napoli owned and operated a music and dance studio, and
also owned a real estate investment company, which held several
rental properties.

Mr. Napoli and Mullin repeatedly discussed the legality of the business.  RT 353.  They initially consulted with Mr. Napoli's father, attorney Andrew Napoli, who reviewed the applicable statutes, and concluded that the proposed business was lawful.  RT 318-20, 2951, 2953-55, 2966-67.  Andrew Napoli told his son that the judgment of a licensed physician determined the appropriateness of any issued prescription.  RT 2981.

Andrew Napoli also recommended that Chris consult an attorney more expert on the subject.  RT 2967.  The Napolis and Mullin then met with attorney Joseph McHale, a partner in a large law firm (Stradley Ronan), who was both a lawyer and a pharmacist.  RT 349-50, 385-86, 2967-68, 3417, 3424.  McHale, too, reviewed the business plan and relevant statutes, and told them that the proposed model did not violate federal law.  RT 3425.  Mullin testified that the attorneys made certain recommendations, and believed that Chris followed them.  RT 385.

McHale suggested that Napoli and Mullin consult with attorney Joseph Green, who specialized in criminal defense.  RT

8

3425-26.  Mr. Napoli then consulted with Green, and they discussed the DEA's unfavorable view of the business model.  RT 3426.  Green told Mr. Napoli that the DEA was lobbying Congress to add a federal requirement of a face-to-face meeting before prescribing a controlled substance.  RT 3428.  Mr. Napoli retained Green, who provided a letter opining about the legality of an internet pharmacy.  RT 3428; JER 1171.

Mullin and Chris Napoli entered into a formal partnership, and opened Pharmacy USA.  RT 148, 151, 154-56, 1037-38.  Neither man had any background in pharmacy or medicine.  RT 148.  Mullin agreed to provide startup cash of up to $100,000, and Chris Napoli was to provide the labor and management.  RT 150-51; Exh. 87.[4]

Pharmacy USA provided prescription medications based on a physician's assessment of an online questionnaire, but without requiring an in-person examination.  The business worked as

---

4 Ultimately, Mr. Mullin provided $25,000 in start-up money.

follows: a customer searching online for a particular medication might come across one of Mr. Napoli's websites, or the site belonging to an affiliated marketing website ("affiliates"). (The affiliates were run by independent operators.) The customer would select the medication and dosage desired, and then complete an online questionnaire to be assessed by a doctor in Mr. Napoli's employ.[5] Exh. 3; RT 89-96, 290-91, Exh. 77(a) & (b). The medical questionnaire sought information regarding height, weight, current medications being taken, blood pressure, the person's primary care physician, and his/her most recent checkup. *Id.* The individual also had to agree to a patient responsibility statement. RT 101. The doctor could then approve or deny the prescription. If approved, a prescription would issue and be transmitted to a fulfillment pharmacy which printed labels and shipped the medication. The business did not involve face-to-face consultation

---

5 The customer also had to provide a credit card for payment.

between the doctor and patient, but the patient was provided with the doctor's telephone number.  RT 149, 515-18.[6]

The government presented the testimony of Dr. Elinor McCance-Katz, a psychiatrist specializing in the treatment of addiction.  RT 575, 675.  She opined that it was outside the acceptable standard of medical practice to prescribe medication, including controlled substances, without an in-person examination which included a physical examination, the taking of a medical history and even ordering laboratory tests.[7]  RT 588-93, 596-97, 606-08.  Dr. McCance-Katz testified that controlled substances by their nature had the possibility for abuse and in-person

---

6 Pharmacy USA offered 72 medications, both controlled and non-controlled substances.  RT 3448.  The controlled substances included anti-anxiety medication, such as Valium and Xanax, and weight loss drugs, primarily Phentermine, all of which are Schedule IV substances.  RT 149.  Pharmacy USA also offered a few Schedule III medications, and non-controlled substance medications like Viagra and Soma.  RT 3448-49.  Pharmacy USA never sold narcotics, such as hydrocodone.  RT 2577-78; 3451-52, 3506-07.

7 Dr. McCance-Katz apparently practiced in an ivory tower: employed by the University of California at San Francisco medical

examination, including an inquiry into whether the patient had any vulnerability to addiction, was necessary. RT 604. She also opined that California law prohibited prescribing or dispensing drugs over the Internet without an appropriate prior medical examination, which requirement could not be satisfied by an online medical questionnaire. RT 613-15.

The second government expert, Carmine Catizone, a pharmacist and the Executive Director of the National Association of Boards of Pharmacy, asserted that it was not in the usual course of professional pharmacy practice for a pharmacist to fill prescriptions written by a doctor based solely on an online questionnaire. RT 815-16. He, too, asserted that a face-to-face meeting was a necessary component of the doctor-patient relationship and that absent such a meeting the prescription was not valid. RT 822-23.

---

school, she saw only a few patients per week and had no limits on the time she could spend with them. RT 641-46, 648-58.

After incorporating the company, Chris Napoli and Mullin advertised for doctors, interviewed five or six, and hired Drs. Alvin Oscar and John Wilkins to evaluate the medical questionnaires and approve or deny the requested prescriptions. RT 158-59, 3429-32. Both doctors represented that they had valid DEA registrations which allowed them to prescribe controlled substances.[8]

Eventually, Mr. Napoli hired Interstate Commerce Corporation (ICC) to maintain the software for Pharmacy USA. RT 3767, 3843. ICC is located in Pekin, Illinois, and is primarily a tax software business which provides an interface between individual customers and banks. RT 3843, 3758, 3981. ICC was and is owned by Daniel Johnson, whose son defendant D.J. Johnson, is a self-taught computer programmer. RT 3981. D.J. graduated from high school and attended community college for part of one semester. RT 3977. D.J. received a salary and commissions from ICC, which were

---

8 Mr. Napoli later learned, however, that Dr. Oscar had forged his registration, and that he did not, in fact, have a valid DEA registration. RT 3434-35.

determined by his father. RT 3843, 3848. Before D.J. began working for his father, he did manual labor at a galvanizing plant and then worked as a machinist and metal finisher. RT 3977-3980.

Dan Johnson assigned D.J. Johnson to work with Pharmacy USA to improve and maintain its software. RT 3861. D.J. designed websites, wrote software, and managed computer services for Pharmacy USA/SSO. RT 1209, 1211, 3898-99. For a short period, D.J. Johnson managed the affiliate websites. RT 175, 3539.

Pharmacy USA began operations on April 15, 2005. RT 163. The doctors had online access to the Pharmacy USA ordering system, and could review prospective orders on their own schedule. Initially, doctors were paid $5.00 per prescription, regardless whether the doctor approved or denied the requested prescription. RT 164, 3432. Later, Chris Napoli changed the compensation plan to provide a flat weekly fee of $2,000 for the review of up to 1,749 prescriptions per week. RT 166, 3432-33. The contract provided for additional compensation if the doctor reviewed more than 1749 prescriptions per week. *Id.*

14

Mr. Napoli used different pharmacies to fulfill orders placed through Pharmacy USA.  RT 184.  He and Mullin needed pharmacies that were willing to handle the volume of orders and ship to a variety of states.  RT 186.  On September 12, 2005, the DEA shut down and searched Budget Drugs, a Pennsylvania pharmacy Pharmacy USA used for filling orders.  RT 193, 537, 548.  Upon learning this fact, Mullin withdrew from the partnership.  RT 191-95.  On October 8, 2005, DEA agents visited Dr. Wilkins.  RT 554.  The agents informed him that writing prescriptions without an in-person examination was illegal.  RT 554-56.  Concerned, Dr. Wilkins stopped working for Pharmacy USA.  RT 3395.  The DEA visited Dr. Oscar and he, too, ceased working for the company.  RT 1058-59, 3435.

Mr. Napoli decided to continue the business as a sole proprietorship, initially as a company called PSA, and later incorporated the new business as Safescripts Online ("SSO").  RT 1038.  In December 2005, he hired Dr. Joseph Carozza to act as

SSO's doctor.[9]   RT 2482.  Mr. Napoli paid Dr. Carozza a salary, regardless whether he approved or denied a prescription.  RT 3441.  Mr. Napoli told Dr. Carozza why he believed the business was legal, and they reviewed and discussed the congressional testimony of DEA Administrator Joseph Rannazzisi in support of the Ryan Haight Act (the "RHA"), which was then pending before Congress. RT 3441-3446.  Mr. Napoli and Dr. Carozza understood that the RHA, if passed, would require a physician to have a face-to-face consultation before prescribing a medication to a patient for the first time, and that the DEA and other groups were lobbying for the law's passage.  RT 3444-45.

During the approximately one year that Dr. Carozza worked for SSO, the government claimed that he approved 184,114 prescriptions and denied 8,564, approximately 4%.  RT 2295-96.[10]

---

9 Dr. Carozza was licensed to practice medicine in New York.  RT 1524, 1528-29.

10 The government's calculation is suspect.  First, the evidence suggests that, at times, government witness Robyn Bloom logged into the system as a "doctor" and approved requests for

Dr. Carozza denied requested prescriptions for various reasons,

ranging from too low of a body mass index for diet pills, to a patient

who was pregnant or nursing, lack of sufficient information, and

concerns about abuse potential. *See* JER 650-892; RT 4143-50.

Internal SSO documents reflected that Messrs. Napoli and Johnson

and cooperator Robin Bloom critiqued Dr. Carozza for his rejection

of prescriptions, and referred to him as "Dr. Deny," based on his

---

prescriptions. *See e.g.*, RT 1367, 1687-88, 4353-55, 4390.
Second, in March 2006, SSO processed approximately 20,000
orders for a competing company called AffPower. RT 2506-13,
2514-21. The volume of approvals during this period was not
realistically possible, suggesting that the AffPower requests were
approved "in bulk" by someone without Dr. Carozza's individual
assessment. *See* RT 3590-93. Third, during the SSO conspiracy
period, SSO maintained data reflecting the IP addresses of some
individuals accessing the SSO database, *i.e.*, the affiliates, the
pharmacies and the administrators, but did *not* track the IP
address of the individual approving prescriptions, so the
government could not show with certainty that Dr. Carozza
approved all the prescriptions ascribed to him; Mr. Johnson added
that IP login tracking feature subsequent to the SSO conspiracy
period. *See* RT 1981-89, 1992, 2630-31, 4105-07, 4427. For these
reasons, the case agent testified that, with respect to evidence of
Dr. Carozza's approval of any "particular order[;] [t]he only evidence
is Dr. Carozza's name on the pill bottle." RT 1988-89.

repeated denials of requested prescriptions.  *See* RT 1767; JER

221-24, 254-55, 1098; Exh. 331 (at p. 343).

The government presented evidence that DEA agents were

able to purchase phentermine over the Internet by completing an

online questionnaire in which they provided false information,

including falsely providing a weight that appeared quite high for the

patient's stated height.  RT 89-96, 99-103, 105, 123-28.

In mid-2006, consistent with his business plan, Mr. Napoli

decided to purchase a brick and mortar pharmacy.  At the time, he

knew that some of the pharmacies that SSO used to fill

prescriptions were being visited by law enforcement agencies.  RT

3482-83.  His former partner, Kevin Mullin, found Discount U.S.

Drugs, in Orlando, Florida.  RT 206-11, 271, 3484-85.  Mr. Napoli

arranged for the pharmacy to be purchased by Tarkhenov Trading,

and the pharmacy was then operated by  Christopher Latham and

Brandon Winstead.  RT 277, 3486-87.  Mr. Napoli disclosed to the

attorney who handled the transaction that Latham was a nominee

owner and that Mr. Napoli was funding the purchase of the pharmacy. RT 3488.

Over time, Mr. Napoli tried to improve the ways in which SSO sold medication, including by adopting changes recommended by Dr. Carozza. RT 4150-52. For example, Mr. Napoli instructed D.J. Johnson to change the software to prevent customers from ordering more than a 30-day supply of medication every 30 days. RT 385, 4135, 4154-55. This so-called "too soon" function ran automatically, to ensure that only eligible customers reordered. RT 3461, 4135. Mr. Johnson also modified the system to catch deliberate variations or abbreviated versions of the same name, and thus to prevent a customer from changing his name slightly to get around the "too-soon" rule. RT 4124. SSO even purchased third-party software to identify and prevent multiple shipments to the same address. RT 4124-25.

SSO also developed a blacklist: a list of customers who were potential abusers or had credit card chargebacks.[11]  RT 3463-64, 4130.  If a doctor observed a problem, he could direct customer service to add would-be patients to the blacklist.  *Id.*  If a blacklisted customer tried to place an order, the system automatically placed it into a "deleted," status.  RT 4131.  The blacklist function ran on all orders at five minute intervals, and was effective, but not perfect.  RT 4131, 4134.  Mr. Napoli further required the shipped packages to be signed for by an adult with identification, in an attempt to prevent minors from obtaining medication.  RT 3461-62. Over its short-lived existence, SSO became more successful in identifying and preventing what appeared to be abusive ordering.  RT 4125-29.

The government showed that over a brief period toward the end of March 2006, SSO processed approximately 20,000 orders for a competing company called AffPower.  RT 2506-13, 2514-21.

---

11 Chargebacks resulted when the wrong medication was shipped to a customer, or when a customer's credit card was used

There were emails and Skype communications back and forth between AffPower personnel and D.J. Johnson about the technical processing of the orders. RT 2511-12. During this period, SSO paid Dr. Carozza extra, because of the large number of orders that needed to be reviewed. RT 2515-16. Skype communications between Mr. Napoli, D.J. Johnson, and Robyn Bloom showed that all three were eager to increase SSO's sales volume. Some of the communications discussed the shutdowns of various pharmacies and an awareness of the DEA's different interpretation of the law. RT 2484-87.

In March, 2006, Mr. Napoli met with some doctors, pharmacists, Mr. Green and other attorneys. RT 3518. The purpose of the meeting was to put together a trade group to file a declaratory judgment action seeking a declaration that, in the absence of congressional action changing the requirements of the CSA, the internet pharmacy model did not violate the CSA. RT 3518. SSO, Dr. Carozza, and Alan Winter, who owned Terrace

---

fraudulently.

Pharmacy, filed suit in July 2006.  RT 3523.  The district court

dismissed it four months later.  RT 3498-99.  Mr. Napoli

immediately closed Safescripts Online and did not engage in any

internet pharmacy related business after the U.S. District Court

dismissed the lawsuit.  RT 3499, 3523-24; Dr. Carozza immediately

ceased reviewing online prescription questionnaires upon dismissal

of the lawsuit.

    After Mr. Napoli closed SSO, ICC, through D.J. Johnson,

provided assistance to other internet pharmacies including leasing

ICC's software and providing introductions to doctors and

pharmacies.  RT 1349-51, 2026-27.  The government presented

evidence, primarily from Robyn Bloom, the former affiliate manager

for SSO, and an independent operator of various pharmaceutical

websites, about D.J.'s activities.

    D.J. testified that he did not understand that, for the

prescription to be valid, there had to be a face-to-face doctor-

patient relationship, nor that such a relationship was required by

the usual scope of professional practice.  RT 3949-50.  D.J. said

that he relied on the judgment of the doctors and pharmacists, and that Chris Napoli had informed him of the views of the attorneys with whom Mr. Napoli had consulted, as well as about the research he had conducted.  RT 3993, 4198-99, 4280-81.

In September, 2006, Dan and D.J. Johnson hired a well-known pharmaceutical attorney named Michael Costa.  RT 3828-36; Exh. 1032.  Costa provided numerous opinions to the effect that IPs were a "gray area" and that, with his advice, the business model could be conducted legally despite the lack of a face-to-face consultation.  *Id.*  Costa also provided numerous opinions that leasing the software was legal at the time and, in fact, drafted the software lease agreements which ICC and D.J. Johnson entered into with Entel and others.  RT 3847, 3931, 4013-16.

*Money Laundering Charges*

The government charged Messrs. Napoli and Johnson with promotional money laundering.  It was undisputed that Mr. Napoli earned money from Pharmacy USA and SSO, and that he reinvested much of this money in the business.  He also invested

and spent some of the money.  Mr.  Napoli explained that he wanted to protect his profits if he were sued, and he also wanted to have money put away in the event of civil proceedings with the government.  RT 3470-72.  After paying taxes on the income, he placed approximately $200,000 in foreign accounts, and placed other money in the name of a domestic corporation.  RT 3473-76.

D.J. Johnson had no authority to calculate, approve, or initiate a wire transfer.  RT 1701.  His role was only to configure the banking information.

### 3.  The Defense Case

The defendants argued that they acted in good faith, as each genuinely and reasonably believed, at the time, that distributing medication based on a doctor's review and assessment of an online medical questionnaire fell within the scope of a doctor's legitimate professional practice.  D.J. Johnson testified that he relied on the judgment of medical professionals including doctors and pharmacists.  RT 4280-81.  Dr. Carozza contended that the records

reflecting his detailed denials of requested prescriptions as either (1) "too soon", or (2) based on his assessment of (a) possible negative interactions with the patient's other medications or physical symptoms,  (b) "potential abuse", and/or (c) his need for additional information, including the need for lab work before assessing a prescription, demonstrated that he exercised medical judgment, and issued prescriptions based on that proper medical judgment.  *See* RT 4764; *see also* JER 251-53, 650-944.  There was no dispute that *each* of the patients who testified for the government previously had valid prescriptions for the same medication SSO subsequently provided upon their submission of on-line questionnaires, and that *each* had a *bona fide* medical need for the medicine SSO provided them.  *E.g.,* RT 1850-51, 1862-64, 1875-76.

Dr. John Wilkins, who practiced medicine for 15 years before joining Pharmacy USA, for whom he worked until he was visited by the DEA, testified that his issuance of prescriptions based upon his evaluation and review of the online questionnaires, fell within the

25

scope of professional practice. RT 3391. Dr. Wilkins understood that he would be issuing prescriptions based on an online questionnaire. RT 3383-84. Dr. Wilkins testified that the questionnaires contained sufficient patient information to determine whether requested prescriptions were for a legitimate medical reason and thus to approve or reject requested prescriptions. RT 3389-90.

Dr. Wilkins recognized that his relationship with online patients was different from the relationship he had with his clinical patients. *Id.* He admitted that it was possible some patients were lying, but he nonetheless believed he was treating patients in good faith, exercising medical judgment and acting for a legitimate medical purpose. RT 3390-91. Dr. Wilkins testified that if he believed the medication requested was appropriate, based on the questionnaire, he approved it. If he did not believe the medication was appropriate, believed he did not have enough information, or saw a "red flag," he denied it. RT 3389-90.

As described above, and as detailed below, the defendants' belief that their distribution of controlled substances fell within the scope of medical practice related, in part, to the pendency, in 2005 and 2006, of the Ryan Haight Act;  the RHA sought to add the specific requirement of an in-person doctor-patient meeting as a predicate for any valid written prescription.  The RHA became effective on April 13, 2009, and was pending during most of the conspiracy period.  The defendants believed that the RHA, if passed, would change the present law to require, for the first time, an in-person consultation as a predicate for a valid prescription. The defendants presented considerable evidence that they believed they were acting within the bounds of the law, based on both legal and non-legal advice and information.  Messrs. Napoli and Johnson, who were not medical professionals, also contended that they acted in good faith, because they depended on the physicians to exercise medical judgment.

Mr. Napoli testified that from 2004 through 2006, he did not believe that the law required an in-person meeting before a

27

prescription was issued and filled. RT 3416. He based this belief on his own research and his consultations with three different attorneys. RT 3416-17. Attorney Joseph Green told Messrs. Napoli and Mullin that a prescription was valid if the prescribing doctor had a good faith belief that the prescription was a legitimate medical practice. RT 3114. Green explained to them that if the doctor was operating in good faith, then the prescription was valid, and its fulfillment by an internet pharmacy was lawful. *Id.* He had multiple meetings with Mr. Napoli where these matters were discussed. RT 3326.

Mr. Napoli (and Mr. Green) understood that the DEA disagreed with this position but Mr. Napoli nonetheless believed, based on his research and consultation with counsel, that allowing consumers to obtain medication through completing an online questionnaire, was lawful, because SSO's doctors were prescribing with the scope of professional practice. RT 3416-17.

D.J. Johnson testified that he, too, believed the online pharmacy business was legal, based on his discussions with Mr.

28

Napoli, Andrew Napoli, and Johnson's own attorney. RT 3933. He had reviewed letters from Joe Green, Michael Costa, and others, opining that their actions were legal. *Id.* D.J. understood that the medical questionnaire would be reviewed by a licensed doctor, who would make a good faith decision on whether to approve or deny the requested medication. RT 3948.

Mr. Napoli also testified that while Dr. Carozza worked for SSO, patients had the opportunity to contact him, because his name and phone number were supposed to be include on either the pill bottle or the prescription which accompanied it when the medication was sent to the customer. RT 106, 113, 3446.

Mr. Napoli explained that SSO did not sell Schedule II medications, because the law at the time required a face-to-face meeting with a doctor and a handwritten prescription. RT 3451. Likewise, he neither imported drugs from Canada, which would have been illegal, nor sold fake drugs. RT 3452.

After Chris Napoli opened the business, he learned about other online pharmacies being shut down. *E.g.,* RT 3503-14. Mr.

Napoli and attorney Green had ongoing communications over pharmacy shutdowns and prosecutions. RT 3512-13. Mr. Napoli believed that these cases involved situations different from his. For example, Mr. Green told Mr. Napoli that an Iowa prosecution involved conduct much more aggressive than that undertaken by SSO, because SSO had a doctor reviewing prescription requests in good faith. RT 370, 3172, 3179, 3182. Other pharmacies sold large quantities of narcotics, counterfeit drugs, did not use doctors for review, imported medications from Canada, and failed to pay income taxes. RT 3452, 3506-09.

Mr. Green affirmatively told Mr. Napoli that a face-to-face meeting was not required to render a prescription valid and therefore lawful. RT 3191. Mr. Napoli received similar information from other persons. For example, he knew that Budget Drugs, which filled prescriptions for many online pharmacies, had been visited several times by the State Board of Pharmacy. RT 3501-02. Budget's owner, however, told him that the Board told her that there was nothing wrong with what they were doing. RT 3502. He

30

later learned that Budget's DEA license, which allowed it to dispense controlled substances, had been suspended.  RT 3503-04.  Budget's owner, however, remained adamant that there was nothing unlawful about her business model.  RT 3504.

## VI.  SUMMARY OF ARGUMENT

The fundamental issue at trial was whether the defendants acted in good faith.  But the district court prejudiced this defense in two critical ways:  it excluded significant evidence demonstrating appellants' good faith, and then narrowly defined good faith so as to permit conviction based solely on appellants' failure to hold in-person consultations *prior* to the passage of the Ryan Haight Act, *viz.*, the district court permitted conviction on an invalid legal theory.

With respect to its exclusion of evidence, the district court violated appellants' Fifth and Sixth Amendment rights to present  a defense when it (1) refused to permit them to call DEA Administrator Rannazzisi in their case-in-chief, (2) precluded

31

admission of a Congressional Research Report, and (3) excluded large portions of the complaint from the Declaratory Relief Action Napoli and Carozza (and others) had filed in district court. The evidence affirmatively showed that appellants' beliefs were reasonable and thus strongly supported appellants' claim that, during the conspiracy period, each reasonably believed that the issuance of prescriptions for Schedule III and IV controlled substances based on a licensed physician's assessment of a medical on-line questionnaire, complied with CSA.

The district court erred. The proffered testimony and evidence was highly probative of the central issue at trial—appellants' intent—and capable of evaluation by the jury, and no other interests substantially outweighed the importance of this evidence. Indeed, the exclusion of this testimony and evidence deprived appellants' of their constitutional right to present a defense.

The district court compounded the prejudicial effect of this error when instructing the jury. The instructions on good faith narrowly defined that term, effectively directing the jury to

disregard the critical evidence that the defendants believed themselves to be acting within the law. The court's instruction that the government was not required to prove that the defendants knew they were violating the law negated the prosecutor's duty to prove the criminal intent necessary for the conspiracy and money laundering counts. The court further erred by failing to instruct the jury that the non-physician defendants were entitled to rely in good faith on the professional judgment of physicians and pharmacists. Absent the instruction, the jury could only hold the non-physician defendants to the same standard as a physician.

Finally, the district court erred when it denied appellants' motion to dismiss the indictment, without prejudice, based upon the prosecution's use of false testimony to secure the grand jury's decision. Although the RHA did not become effective until more than one year after the alleged conspiracy period, and even though the RHA—for the first time—required an in-person consultation as a predicate for a valid prescription, the government twice presented testimony to the grand jury that during the conspiracy period,

federal law required an in-person medical examination a predicate to any valid prescription. In other words, the government secured its indictment by falsely telling the grand jury that appellants were subject to the requirements of the RHA more than a year prior to the Act's effective date. Because there can be no genuine dispute that the prosecution's introduction of errant testimony substantially influenced the grand jury's decision to indict, or that there at least exists grave doubt that the decision to indict was unaffected by that false presentation, the district court was required to dismiss the indictment. This Court should thus reverse the convictions and remand the matter for further proceedings.

# VII.  ARGUMENT

A.   The District Court Erred Under The Federal Rules Of Evidence And Violated Appellants' Right To Present A Defense Under The Fifth And Sixth Amendments By Excluding Evidence Supporting Appellants' Good-Faith Belief That The CSA Did Not Require In-Person Medical Examinations To Support The Issuance Of *Bona Fide* Prescriptions For Schedule III And IV Controlled Substances.

*1.    Standard of Review*

This Court reviews a district court's evidentiary rulings for abuse of discretion.  *United States v. Orm Hieng,* 679 F.3d 1131, 1135 (9th Cir. 2012).  The Court reviews *de novo* "whether an evidentiary error rises to the level of a constitutional violation." *United States v. Pineda-Doval,* 614 F.3d 1019, 1032-33 (9th Cir. 2010).  Mixed questions of law and fact are reviewed *de novo.* *Suzy's Zoo v. C.I.R.,* 273 F.3d 875, 878 (9th Cir. 2001).

"A violation of the right to present a defense requires reversal of a guilty verdict unless the Government convinces [the Court] that the error was harmless beyond a reasonable doubt." *United States v. Stever*, 603 F.3d 747, 757 (9th Cir. 2010).  Where a district court

35

commits non-constitutional error, the Court "must reverse . . . unless it is more probable than not that the error did not materially affect the verdict." *United States v. Bailey*, 696 F.3d 794, 803 (9th Cir. 2012). The government bears the burden of showing harmlessness. *Id.*

2. *The Relevant Legal History.*

Federal law did not specifically address the issuance of valid prescriptions based on a licensed physician's assessment of on-line medical questionnaires in the years before and encompassing the conspiracy period. For example, in 2004, the Congressional Research Service released a report entitled "Prescription Drug Importation and Internet Sales: A Legal Overview." (The "CRS Report"). *See* JER 225. The CRS Report distinguished between "*legitimate*" online pharmacies and pharmacy websites, *viz.*, the latter "engage in practices that are illegal, such as selling unapproved or counterfeit drugs or dispensing drugs without a prescription." JER 244-45. (emphasis added). The CRS Report

36

identified a third category of pharmacy sites, *i.e.*, sites that "operate in a legal gray area in which the online pharmacy, as mandated by federal law, requires a prescription before dispensing prescription drugs, but allows patients to secure a prescription by completing an online questionnaire that is reviewed by a doctor who never examines or speaks with the patient." *Id.* This latter practice, continued the report, "though potentially unsafe for patients who may be diagnosed incorrectly, *is not necessarily illegal*." *Id.* (emphasis added).

In December of the following year, DEA Deputy Assistant Administrator Joseph Rannazzisi testified in support of obtaining congressional action to change the law with respect to on-line pharmacies. In his testimony, Rannazzisi conceded that as of December 2005, "there exists no statutory definition specifically outlining what constitutes a valid 'doctor/patient' relationship." JER 293.

On February 16, 2005, Senators Norm Coleman and Diane Feinstein introduced S.399, also known as the "Internet Pharmacy

Consumer Protect Act" or the "Ryan Haight Act." A companion bill, H.R. 840, the "Ryan Haight Internet Pharmacy Consumer Protection Act," was introduced the same day in the House of Representatives. The purpose of this legislation was "to amend the Federal Food, Drug, and Cosmetic Act with respect to the sale of prescription drugs through the Internet." S.399, 109th Cong. (2005). The bills proposed to do so, in relevant part, by prohibiting the dispensation or sale of a prescription drug through the Internet by a practitioner who lacked a "qualifying medical relationship" with the person seeking the drug. *Id.* § 2. The bills defined a "qualifying medical relationship" to require "(i) at least one in-person medical evaluation of the patient ... by the practitioner; or (ii) the practitioner conducts a medical evaluation of the patient as a covering practitioner." *Id.* The bills further specified that "[a] medical evaluation by a practitioner is an in-person medical evaluation . . . if the practitioner is in the physical presence of the patient as part of conducting the evaluation, without regard to

38

whether portions of the evaluation are conducted by other health professionals." *Id.*

Not surprisingly, the introduction of the Ryan Haight legislation and its progress through Congress were of great interest to the online-pharmacy industry. Indeed all three appellants proffered, and Messrs. Napoli and Johnson testified, that each was aware that the Ryan Haight Act was pending, but had not yet been enacted into law, at the time of the events alleged in the indictment. RT 3119-3139, 3147-3148; 3178-3181; 3196; 3280-3290. Among other things, in April 2006, Mr. Napoli convened a meeting of lawyers, doctors, and pharmacists in Pennsylvania, including Dr. Carozza. *See e.g.*, RT 3133-3147; 3441-3446; 3191-3196. The participants discussed forming a trade group to litigate the DEA's authority to enforce its interpretation of a valid prescription. RT 3133-47. The participants discussed the pendency of the Ryan Haight Act and its requirement for a face-to-face examination. *Id*. It was proposed that the trade group file a Declaratory Judgment action to seek an independent assessment of whether the executive

branch had the right to decide the scope of ethical medical practice by requiring a face-to-face examination as a condition of a valid prescription in the absence of congressional action. *Id.*

Two months later, the newly formed trade association, PSA, along with Mr. Napoli, Dr. Carozza, and a pharmacist filed a federal action in the Eastern District of Pennsylvania. JER 300. The action sought a declaratory judgment that, in the absence of congressional action, the executive branch "(a) lack[ed] the authority to declare that no legitimate doctor-patient relationship can be established without a face-to-face meeting between a physician and a patient, and (b) cannot interfere with the operation of legitimate electronic commerce in pharmaceuticals as described herein on such a basis." JER 308-09. The complaint specifically cited to the pendency of the Ryan Haight Act as a reason that the defendants purportedly lacked the authority to enforce their interpretation of existing law:

> There remains pending before the Congress an 'Internet Pharmacy Consumer Protection Act,' H.R. 840, that would impose a face-to-face meeting requirement for the

> prescriptions of pharmaceuticals. It is improper for
> Defendants to claim the authority to impose such a
> requirement before Congress has passed this law and
> spoken on this issue.

*Id.* at 9 ¶ 25.1. Equally important, the Declaratory Relief Action set

forth the defendants' express, good-faith reliance on Rannazzisi's

public testimony as a basis to conclude that SSO could lawfully

issue *bona-fide* prescriptions based on Dr. Carozza's review and

assessment of on-line medical questionnaires. JER 305-07.

### 3. *The District Court Erroneously Excluded Evidence Of Appellants' Good-Faith Belief In The Propriety Of Issuing Prescriptions For Schedule III And IV Controlled Substances Based On A Licensed Physician's Review And Assessment Of On-Line Medical Questionnaires.*

The district court excluded key evidence by which appellants

sought to demonstrate their good-faith belief that Dr. Carozza's

issuance of prescriptions for Schedule III and IV controlled

substances based on his review and assessment of on-line

questionnaires, was valid.

To bolster their defense, appellants sought to introduce three

critical pieces of evidence to show that they believed in good-faith

that Dr. Carozza's issuance of prescriptions for Schedule III and IV

41

controlled substances was lawful under the then-controlling federal

regulations.   Appellants sought to introduce:

1.  The live testimony of DEA Deputy Assistant
    Administrator Rannazzisi, who appellants proffered
    would testify—based on his 2005 Congressional
    testimony—that prior to the 2008 passage of the
    RHA, the controlling federal regulations did *not*
    require any in-person examination as a predicate
    for the issuance of a valid prescription under the
    CSA;

2.  The 2004 CRS Report that noted the legitimacy of
    on-line pharmacies during the conspiracy period,
    and which expressly noted such pharmacies could
    lawfully provide prescriptions for controlled-
    substances under federal law; and

3.  The Declaratory Relief Action ("DRA") that Napoli
    and Carrozza filed in the district court, in which
    they set forth their reliance on (a) DEA Rannazzasi's
    public statements that the Department of Justice
    believed that federal law did *not* provide a statutory
    definition for "doctor-patient relationships" that
    would have prohibited the conduct of SSO during
    the conspiracy period; and (b) the pendency of the
    legislation to change the law to outlaw on-line
    pharmacies.

*See e.g.*  RT 3453, 4533 (Rannazzisi), 3442-43 (Congressional

Report); JER 300-318 (unredacted DRA).

Although a defendant's "good-faith" belief that his conduct

complied with the law is a complete defense, "whether or not the

42

claimed belief or misunderstanding is objectively reasonable[,]" *United States v. Cheek*, 498 U.S. 192, 202 (1991), evidence demonstrating that appellants' good-faith beliefs were objectively reasonable would have substantially bolstered their defense. *See United States v. Bishop*, 291 F.3d 1100, 1111 (9th Cir. 2002) (stating that "a defendant raising a good faith reliance defense is entitled to offer evidence of what he relied upon"); *United States v. Todd*, 108 F.3d 1329, 1334 (11th Cir. 1997); *United States v. Dellinger*, 472 F.2d 340, 381-82 (7th Cir. 1973).  It is far more believable to a jury that a defendant's belief is held in good faith, when it is one that lay people can understand might be held by a reasonable person.

Nonetheless, the district court excluded Rannazzisi's testimony and the CRS report, and allowed the Government to replace appellants' exhibit containing the DRA with a redacted version that blocked reference to Rannazzisi's public position, as well as the current state of federal law.  Compare JER 300-318 with JER 319-329; *see also* RT 4562, 4573.  In other words, the court

43

excluded significant evidence that established the objective reasonableness of appellants' good-faith belief that their conduct comported with the requirements of the CSA. These rulings deprived appellants of their right to present their defense.

### a. The proffered evidence was relevant and necessary to demonstrate the reasonableness of appellants' good-faith belief in that their conduct complied with the CSA.

The proffered evidence supported appellants' good-faith belief that their actions comported with the requirements of the CSA. Under the Federal Rules of Evidence, "[e]vidence is relevant if . . . (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. For the reasons that follow, evidence regarding the appellants' good-faith belief that Dr. Carozza could properly issue prescriptions for Schedule III and IV controlled substances based on his review and assessment of on-line medical questionnaire was relevant to the element of intent.

44

### i.   **Rannazzisi's testimony**.

As recited by the government, appellants proffered three bases

for permitting Rannazzisi's testimony:

> First, Mr. Rannazzisi will testify that the doctor-
> patient relationship was undefined at the time of the
> charged offenses and that he said so publicly during
> the relevant period of time. . . . This testimony
> supports the reasonableness of a doctors' belief, in
> 2006, that a doctor-patient relationship could be
> forged online based on the completion and review of
> a medical questionnaire.

> Second, Mr. Rannazzisi will testify that DEA
> interpreted the doctor-patient relationship to require
> a face-to-face examination at the time of the charged
> offenses.  As Mr. Rannazzisi testified in December
> 2005, it was "DEA's contention that no legitimate
> doctor-patient relationship exists during these
> transactions" because there was no face-to-face
> examination of the patient. *Id.* (emphasis added).
> This testimony demonstrates that DEA's enforcement
> actions against online pharmacies during the
> relevant time period were based on the agency's
> interpretation of an undefined standard, and that the
> agency understood it was conte[st]ing that
> interpretation.  This, in turn, supports the
> defendants' good-faith belief in the lawfulness of
> their conduct notwithstanding contemporaneous
> DEA enforcement activities.  ...

> Third, the defendants may assert a good-faith and/or
> advice-of-counsel defense at trial. The evidence will

> show that the defendants were aware of Mr.
> Rannazzisi's comments at the time of the charged
> offenses, and that his comments - particularly his
> testimony that the doctor-patient relationship was
> undefined - informed their state of mind....

Dkt. 831 at 2-3; *see also* JER 287-295 (Rannazzisi congressional testimony). Appellants established that they were aware of Rannazzisi's testimony which supported their belief that the operation of SSO stood in compliance with federal law. RT 6/12/12 at 13; Dkt 840; *see also* RT 3125-27; RT 3444-45. The district court agreed that Rannazzisi's congressional testimony, if known by appellants, presented evidence about "the reasonableness of [appellants'] belief[s]" that their conduct was lawful and constituted "a factor that the jury could consider in deciding whether or not [a defendant] committed a crime." RT 6/12/12 at 15. So too, the district court recognized the problem with excluding Rannazzisi's testimony:

> How does [a defendant] demonstrate the
> reasonableness of his belief? . . . How does he
> demonstrate that his view, whatever his view is, is a
> reasonable view? And isn't it a way to demonstrate

46

> that it's a reasonable view to show that the
> Government also held this view?

*Id.* at 23-24.[12]

Nevertheless, the district court—without identifying any basis whatsoever—quashed the trial subpoena appellants had served upon Rannazzisi, but "without prejudice to the defendants requesting a subsequent trial subpoena at the conclusion of the government's case-in-chief." Dkt. 842. And request again appellants did, only to have the district court defer ruling until the very last day of testimony, when it rejected their request. RT 3124-25, 3453, 4553; *see also* Dkt 1237 at 10 & n.2.

### ii.    The Congressional Research Service Report.

For reasons essentially identical to the relevance of Rannazzisi's testimony, appellants sought to introduce the 2004 CRS Report. *See e.g.*, Dkt 890. This Report, of a congressional

---

[12]The government barely contested the relevance of Rannazzi's testimony. Dkt 831 at 1-8. After claiming that appellants could demonstrate their intent through their own testimony, the government simply contended, *ipse dixit*, that the testimony was irrelevant. *Id.* at 8.

investigation into prescription drug importation and internet pharmacies, concluded that the practice of online pharmacies of issuing prescriptions based on a licensed physician's review and assessment of an online medial questionnaire was "not necessarily illegal." JER 245. Appellants each reviewed and relied on the CRS Report when assessing whether SSO's business model comported with the CSA. *See* RT 3041; 3442-3444; 3593; *see also* Dkt 890. This authoritative report, too, demonstrated the reasonable nature of appellants' good-faith beliefs that licensed physicians could issue *bona fide* prescriptions based on a review and assessment of an online medical questionnaire.

The district court didn't rule the CRS Report irrelevant, but declined its admission during the questioning of the Government's expert witnesses, Dr. Elinor McCance-Katz and pharmacist Carmine Catizone, and deferred ruling until it was offered in the defense case, warning that it might "be excluded under [Fed. R. Evid.] 403." RT 191-99. Then, during the defense case, appellants established that Mr. Napoli read the CRS report and discussed it

48

with Dr. Carozza.  RT 3041, 3442-3444, 3593.  The district court

admitted the CRS Report into evidence, but then backtracked:

> *MS. AULT:*  Objection, Your Honor, hearsay.
>
> *THE COURT:*  Well, it will be -- pardon me, it will be admitted, not for the truth of the matter, but for a subject that this witness testifies having discussed.
>
> *MS. AULT:*  Your Honor, we also had an objection that we have raised with the Court on the reliability and the foundational aspects of this report.
>
> *THE COURT:*  Well, your foundation, are you saying that this -- the question is whether this document was discussed, not whether it's reliable or not.  So I'm going to admit it.
>
> *MR. CANNON:*  Thank you, Your Honor.  So we would move Exhibit 3052.
>
> *MS. AULT:*  Your Honor, we have an objection to the document itself coming into evidence.  The defendant's understanding of what it said, he may ask him, but the document itself is highly unreliable and we have serious concerns about.
>
> *THE COURT:*  Well, the document won't be admitted; however, he can to testify as to what he said about the document or what he understood about the document.

*MS. AULT:*        Thank you, Your Honor.

The government's "unreliability" argument was spurious.

Exhibit 3052—a true copy of the CRS Report—constituted a

Congressional Research Report prepared by the public policy

research arm of the United States Congress.  JER 225.  The Report

surveyed the current legal framework for regulating online

pharmacies, including the patchwork of federal and state laws

regarding controlled substances, prescription drugs, pharmacies,

and the practice of medicine.  JER 225-250.  The executive may not

cast aside the findings of this legislative branch agency, part of the

Library of Congress, *ipse dixit* or because it disagrees with or

dislikes its assessment.  *See* www.loc.gov/crsinfo.

The only portion of the Report the Government took issue

with, and thus claimed made the entire report "untrustworthy" and

inadmissible under Fed. R. Evid. 803(8)(A)(iii), was its finding "that

certain unspecified types of online pharmacies are 'not necessarily

50

illegal.'" Dkt 899 at 4.[13]  But the Report in general, and that finding in particular—which the Government bore the burden to establish was "untrustworthy" *see Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999)—were essentially identical to the congressional testimony of Administrator Rannassizi, who confirmed that before passage of the RHA in 2008, federal law *did not* define the doctor-patient relationship to *require* a face-to-face examination.

Indeed, the government's own trial expert—Carmine Catizone—testified, consistent with his prior congressional testimony, that prior to the passage of the RHA, on-line pharmacies were not necessary illegal, "may fall within a regulatory gray area[,]" and that Congress needed to "[c]hange the federal law to codify what existed in [some] state law."  *See* RT 920-923.   How the

---

[13]After making this limited objection to exclude the entire report, the government then emphasized its accuracy and thoroughness. *See* Dkt 899 at 6-7.

government could then tell the district court the opposite, as a basis to exclude defense evidence of good-faith, is a mystery.

Moreover, the government did not argue (much less demonstrate) that online pharmacies were "necessary illegal[,]"—in other words, *per se* illegal—prior to the passage of the RHA, the necessary predicate to support its objection. The government actually conceded this fact in summation, after it had successfully excluded the CRS Report from evidence. *See* RT 4802 ("The only thing the Ryan Haight Act did was clarify that if a doctor issues a prescription without having a face-to-face meeting with the patient, that it's *per se*, that it's automatically, outside the usual course of professional medical practice"). Indeed, the need for the passage of the RHA to close this legislative gap necessarily demonstrates both the trustworthiness of the CRS Report and the spuriousness of the government's objection; the Report was prepared so that Congress could assess the need for and wisdom of the RHA. Considering that the multiple attempts to close this legislative loop fell short until

the RHA finally passed,[14] Congress no doubt believed that on-line pharmacies, like SSO, were not "necessary illegal."  Most simply, Congress did not impose the requirement of a face-to-face meeting to establish a valid doctor-patient relationship until it enacted the RHA in 2008, proving the trustworthiness of the CRS Report.[15]

### iii.  The Declaratory Relief Action.

Last, appellants sought admission of the complete complaint filed in the Declaratory Relief Action ("DRA") during the conspiracy

---

[14]  *See e.g.,* S. 399 (109th Cong.) (2006) (requiring in-person medical examination for valid prescription of controlled substance); S.3884 (109th Cong.) (same); H.R. 840 (109th Cong.) (2006) (same); H.R. 3880 (108th Cong.) (2004) (imposing in-person examination requirement for prescription of controlled substances); S. 2464 (108th Cong.) (2004) (same); H.R. 840 (109th Cong.); H.R. 4990 (2002) (requiring the name of the doctor and pharmacy to be prominently displayed on prescriptions); S. 3208 (2000) (proposed amendment to Food, Drug, and Cosmetic Act that specifically addressed Internet prescribing).

[15]  On this point, it is worth noting that if the government prosecuted this case because the issuance of prescriptions in the absence of a face-to-face examination established a *per se* violation of the CSA—*viz.*, applying the RHA standard to conduct preceding the passage of the RHA, then this prosecution violated the Ex Post Facto clause and Appellants lacked fair notice regarding the scope of the CSA.  *See e.g.*, Dkt 102, 123, 128.

period. This complaint was critical to establishing appellants' good-faith defense because it provided objective evidence of the legal advice supporting their claim that the CSA, as of 2006, did *not* require an in-person medical examination as a predicate for a valid prescription. JER 300-318. The context of this complaint—a public filing served against the executive officers who could (and then did) prosecute them—also supported the genuineness of appellants' beliefs and their willingness to litigate the issue. *See id.*; *see also* RT 4605-08. The DRA complaint identified the DOJ's patterns of prosecution and enforcement, which it contended were unlawful in the absence of congressional action. The complaint relied heavily on Rannazzisi's testimony to establish the then-current gap in the law, and the unlawfulness of the executive branch "to claim the authority to impose such a requirement before Congress has passed this [pending bill] and spoken on the issue." JER 305-308.

During the defendants' case, the district court admitted the document, but excised the exhibit attached to it which contained

Rannazzisi's congressional testimony.  RT 3335.  Shortly thereafter,

the district court backtracked *sua sponte*, ruling:

> By the way, there are a couple of paragraphs of the
> declaratory relief action that should be excised, and
> they deal within [sic] Mr. Rannazzisi's statement, so
> they are going out. I'm not going to let the
> declaratory relief action in in its entirety.

RT 3341.  Ultimately, over appellants' objection, the district court

admitted a version of the DRA complaint redacted by the

government which excised (a) appellants' response to the

government's acts of closing down on-line pharmacies and  (b)

references to Rannazzisi's testimony.  *See* RT 4561-62, 4573; JER

300.  .

The district court's ruling was erroneous and unfair.  During

trial, the government emphasized that appellants knew of many

closings of internet pharmacies and their fulfillment pharmacies.

After emphasizing this evidence in opening, *see* RT 19-22, and

presenting painstaking details throughout trial, the government

then hammered on this evidence in summation, and argued that

the defendants' knowledge of the closures established the lack of a

good faith belief in the legality of their conduct regarding the SSO

pharmacy, including:

> And [Mr. Napoli] knew that he was going to be violating some laws the laws of Florida and Nevada, which he specifies in here. And [Mr. Napoli] knew that people had been arrested, indicted, imprisoned and had their assets seized for doing exactly what he was planning to do. [Mr. Napoli] had an appendix to his business plan that set that out.

RT 4603.

> [Mr. Johnson] joined that RX Affiliate Forum, and on the RX Affiliate Forum were all of these other affiliates who were talking about the legality of the business. It wasn't legal, DEA didn't like it, people were being arrested. And that the problem was that if you were distributing drugs based on a prescription issued by a doctor who had never seen the patient, you were going to get in trouble.

RT 4606.

> And the third [pharmacy affiliated with Mr. Napoli] was Budget Drugs in Feasterville, Pennsylvania. On September 12th, 2005, the DEA closed down Budget Drugs' Internet operations and took away their controlled substance license. Told them they were no longer allowed to fill orders to Internet pharmacies.

RT 4607.

56

And then one month later, on March 8th of 2006, United Care Pharmacy, one of his fulfillment pharmacies, was shut down, not just by the DEA but also by the North Carolina Board of Pharmacy. So what did Chris Napoli do? Did he stop? No.

RT 4620.

D.J. Johnson, Robyn Bloom, Chris Napoli, all knew that Kwic Fill had been shut down, but their only concern, their only concern was whether Woodbury, the big pharmacy that was left, would be able to pick up the slack and keep getting the orders out. None of them, not one of them talked about stopping what they were doing. Because this, having a pharmacy shut down by the local Board of Pharmacy, by the DEA, this was something that happened all the time. So they just kept going, business as usual. So what did Chris Napoli do now? Did he stop? No.

RT 4623.

Chris Napoli and D.J. Johnson knew that their fulfillment pharmacies were being shut down one by one. D.J. Johnson knew that. We know that they knew that because they talked about it. But they also knew that because D.J. Johnson was the one who had to put the pharmacies in the system and take the pharmacies out of the system when they were shut down. Otherwise, they would be sending orders to a nonexistent pharmacy.

RT 4651.

57

But appellants had an answer to *why* the government shutdowns did not deter them: they each possessed a reasonable, good-faith belief, that under the CSA and *then* established regulations, federal law did *not* require an in-person examination as a predicate for a lawful prescription, and the executive's unilateral enforcement practices exceeded the CSA. The federally-filed complaint, prepared by counsel, challenging the method of enforcement provided substantial *evidence* showing that their beliefs were reasonable and genuine. But the district court refused the jury access to critical portions of document that challenged the government's enforcement activities. Plainly, this evidence "had a tendency to make [the reasonableness of appellants' good-faith beliefs that their conducted comported with the CSA] more . . . probable than it would without the evidence." Fed. R. Evid. 401.

**b.     The probative value of the excluded evidence outweighed the possibility of jury confusion.**

Fed. R Evid. 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Although the district court did not cite Rule 403 when excluding the aforementioned evidence, it had discussed the rule previously and invoked it mid-trial, when opining that appellants' defense was invalid because the *court* determined it was a contrivance to manufacture a defense.  RT 191-199, 2444-45.  If the court relied on Rule 403 in precluding the defense from introducing its corroborating evidence, it so ruled based on an improper judicial determination that appellants did not possess a good-faith belief in the propriety of their conduct.  Such a ruling is error, because this question was for the jury to decide, *not* the judge.  "It is improper to exclude evidence of a good faith defense based solely on a judicial

determination that the good faith belief lacks credibility." *United States v. DeMuro*, 677 F.3d 550, 566 (3d Cir. 2012). While the jury may have concluded that appellants' expressed beliefs were lies, and therefore they did not act in good faith, it was error for the court to take that assessment away from the jury and replace it with a ban on their evidence. *See United States v. Urfer*, 287 F.3d 663, 665 (7th Cir. 2002) ("[T]he more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws and will find that the Government has carried its burden of proving knowledge"); *United States v. Dellinger*, 472 F.2d 340, 382 (7th Cir. 1972).

Furthermore, to the extent that the court relied on Rule 403, there was nothing about Rannazzisi's testimony, or the introduction of the DRA complaint or the CRS Report that would have confused this jury, unless by "confusion" the Government and the district court meant "credit their defense." Rather, any challenge to the *bona fides* of appellants' beliefs based on credibility and

reasonableness (or unreasonableness) was an *argument* for the government to make to the jury. *See* RT 4800-4839. Appellants should have been permitted to introduce the evidence which supported their good faith, so the jury could have assessed fairly the competing arguments.

*4. The District Court's Exclusion Of Evidence Supporting The Good-Faith Defense Improperly Abridged Defendants' Rights To Present A Complete Defense Under The Fifth And Sixth Amendments.*

"Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, the Constitution guarantees criminal defendants meaningful opportunity to present a complete defense." *United States v. Leal-Del Carmen*, 697 F.3d 964, 969 (9th Cir. 2012) (quotation marks omitted). The right to present a complete defense includes, at a minimum, "the right to put before a jury evidence that might influence the determination of guilt[,]" *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987), the right to present exculpatory evidence, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), and the

61

right to "confront and cross-examine witnesses[,]" *see Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

This Court has articulated a two-part test to assess whether a defendant's right to present a defense has been abridged. *See Wood v. Alaska*, 957 F.2d 1544, 1549-50 (9th Cir. 1992). First, the Court inquires "whether the excluded evidence is relevant." *Id.* at 1550. If relevant, the Court asks "whether other legitimate interests outweighed [the defendant's] interest in presenting the evidence." *Id.* In weighing the enforcement of an evidentiary doctrine against a defendant's rights, this Court has identified several relevant factors:

> the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense.

*United States v. Stever*, 603 F.3d 747, 756 (9th Cir. 2010), *(citing Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003)).

**a.    The excluded evidence was relevant.**

As discussed above, the DRA complaint, the CRS report, and Rannazzisi's testimony was relevant to appellants' good-faith defense, particularly to the "reasonableness" of their beliefs. Accordingly, this prong of the constitutional test is satisfied.  *Wood*, 957 F.2d at 1550.

**b.    The evidence was highly probative on the central issue at trial: the defendants' intent.**

There can be little doubt that appellants had a substantial interest in presenting evidence that supported their good-faith belief that prior to the passage of the RHA, federal law did *not* require an in-person medical examination as a necessary predicate for a valid prescription.  While a defendant's good faith belief is subjective in nature, evidence that the belief is reasonable tends to corroborate the fact of good faith.  Thus, evidence tending to show that executive and legislative officials believed that the CSA, as in effect at the time of the conspiracy, did *not* preclude the issuance of valid prescriptions based on a licensed physician's review and

assessment of an on-line questionnaire, constituted powerful evidence that appellants' beliefs were held in good faith. Furthermore, "after the government presented proof from which the" jury might "reasonably infer" that medical standards required in-person examinations to establish a valid prescription, appellants "should have been permitted to introduce evidence to rebut that inference" by presenting the existence of a conceded gap in *federal* law. *See United States v. Crenshaw*, 698 F.2d 1060, 1066 (9th Cir. 1983).

This Court has not hesitated to find constitutional error in the preclusion of defense evidence rebutting the government's theory of the case. *United States v. Whitman*, 771 F.2d 1348, 1350-51 (9th Cir. 1985). As in *Whitman*, "once the government presented [its] theory" that no valid prescription could issue in the absence of a face-to-face examination, the defendants had the right to rebut it by offering objective evidence to bolster their defense of good faith.

There was no dispute in this case about the central fact: appellants distributed Schedule III and IV controlled substances

64

based on Dr. Carozza's (and other physician's) issuance of prescriptions following review and assessment of an on-line questionnaire. The main issue, and the only real defense, concerned whether appellants believed in good faith that their conduct was permitted under the CSA. Not surprisingly, the majority of the trial was directed at establishing appellants' intent, including by focusing on the closures of other on-line and fulfillment pharmacies, and appellants' knowledge of those closings.

Although Messrs. Napoli and Johnson (among others) took the stand on behalf of the defense, the district court forced them to do so without corroborating documents and testimony on which their good-faith beliefs depended. But a criminal defendant is fundamentally entitled to present corroborating evidence. In *United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999) (*en banc*), for example, this Court reversed the defendant's conviction because the lower court had excluded records corroborating her defendant's self-defense claims, *viz.*, that she believed she was in imminent harm because the victim previously told her he was violent. The *en*

65

*banc* Court reasoned that the defendant's "only defense was that she believed that she and her daughter were in danger of grievous bodily harm or death from" the victim, and "[e]ssential to that defense was her belief in [the victim's] stories of previous acts of vicious violence committed by him." *Id.* at 1214. *Accord United States v. Saenz*, 179 F.3d 686 (9th Cir. 1999) (error, in self defense case, to exclude evidence corroborating the "defendant's reasonable belief that his use of force was necessary").

Likewise, in *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001), this Court emphasized that "the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense." Where the success of the defense depended on the jury's believing petitioner's testimony about her state of mind, the state court acted objectively unreasonably in excluding a journal that corroborated petitioner's testimony, and in preventing the her "from testifying fully in her own behalf about why she did what she did." *Id.*

66

These cases illustrate the district court's errors here. Although Messrs. Napoli and Johnson testified, and the parties offered competing arguments regarding the passage of the RHA and its effect on SSO's business, the district court precluded the defense from introducing critical evidence corroborating the defendants' *mens rea*, the core issue at trial. Under these circumstances, this Court should find that the excluded evidence was highly probative of central issue at trial, and was a major part of the attempted defense. *Stever*, 603 F.3d at 756.

### c. The probative value of the evidence was not substantially outweighed by other interests.

No other interests outweighed appellants' need for the excluded evidence. *First*, the evidence was reliable. *See id.* Rannazzisi worked for the DEA; the CRS Report was prepared for congressional assessment; and the defendants' DRA complaint was publicly filed and litigated in federal district court.

*Second*, the evidence was capable of evaluation by the jury. *Id.* "Our criminal and civil justice systems routinely charge juries

with deliberating in cases involving exceedingly complex factual and legal issues, often involving multiple parties and multiple events." *Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027, 1040 (9th Cir. 2005).  The evidence at issue here, "by comparison, is rather straightforward." *Id.*  Particularly after the jury heard evidence regarding the passage of the RHA and the filing of the declaratory relief action, evidence demonstrating why appellants believed their conduct was sanctioned by the pre-RHA regime merely presented their side of the case.  *See Alcala*, 334 F.3d at 886.  There is no reason why the jury could not understand the proffered evidence.  *Fowler*, 421 F.3d at 1040.

*Third*, the evidence was the sole documentary evidence corroborating appellants' good-faith beliefs that was not inherently subject to impeachment on motive and bias.  The evidence also was the only corroborating evidence that tended to show the appellants' beliefs were reasonable.  Thus, the evidence was not cumulative. *Stever*, 603 F.3d at 756.  Indeed, the district court's exclusion of this documentary evidence was particularly harmful, because there

68

was nothing else in the record as supportive of appellants' defense.

*See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

*5.    The Government Cannot Establish The Error Was Harmless Beyond A Reasonable Doubt.*

The Court need not labor long to find prejudice.  In *Stever*, for example, the Court reversed because the district court "excluded the sole evidence on an issue that constituted a major part of the attempted defense."  603 F.3d at 757 (quotation marks and brackets omitted, emphases in original).  *Id.* Similarly, in *James*, this Court observed "[b]ecause the crux of James's defense rested on her credibility[,] and because her credibility could be directly corroborated through the excluded documentary evidence, exclusion of the documents was prejudicial and more probably than not affected the verdict."  169 F.3d at 1215.  *See also Saenz*, 179 F.3d at 689.

Here, because the district court excluded the testimony and evidence demonstrating the reasonableness of appellants' good faith beliefs, they were prevented from making their defense.  The

error cannot be harmless beyond a reasonable doubt where the district court prevented appellants from presenting all documentary corroboration for their intent defense.  *Accord United States v. Boulware*, 384 F.3d 794, 808-09 (9th Cir. 2004) (erroneous exclusion of corroborating evidence not harmless where, as here, the defendant "was the least effective witness to testify about the judgment because of his perceived self-interest and bias").

Other features of the case also demonstrate that the government cannot overcome the presumption of prejudice.  This Court recognizes the importance of the prosecutor's closing argument in assessing harmless error.  *DePetris*, 239 F.3d at 1063. Here, in both opening statement and summation, the government relied on evidence that appellants knew about the shutdowns of many on-line and fulfillment pharmacies, but nevertheless continued its operations based on physician review of on-line medical questionnaires, to show a lack of good faith.  RT 4603, 4606-07, 4620, 4623, 4651.  Documents and testimony demonstrating that their beliefs were objectively reasonable would

70

have given the jury ample reason to turn aside the government's contentions. Here, had appellants been permitted to introduce corroborating evidence that federal law did *not* proscribe the issuance of prescriptions based on a licensed physician's review and assessment of an online medical questionnaire, in the form of testimony from a veteran DEA administrator, an authoritative legislative report, and a federal complaint they filed and which challenged the government's enforcement actions, the jury would have retired to deliberate with a complete universe of facts, and one more strongly pointing to innocence on the key element of intent.

For these reasons, "[t]he preclusion of this highly probative evidence went to the crux of the case, and the harm caused by its exclusion was not cured by the receipt of other evidence." *Id.* This Court should reverse appellants' convictions and remand for a new trial.

71

## B.  The Jury Instructions Provided a Truncated Definition of Good Faith, Reducing the Government's Burden of Proof and Allowing Conviction Based upon a Failure to Investigate and Correctly Discern the Law.

***1****. Standard of Review and Applicable Law*

The questions whether the court correctly instructed the jury on the elements of the offenses and the defense theory are reviewed *de novo*.  *See, e.g., United States v. Anguiano-Morfin*, 713 F.3d 1208, 1210 (9th Cir. 2013).  The instructions, taken as a whole, must adequately encompass the theory of the defense. *United States v. Thomas*, 612 F.3d 1107, 1120 (9th Cir. 2010).

A defendant is entitled to an instruction concerning his theory of the case "if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987).  This standard requires a defendant to show only that there is evidence upon which a jury could rationally sustain the defense.  *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam).

72

A district court's formulation of jury instructions is otherwise reviewed for an abuse of discretion. *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). This Court reviews the district court's decision to give a deliberate ignorance instruction for abuse of discretion. *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (en banc).

*2.     Background*

Messrs. Johnson and Napoli requested instructions that defined good faith to include the good-faith reliance by the non-physician defendants on the judgment of a medical professional, to wit:

> [Napoli and Johnson] contend that [they] had a honest belief that the prescriptions issued in this case were valid. ....
>
> [Napoli and Johnson] contend that [they] acted in good faith relying in whole or in part upon the judgment of professionals including doctors, pharmacists, and attorneys. If you find that [Napoli and Johnson] acted in good faith relying in whole or in part on the judgment of any professionals, then you must acquit [them] even if you disagree with the judgment of those professionals. In evaluating

73

> [Napoli and Johnson's] beliefs, you should consider
> the fact that the law assigns the responsibility for the
> proper prescribing and dispensing of controlled
> substances to the prescribing practitioner and that a
> corresponding responsibility rests with the
> pharmacist who fills the prescription.

JER 189.

Dr. Carozza requested a separate good faith instruction, in

pertinent part:

> The defendants in this case maintain that their
> actions were done with a good faith belief that they
> were distributing controlled substances in a lawful
> manner, that is, by means of prescriptions issued by
> a physician for a legitimate medical purpose and in
> the usual course of professional practice. Because
> defendant Carozza was a licensed physician, you
> cannot find him guilty of distributing controlled
> substances in violation of the Controlled Substances
> Act if you find that he acted in good faith in issuing
> prescriptions for those substances.
>
> Good faith means a sincere belief that the
> prescriptions were issued lawfully, that is, for a
> legitimate medical purpose and in the usual course
> of professional practice. ...

JER 214.

74

The trial court refused to give the requested instructions. JER 83-84. Instead, the court gave a single good faith instruction which narrowly defined good faith:

> The defendants in this case maintain that at all times their actions were done with a good faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of a professional medical practice.

> "Good faith" means an honest belief that the physicians issued the prescriptions for a patient's condition in accordance with the standard of medical practice generally recognized in the country. In other words, the government must prove the defendants did not have an honest belief that prescriptions were issued by a physician for a legitimate medical purpose and in the usual course of professional practice.

> When you consider this "good faith" defense, it is the defendant's belief that is important. It is the sincerity of his belief that determines if he acted in good faith. If the defendant's belief is unreasonable, you may consider that in determining his sincerity of belief, but an unreasonable belief sincerely held is good faith.

> The burden is upon the government to prove beyond a reasonable doubt that the defendants did not act in good faith. Unless you find beyond a reasonable doubt that the conduct charged against the defendants was not done in good faith, you must find the defendant not guilty of these charges. *The government does not have to*

*prove that a defendant knew he was violating the law. A defendant's belief, even in good faith, that his conduct did not violate the law* or that the government lacked the authority to enforce the law in a particular way *is not a defense.* It is a defendant's good faith belief regarding whether physicians were issuing prescriptions in the usual course of professional practice and for a legitimate medical purpose that you must consider.

JER 183-84.

### 3. The District Court's Definition of Good Faith Undermined the Defense Theory and Allowed the Government to Shift the Burden of Proof.

Over defense objection, the court instructed that "[t]he government does not have to prove that the defendant knew he was violating the law." *Id.* Also over objection, the district court limited "good faith" to "an honest belief that the physicians issued the prescriptions for a patient's condition in accordance with the standard of medical practice generally recognized in the country." *Id.* This definition unduly truncated the concept of good-faith and constitutes prejudicial error for several reasons.

The district court's restricted definition of good faith appears to have been based upon a misreading of the Supreme Court's decision in *Cheek v. United States*, and a misapprehension of the

76

precise defense sought to be presented. The defendants' claim

throughout the trial was that they believed in good faith that their

actions were lawful, because the federal government had not

criminalized the sale through prescription of Schedule III and IV

controlled substances in the absence of an face-to-face consultation

with a licensed physician. This defense was not, contrary to the

arguments presented by the government, a claim that the

government lacked the power to forbid distribution without a face-

to-face consultation, only that the government had not, at the time

of the events charged in the indictment, enacted such a

requirement. *See* JER 75-77. The government took the position

that the defendants' belief in the lawfulness of their conduct was

irrelevant, and that the only relevant inquiry was whether the

defendants believed in good faith that the medications at issue were

being distributed by a licensed physician in the usual course of

professional practice and for a legitimate medical reason. *See* JER

67. Ultimately, the district court so instructed the jury. As is

explained in detail below, these instructions improperly limited the

definition of good faith, allowed the government to shift the government's burden of proof, and most important, allowed the jury to convict the defendants based on an invalid legal theory.

### a.  The defendants' belief in the lawfulness of their conduct was the heart of the defense and a legitimate basis of good faith.

To begin, the district court's instruction that "the government does not have to prove that the defendant knew he was violating the law" miscast the proper inquiry, because there was no meaningful distinction between knowingly violating the law and knowingly issuing prescriptions outside the usual course of professional practice and not for a legitimate medical purpose.  *See* JER 72-73.  Indeed, the government itself recognized that a defendant's belief that he was not violating the law was inextricably intertwined with his belief that drugs were being distributed in the usual course of professional practice and for a legitimate medical purpose. *See* Dkt 986 at 6.

Dr. Carozza's proposed instruction made clear that the two concepts the government sought to distinguish were actually one

and the same.  *See United States v. Fierros*, 692 F.2d 1291, 1294
(9th Cir. 1983).  The applicable law governing the issuance of
prescriptions required that the prescriptions be issued in the usual
course of professional practice and for a legitimate medical
purpose.  *See* 21 C.F.R. § 1306.04.  By definition, therefore, a
doctor's belief that he is complying with the law *is* a belief that he is
acting in the usual course and for a legitimate purpose – which
belief, if found by the jury, negates an element of the offense. *See*
*United States v. Feingold*, 454 F.3d 1001, 1007-08 (9th Cir. 2006).
Accordingly, as applied to Dr. Carozza, the district court's *sui*
*generis* instruction that a defendant's good-faith belief that his
conduct comported with the law was not a defense to the crime was
erroneous and confusing.

The instruction was equally prejudicial as to defendants
Napoli and Johnson, who, like most laypeople acting in good faith,
focused on the legality of conduct rather than the standard of
medical practice, a specialized subject about which he had little
knowledge.  Napoli, who consulted several attorneys to ascertain

79

the lawfulness of his business, understood that legality turned on the conduct and good faith of the physicians involved. He himself, however, was concerned with whether he was violating the CSA, and rightly so. Likewise, Johnson relied on the medical judgment of doctors. The court's instructions created a false dichotomy between good faith and Napoli and Johnson's beliefs that they were acting within the bounds of the law.

**b. The defendants' good faith belief in the lawfulness of their conduct was not equivalent to an invalid defense that the existing law was invalid.**

*Second*, the district court's instruction fundamentally misapplied Supreme Court precedent. In support of the instruction, the government argued that a defendant's belief that the government lacks the authority to take a particular action cannot support a good-faith defense. *See* Dkt 1012, JER 74-75. The government and the court misread *Cheek v. United States*, 498 U.S. 192 (1991), and in particular, one passage where the Court observed that "a defendant's views about the validity of the tax

80

statutes are irrelevant to the issue of willfulness and need not be heard by the jury, and, if they are, an instruction to disregard them would be proper." *See* Dkt 1012 at 2; JER 72-74.

*Cheek*, however, was a tax-protestor case involving a defendant who knew he was legally obligated to file his taxes but intentionally disregarded that duty, because he claimed to believe that the government lacked the authority to impose an income tax. Under the Supreme Court's analysis, the defendant could not argue a good-faith belief in the lawfulness of his actions because he did not believe his actions to be lawful. *Id.,* 498 U.S. at 207; *see also United States v. Svoboda*, 633 F.3d 479, 486 (6th Cir. 2011) (noting that *Cheek* "held that the good-faith defense instruction was . . . unavailable to Cheek because of the particular type of argument that Cheek sought to make").

The defense here is not analogous. The defendants did not contend that Dr. Carozza knew that he was violating the law, but did it anyway because he believed the law to be invalid. Rather, the defendants contended that, under then-existing law, Dr. Carozza

81

believed his issuance of prescriptions based on his assessment of on-line questionnaires fell within the usual course of professional practice and for legitimate medical purposes. The non-physician defendants testified that they relied on Dr. Carozza to act within the scope of the law and usual course of medical practice. Accordingly, nothing precluded Dr. Carozza, and by extension defendants Napoli and Johnson, from asserting good faith based on an understanding that Dr. Carozza's conduct was lawful, because Congress had not yet legislated against it. While the jury certainly could conclude that the defendants' understanding was unreasonable, and therefore that they did not act in good faith, the court wrongly took that assessment away from the jury, replacing it with a *per se* ban against consideration of that defense. *See United States v. Urfer*, 287 F.3d at 665; *United States v. Rhone*, 864 F.2d 832, 836 (D.C. Cir. 1989). It was up to the jury to evaluate the genuineness and reasonableness of the defendants' belief in the course of deciding whether the government had carried its burden to prove a lack of good faith. By instructing the jury that the defendants' good-faith

belief in the *lawfulness* of their actions was not a defense to the charge, the court below relieved the government of its burden to disprove good faith.

### c. The instructions allowed conviction based on malpractice.

Finally, the district court erred when it defined "good faith" as meaning:

> an honest belief that the physicians issued the prescriptions for a patient's condition in accordance with the standard of medical practice generally recognized in the country.

JER 183. This formulation permitted Dr. Carozza's conviction to be based a finding of medical malpractice. This is unacceptable under binding Ninth Circuit law. *Feingold* squarely holds that a licensed practitioner cannot be convicted of violating the Controlled Substances Act based solely on a finding of malpractice. *See* 454 F.3d at 1007. "An instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise." *Id.* at 1010.

As given, this instruction permitted the jury to convict Dr. Carozza based on malpractice. To guard against just such a result, Dr. Carozza requested the Court to instruct the jury using language contained in *Feingold,* that the physician must have "so wantonly ignored the basic protocols of the medical profession that he acted as a large-scale drug pusher – not as a physician." *Feingold* imported this language from the Supreme Court's decision in *United States v. Moore*, 423 U.S. 122 (1975). *See* 454 F.3d at 1010.

In response, the government will likely note that the district court also instructed the jury that "[i]t is not enough for the United States to prove that a practitioner committed malpractice, intentional or otherwise." *See* JER 170. But the conflict between the district court's instruction regarding violations of the CSA and its definition of good faith permitted the jury to disregard appellants' good-faith defense by simply finding that Dr. Carozza (or any other doctor) committed malpractice by issuing prescriptions based on the assessment of an on-line medical questionnaire.

84

Most directly, a jury determination that Dr. Carozza (or any other doctor) committed malpractice established, under the court's instruction, the lack of any good-faith belief that the prescriptions were valid.   Under *Feingold*, the district court's instruction was erroneous.  454 F.3d at 1010.

*4.  The Court's Failure to Instruct on the Ryan Haight Act and/or the Question Whether an In-Person Examination Was Required Allowed Conviction on The Invalid Legal Theory that the Lack of an In-Person Examination Alone Proved Guilt.*

In closing argument, the government took the position that the lack of an in-person examination rendered the defendants' sale of controlled substances unlawful.  *See e.g.* RT 4602, 4645-49, 4800.  The government also insisted, however, that the defendants were being prosecuted for a wholesale course of conduct, not merely the sale of controlled substances based on an online medical questionnaire.  *E.g.*, 9/24/12 RT 54-55, RT 2763, 4652. Thus, the case squarely presented the possibility that the jury would return a guilty verdict solely on the basis that controlled substances were sold without an in-person medical examination.

85

Such a theory of conviction would be invalid, because it was not clear prior to the passage of the RHA that such activity was, in fact, illegal.

Not surprisingly, therefore, the defendants requested that the court instruct the jury that the applicable law did not specifically require that a doctor conduct an in-person examination before issuing a prescription. See Dkt. 963, 974, 1001. The defendants also proposed that the court should instruct the jury on the significance of the Ryan Haight Act to the question of the defendants' good faith belief. JER 56-57, 208-10. The government vigorously opposed these requests, despite the fact that throughout pretrial litigation, it had opposed the defense arguments for dismissal based on the *ex post facto* clause by insisting that the defendants were not being prosecuted for selling controlled substances without in-person examinations. *See e.g.*, Dkt 111, 134. Rather, said the government, Dr. Carozza was being prosecuted for issuing prescriptions outside the usual course of

86

professional practice and not for a legitimate medical purpose, and the other defendants were being prosecuted for conspiring to do so.

Given the government's claim that it was prosecuting the defendants based on an entire course of conduct, all of the defendants were entitled to an instruction that the mere failure to conduct an in-person examination did not render the distribution of medication outside the usual course of professional practice and not for a legitimate medical purpose. *See* JER 209. In this regard, this case is strikingly similar to the stock-option backdating cases. Just as backdating was not itself against the law (but was evidence of the crime of falsifying books and records), so too the failure to examine in-person is not itself against the law as it existed in 2006 (but is evidence of a CSA violation). *See United States v. Reyes*, Case No. CR-05-0556 CRB, Docket No. 524-1, at 35 (N.D. Cal. 2007), *aff'd* 660 F.3d 454 (9th Cir. 2012) (instructing jury that "[r]etroactively dating or pricing, or alternatively 'backdating,' stock-option grants or related paperwork is not in and of itself a violation of the criminal law. . . . However, evidence of such practices may be

considered by you along with other evidence, in connection with the crimes charged in the indictment.").

An instruction regarding the RHA and the requirement of in-person examinations was necessary, because of the government's emphasis, throughout the trial, on the lack of face-to-face examinations. Indeed, the government emphasized this point in closing, contending that the lack of in-person examinations alone rendered the issuance of the prescriptions unlawful. RT 4644, 4647.

### 5. The Jury Instructions Wrongly Excluded from The Definition of Good Faith the Notion That Laypeople May Act in Good Faith By Relying on The Professional Judgment of Physicians and Pharmacists.

Medicine is a highly regulated industry, with rules applicable only to medical professionals. *E.g.* Cal. Bus. & Prof. Code § 2050, *et. seq.* Persons who are not health care professionals are not, and cannot be deemed to be, familiar with the regulations governing the physician-patient relationship, nor the requirements for issuing valid prescriptions. Rather, common experience demonstrates a

profound knowledge gap between laypeople and medical professionals – a gap which often results in great deference given to medical professionals in their relationships with laypeople. Additionally, the practice of medicine is governed by privacy laws that prevent laypeople from inquiring about the medical basis for a particular prescription or interfering with the prescription writing and dispensing practices of licensed professionals. *E.g.* 5 U.S.C. § 552a.  Accordingly, a layperson's reliance on the judgment of licensed professionals in good faith negates *mens rea*.  *See United States v. Quinones*, 635 F.3d 590, 594-95, 604 (2d Cir. 2011)(jury instructed that lay defendants were "entitled to reasonably rely on the determinations of doctors and pharmacists"); *United States v. Vamos*, 797 F.2d 1146, 1153 (2nd Cir. 1986)(those who assist practitioners in distributing controlled drugs cannot be held to the standard of a reasonable practitioner and may reasonably rely on a practitioner's judgment.)

An essential element of the charges involved the distribution of or intent to distribute medications pursuant to prescriptions

issued, whether rightly or wrongly, by a licensed physician. Unlike the sale of street drugs or the distribution of medications without prescriptions, the *actus reus* includes potentially innocent conduct. Thus, the concept of good faith is different as between medical professionals and laypersons, and the defendants should have been permitted to argue that their good faith reliance on the professional judgment of licensed professionals was grounds for acquittal. *See* JER 82-83. For these reasons, the proposed instruction identified a legally sound theory of the defense.

The jury instructions did not allow for a distinction between laypeople and medical professionals. JER 49, 83-84.[16] Instead, the district court derived its good faith instruction from the prosecution of a licensed practitioner in *Feingold*, 454 F.3d 1001, but even there, it erred. The *Feingold* definition of good faith presumes that the defendant is familiar with the professional standards that apply to the practice of medicine. While such a

---

16 Indeed, the court below specifically rejected such a distinction. JER 82-83.

90

presumption may be fairly applied to licensed practitioners, laypeople cannot not be presumed to be aware of the complex rules governing professional practice in the highly regulated medical industry. *See Vamos,* 797 F.2d at 1153; *United States v. Lovern*, 590 F.3d 1095, 1104-05 (10th Cir. 2009) (insufficient evidence to support conviction of non-physician where there was ample evidence he knew something was "fishy" about pharmacy operations but not that he knew that substances were being distributed outside the usual course of professional medical practice).

Indeed, applying such a presumption to laypeople is likely to criminalize innocent conduct. As Justice Stewart explained:

> [M]embers of a regulated industry, and their officers, agents, and employees are required by law to be conversant with the regulations in question. . . . It would be wholly natural for [a casual shipper] to assume that he could deliver the article to the common carrier and depend upon the carrier to see that it was properly labeled and that the shipping papers were in order. Yet today's decision holds that a person who does just that is guilty of a criminal offense punishable by a year in prison. This seems to me a perversion of the purpose of criminal law.

*United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 568-569 (1971)(Stewart, J., dissenting).

The district court erroneously concluded, based on prosecutorial argument, that the defendants' proposed instruction on good faith was premised on a mistake of law and therefore provided a legally invalid defense. JER 82-89. In fact, good faith reliance on the professional judgment of others is not a legal mistake, but a factual error that vitiates *mens rea. United States v. Fierros*, 692 F.2d at 1294 (defendants accused of alien smuggling could have asserted defense that they reasonably believed workers were not aliens or that they had been legally admitted to the United States); *see also United States v. Smith-Baltiher*, 424 F.3d 913, 924-25 (9th Cir. 2005) (mistake as to legal status); *United States v. Petersen*, 513 F.2d 1133, 1135 (9th Cir. 1975)(defendant charged with embezzlement or theft was entitled to an instruction on his defense theory that he reasonably believed that the person from whom he bought the property was legally authorized to sell it).

The record contained sufficient evidence to support the provision of the requested instruction. Napoli, Johnson and attorneys Andrew Napoli and Joseph Green all testified about the steps taken to ensure that Safescripts was operating legally. Napoli and Johnson also testified to their belief that the doctors and pharmacists working with Safescripts acted in good faith.

As discussed in greater detail, *supra* at __ (SOF), Napoli consulted with attorneys who reviewed his business plan and advised him that his plan for operating Safescripts/Pharmacy USA was legal. RT 3607-09; 3530; 3535-38; 3425-27. Napoli told Johnson that attorneys had advised him that a legitimate doctor patient relationship would be established using his business model. RT 3535-37.

That evidence, along with the testimony of Napoli and Johnson that they believed Safescripts was operating in compliance with the law, could have allowed a rational jury to conclude that they reasonably relied on the judgment of licensed physicians and

pharmacists in good faith. Harmless error is discussed *infra* at 93-99.

### 6. The Instructional Errors Allowed Conviction on Invalid Legal Theories and Were Not Harmless, Requiring Vacatur of the Convictions.

The errors in providing a truncated definition of good faith require vacatur of the defendants' convictions. The instruction limiting the definition of good faith to the standard of medical practice improperly diverted the jury's focus away from all of the defense testimony regarding the defendants' attempt to comply with the law to the detriment of all of the defendants. And, the court's instructions wrongly held the non-physician defendants to the good faith standard applicable to licensed professionals. No instruction allowed the jury that Napoli and Johnson were entitled to rely on the professional judgment of licensed practitioners who they believed to be acting in good faith. Because correct instructions were essential to the defense, the convictions should be reversed.

Conspiracy is a specific intent crime, requiring the agreement to do something unlawful. *United States v. Bailey*, 444 U.S. 394,

94

405 (1980). To obtain a conviction, the prosecution was required to prove that the defendant knowingly and willfully joined the conspiracy with the intention to further the conspiracy's unlawful objective. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443-45, & n.20 (1978). Likewise, an essential element of the money laundering charges is that the defendants intended to promote the illegal distribution of controlled substances. JER 181-82. *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir.1994).

The district court defined "knowingly" to require that the defendants knew that they were distributing controlled substances by means of a prescription issued by a licensed physician not for a legitimate medical purpose and not in the usual course of professional practice. JER 171-72, 178. The defendants argued at trial that the government failed to prove scienter, in large part based upon evidence showing the defendants believed their conduct was lawful. The district court's good faith instruction provided to the contrary, that the government did not have to prove that a defendant "knew he was violating the law." JER 183.

95

When the defendants are charged with offenses that require subjective knowledge of unlawfulness or the violation of a specific professional standard, a conflicting general knowledge instruction negates that element. *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir.1997); *United States v. Stein*, 37 F.3d at 1410. That is particularly true where, as here, the general instruction did not make sufficiently clear to which charges it applied. *See United States v. Knapp*, 120 F.3d 928, 931–32 (9th Cir.1997). When instructions conflict, a reviewing court may not presume the jury followed the correct one. *Francis v. Franklin*, 471 U.S. 307, 322 (1985).

Here, the limited definition of good faith allowed the government to argue for conviction based on the lack of evidence that the defendants believed that they, or the physicians working for SSO, were acting within the usual scope of medical practice, in derogation of the evidence that the defendants believed they were acting lawfully. *See* RT 4800. The prosecutor's closing argument

well illustrates this point, demonstrating that the error was not

harmless, to wit:

> Neither D.J. Johnson nor Chris Napoli testified that
> he believed that Dr. Joseph Carozza or any other
> doctor was acting in the usual course of professional
> medical practice. Neither Chris Napoli nor D.J.
> Johnson testified he believed that Dr. Joseph
> Carozza was issuing prescriptions to treat patients'
> legitimate medical needs. The only thing they tried to
> convince you of was that they believed that what
> they were doing did not violate federal criminal law.

*Id.* Of course, this argument also shifted the burden of proof by

arguing that the defense had presented "no evidence" that Dr.

Carozza conformed with the usual course of professional practice or

that he was issuing prescriptions "for any legitimate medical

purpose." RT 4801. The prosecutor reiterated this argument,

characterizing the testimony about good faith as a "giant red

herring," and insisting that "the defendants' belief, even in good

faith, that they were not violating the law is not a defense." *Id.*; *see*

RT 4812, 4838.

Further, the instructional errors allowed the jury to convict

Johnson and Napoli based on the flawed theory that even if they

believed in good faith that the prescriptions issued were valid in reliance on the judgment of medical professionals, they *should have known* that the prescriptions were not issued in the usual course of professional medical practice. See also infra at 100-08. But, as explained *supra*, the defendants did not have a duty to investigate, and "should have known," is a *mens rea* applicable to civil not criminal liability. *United States v. Vamos*, 797 F.2d 1146, 1153 (2nd Cir. 1986).

The danger of a faulty conviction is real: the prosecutor contended that the defendants bore a duty to investigate whether the prescriptions were issued in the usual course of professional practice, because they "chose to get into . . . the highly regulated business, of working with a pharmacy and ... a medical professional." RT 4814-15. Indeed, the government contended that the non-physician defendants were responsible for ensuring that the doctors complied with their own professional standards because they "Didn't choose to sell books. Didn't chose to sell CDs. They chose to sell drugs. And so they were responsible for knowing

what the rules were." RT 4814-15. The prosecutor continued, arguing that Johnson and Napoli should be convicted because they did not educate themselves about "what the rules are" and because "It was clear to them there was something not right about what they were doing. And it was their responsibility to figure out what that was." RT 4815. In so doing, the prosecutor argued for conviction not only because the defendants failed to investigate, but also because their conclusions were mistaken. The law is to the contrary.

Here, it is reasonably probable that the jury could have concluded that the government disproved good faith on the basis that the lay defendants failed to investigate the medical standard of practice. The jury could have erroneously found that the government disproved good faith as to Dr. Carozza on the sole basis that he did not have an in-person meeting with each patient, before writing their prescription. Alternatively, the jury could have convicted all of the defendants without a finding that they understood that the object of the conspiracy and the acts

underlying the money laundering charges were unlawful. Taken as a whole, the instructions negated the element of *mens rea.*

In the unique circumstances of this case, the court's general instruction that the government was not required to prove that the defendants knew they were violating the law negated the government's burden to prove the specific mental states required for conspiracy and money laundering. This Court must vacate the defendants' convictions for conspiracy and money laundering.

## C. The Interaction of the Good Faith and Deliberate Ignorance Instructions Shifted the Burden of Proof on Good Faith to the Defendants.

The district court abused its discretion in giving a jury instruction on deliberate ignorance. The district court erred because the evidence at trial supported either a conclusion of actual knowledge that the controlled substances were being distributed outside the course of professional medical practice or a good faith belief in the propriety of defendants' own actions. It did not support a finding of deliberate ignorance.

The court instructed the jury as follows:[17]

> You may find that a defendant acted knowingly if you find beyond a reasonable doubt that the defendant:
>
> *First*, was aware of a high probability that controlled substances were being distributed by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of professional practice, and
>
> *Second*, deliberately avoided learning the truth.
>
> You may not find such knowledge, however, if you find that the defendant had a good faith belief that controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of professional practice, or if you find that the defendant was simply careless.

JER 184.

Deliberate ignorance or wilful blindness is a state of mind close to, but inconsistent with, that of actual knowledge. *United States v. Yi,* 704 F.3d 800, 804 (9th Cir. 2013). It is not a state of mind of recklessness or negligence. *United States v. Heredia,* 483 F.3d at 918 n.4 & 920. To give a deliberate ignorance instruction,

---

17 The defense objected, which objection the court overruled. JER 79-80.

there must be evidence that the defendant <u>purposely avoided</u> learning the critical fact or facts which if known would impose criminal culpability. *See United States v. Baron*, 94 F.3d 1312, 1317 (9th Cir. 1996), *overruled in part by Heredia*, 483 F.3d at 920. Thus, the deliberate ignorance instruction is appropriate only if the jury could rationally find wilful blindness even though it rejected the government's evidence of actual knowledge.[18]  *Yi*, 704 F.3d at 804*; United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013).  Before a deliberate ignorance instruction is given, therefore, the government must provide some evidence supporting a conclusion that the defendant subjectively believed in a high probability that a particular fact or facts existed and acted deliberately to avoid learning the truth.  *Ramos-Atondo*, 732 F.3d at 1119.  A failure to investigate or educate oneself does not constitute deliberate ignorance, unless it is done with the specific intent to

---

18 A deliberate ignorance instruction, also known as a *Jewell* instruction, should not be given routinely, because it poses  a risk that the jury will convict a defendant based on negligence.  *United States v. Mitchell,* 681 F.3d 867 (6th Cir. 2012).

avoid guilty knowledge. *Yi*, 704 F.3d at 804; *Heredia,* 483 F.3d at 928-29 (Kleinfeld, J., concurring).

Given the facts and evidence in this case, the court erred in giving the deliberate ignorance instruction. The error was not harmless, because the instruction allowed the government to shifted the burden of proof of intent and obtain a conviction on the basis that the defendants failed to investigate and/or were careless or reckless. While certainly prejudicial to all three defendants, including Dr. Carozza who evaluated the state of the law before joining SSO and issuing prescriptions based on his review and assessment of on-line medical questionnaires, this error was even more prejudicial to Napoli and Johnson who are not licensed medical professionals with an independent duty to investigate the applicable standards.

The critical issue in this case was whether the defendants acted in good faith and genuinely (whether reasonably or unreasonably) believed that they were facilitating the provision of medication within the scope of professional practice and/or for a

legitimate medical reason.  A substantial part of the defense evidence was that each defendant believed what he was doing was legal: defendants introduced considerable evidence that they and the people around them believed that it was lawful to sell medication over the Internet, provided that the prescribing doctor assessed a legitimate online questionnaire.  With respect to Messrs. Napoli and Johnson, it is quite natural that a layperson would focus on the lawfulness of their actions, rather than on whether his actions fell within the scope of professional medical practice: a subject about which they were not an expert.  Thus, the core of the defense was the defendants' belief that the law, as it stood in 2005-06, did not *require* an in-person meeting between a doctor and patient before a prescription was written.  In other words, the defendants believed that the law did not provide that a doctor who prescribed medication based solely on an online questionnaire was acting outside the scope of professional practice.

The government, of course, disagreed, and presented evidence supporting its view of the limits of professional medical practice.

In deciding to give the deliberate ignorance instruction, the court referred to the evidence that the defendants learned about the shutdowns of various pharmacies and still continued the business. JER 79-80. The district court erred, because this evidence failed to allow an inference that the defendants deliberately remained ignorant. There was no dispute that the defendants knew about the pharmacy shutdowns. Indeed, Mr. Napoli discussed the shutdowns with counsel. RT 3170, 3172-75, 3177, 3179-82, 3753. Chris Napoli, attorney Green, and Andrew Napoli all understood that the DEA did not approve of Mr. Napoli's business model, selling controlled substances based on a doctor's review of an online questionnaire. RT 3116-19, 3125-26. But there was no evidence that Mr. Napoli or his codefendants were ignorant about what the business was doing, the DEA's view of it, or the pharmacy shutdowns. Thus, this evidence supported either a conclusion of actual knowledge that the controlled substances were being distributed outside the range of professional medical practice, or a good faith belief in the propriety of defendants' own actions. For

105

these reasons, the district court erred in giving the deliberate

ignorance instruction.

The error was not harmless. The deliberate ignorance

instruction unfairly harmed the defense by suggesting to the jury

and allowing the government to argue that the defendants bore an

evidentiary burden to prove that they had sufficiently -- and

correctly -- educated themselves about the law. The government

effectively used the deliberate ignorance instruction, in combination

with its truncated definition of good faith, to contend that because

the defendants were selling controlled substances, they assumed

the risk of violating the law, a standard akin to strict liability, to

wit:

> But Chris Napoli and D.J. Johnson also chose to sell
> controlled substances. They chose to get into the
> business, the highly regulated business, of working
> with a pharmacy and working with a medical
> professional. Didn't choose to sell books, didn't
> choose to sell CDs, didn't choose to sell toothpaste.
> They chose to sell drugs. And so they were
> responsible for knowing what the rules were. And
> that's why saying, I thought it was legal, I made a
> mistake about the law, I was ignorant of the law, is
> not a defense. Because if you're going to do this,

> because if you are going to sell controlled
> substances, you need to know what the rules are.

RT 4814-15. The prosecutor continued:

> And that is especially true when it became clear to
> them that they weren't following the rules. When
> their pharmacies, the pharmacies they were working
> with, not some other pharmacies somewhere else in
> the country, but the pharmacies they were working
> with kept getting shut down over and over and over
> again. It was clear to them there was something not
> right about what they were doing. And it was their
> responsibility to figure out what that was.

> And, as the judge instructed you -- there's actually
> an instruction for this, it's called the deliberate
> ignorance instruction. And so if *they* were aware that
> there was a high probability that what *they* were
> doing was illegal and *they* didn't do anything to
> figure it out, that's the same thing as knowing that
> what they were doing was wrong.

> And D.J. Johnson was clearly aware of that risk.

*Id.* (emphasis added).

This argument conflated the civil concept of assumption of the

risk with criminal liability, based upon an alleged failure to

investigate or educate oneself, in the absence of evidence that the

defendants purposely avoided learning facts. The government's

107

argument wrongfully imposed a duty on the defendants both to investigate and to arrive at the legally correct conclusion. *See Heredia*, 483 F.3d at 920. This was compounded by the court's instruction that the fact that the defendants believed that they were complying with the law was not a defense.

The notion that a defendant is culpable for failing to correctly investigate results in a standard of intent that is closer to strict liability than actual knowledge. The principles of deliberate ignorance are not intended to replace actual knowledge with strict liability nor to impose a duty of inquiry on the defendant. *See id.* at 922 & 928 (Kleinfeld, J., concurring). The argument and instruction shifted the burden of proof to the defense to show that they had adequately investigated and correctly informed themselves in violation of *Sandstrom v. Montana*, 442 U.S. 510, 518 (1979); *see United States v. Sandoval-Gonzalez*, 642 F.3d 717, 725 (9th Cir. 2011).

The government's argument effectively eliminated the concept of good faith from the jury's consideration, suggesting instead that

the defendants were strictly liable for their conduct, because they failed to know the rules. The prosecutor's argument informed the jury that the defendants were required to learn the law and that their failure to do so correctly required a guilty verdict. The argument urged conviction based on failure to investigate rather than wilful blindness.

The district court abused its discretion in providing a deliberate ignorance instruction in the absence of evidence showing a purposeful attempt to avoid learning information. The error was not harmless and requires vacatur of the defendants' convictions.

## D.   The District Court Should Have Dismissed The Indictment Based On The Government's Introduction Of Perjured Testimony.

### 1.   *Introduction And Standard Of Review.*

In 2006, the Controlled Substances Act ("CSA") prohibited the distribution of controlled substances without a prescription. *See* 21 U.S.C. § 829. Under the Code of Federal Regulations, "[a] prescription for a controlled substance to be effective [had to] be

issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. This is *all* that federal law required in 2006. Critically, federal law did *not* require an in-person examination, face-to-face consultation, or other form of physical doctor-patient relationship as an express condition of a valid prescription.

In 2008, Congress enacted the Ryan Haight Act ("RHA"), which became effective in April 2009. The RHA amended the CSA by defining a valid prescription as one issued "for a legitimate medical purpose in the usual course of professional practice" by a "practitioner that has conducted at least 1 in-person medical evaluation of the patient." 21 U.S.C. § 829(e)(1), 2(A). As set forth in the Preamble to the Ryan Haight legislation:

> While the lack of an in-person medical evaluation has always been viewed as a 'red flag' indicating that diversion might be occurring, the Ryan Haight Act makes it unambiguous that it is a *per se* violation of the CSA for a practitioner to issue a prescription for a controlled substance by means of the Internet without having conducted at least one in-person medical examination, except in certain specified circumstances.

74 Fed. Reg. 15596, 15599 (Apr. 6, 2009).

In the words of Administrator Rannazzisi, the RHA "create[d] a definition for what a valid prescription is." *Online Pharmacies and the Problem of Internet Drug Abuse: Hearing Before the Subcomm. on Crime, Terrorism and Homeland Security of the House Comm. on the Judiciary*, 110th Cong. 71 (June 24, 2008). Succinctly, federal law before 2008 did *not* require at least one in-person examination as a condition of a valid prescription; but starting in 2008, it did.

Nonetheless, to support the claim that appellants conspired to violate, and in fact violated, the CSA from 2004 through 2006—*i.e.*, *prior* to the passage of the Ryan Haight Act—two Government agents testified before the grand jury that federal law *required* an in-person examination to establish a valid prescription. *See* JER 377-389. Upon learning of this errant testimony shortly before trial, appellants moved to dismiss the indictment. Dkt 844. The district court denied the motion. *See* JER 1-28. This Court

conducts *de novo* review. *United States v. Isgro*, 974 F.2d 1091,

1094 (9th Cir. 1992).

### 2. The false grand jury testimony of Special Agents Chin and Bridgers

On March 16, 2010, the government called Special

Agent Jason Chin to testify before the grand jury. In relevant

part, SA Chin testified as follows:

Q. What makes a prescription valid?

A: ... it first has to be issued for a legitimate medical purpose, *and then there has to be a good-faith medical exam conducted by a physician of the patient, so there has to be a . . . a physical patient-doctor relationship.* The doctor has to have reviewed the patient's condition and determined that the patient did in fact need the drug that's prescribed.

Q. Okay. Now, does the doctor have to see the patient physically every time they prescribe a drug to a particular patient?

A. No. That's not the case. *Just at least once.*

Q. Okay. And where do these requirements come from?

A. *They come from the Code of Federal Regulations.* They come from state pharmacy boards, state

medical boards, and also the American Medical Association guidelines.

Q. *And so a valid doctor-patient relationship requires at least one face-to-face visit. Is that correct?*

A. *Yes. That's correct.*

JER 379-80 (emphasis added).

Then, on August 24, 2010, Special Agent Brandon Bridgers

testified before the same grand jury, as follows:

Q. Okay. Now, what is required in order for a prescription to be valid?

A. *A prescription to be valid requires a face-to-face relationship with your physician* and a . . .

Q. And where does that requirement come from?

A. *That requirement comes from the Drug Enforcement Administration* as well as the state boards of . . . medical boards.

Q. Okay. *So the DEA has published regulations that require that you have at least one face-to-face visit with your doctor before he can prescribe a controlled substance for you; is that right?*

A. *Yes, ma'am. That is correct.*

JER 388-89 (emphasis added) (ellipses in original).

113

In sum, both agents testified falsely that the prescriptions at issue in this case were invalid because they were issued without at least one face-to-face consultation. Because the events in this case occurred no later than 2006, two years before the Ryan Haight Act was passed, neither Dr. Carozza nor any other doctor was *required* by federal law to conduct "at least one face-to-face visit" before issuing an effective prescription.

### 3. The agents' materially false testimony required dismissal of the indictment.

Courts may dismiss indictments based on "constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceedings[,]" and may separately issue a dismissal based on their supervisory powers. *Isgro*, 974 F.2d at 1094. In other words, "particularized proof of irregularities in the grand jury process" are sufficient to overcome the presumptive validity of a grand jury's indictment. *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring). Misstatements before the grand jury that have a substantial likelihood of

influencing the grand jury's decision to indict are grounds for dismissal of a facially valid indictment.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (dismissal of an indictment is appropriate "if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations") (citation and internal quotes omitted); *see also Isgro*, 974 F.2d at 1094.

In determining whether dismissal is warranted for grand jury misconduct, the inquiry focuses on the impact of the misconduct on the grand jury's impartiality.  *United States v. Sears, Roebuck & Co.*, 719 F.2d 1386, 1392 (9th Cir. 1983).  For example, while erroneous grand jury instructions do not automatically invalidate an otherwise proper indictment, dismissal is warranted where the instructions significantly deceived the grand jury.  *United States v. Larrazolo*, 869 F.2d 1354, 1359 (9th Cir. 1989), *overruled on other grounds by Midland Asphalt Corp. v. United States*, 489 U.S. 794,

115

799-800 (1989); *see also Basurto*, 497 F.3d at 784-86.  As

explained by the Supreme Court:

> dismissal of the indictment is appropriate only if it is
> established that the violation substantially influenced
> the grand jury's decision to indict, or if there is grave
> doubt that the decision to indict was free from the
> substantial influence of such violations.

*Bank of Nova Scotia*, 487 U.S. at 258 (internal quotations and

citation omitted).

Here, there is no doubt that the agents' testimony concerning

the validity of prescriptions issued without in-person examinations

was erroneous.  Both agents testified, in response to leading

questions from government counsel, that for the prescriptions at

issue to be valid, federal regulations *required* the doctor to have

conducted after at least one in-person examination.  But this was

decidedly *not* federal law until the passage of the Ryan Haight Act

in 2008, *viz.*, two years *after* the alleged conspiracy.  *See* 74 Fed.

Reg. at 15599.

This conclusion is only confirmed when the Court reviews how

limited the indictment's allegations against Dr. Carozza were, *viz.*,

116

the sum total of the indictment's allegations to support a funding

that the prescriptions issued by Safescripts Online were "not for a

legitimate medical purpose" and "fell outside the scope of

professional practice" may be found in first three paragraphs:

1.  . . . Napoli and his co-conspirators permitted customers to provide their credit card information and required them to complete brief, on-line questionnaires before ordering specific drugs, including the Controlled Substances [defined as certain Schedule III and IV drugs]. Customers were not required to submit a valid form of identification or a valid prescription for the Controlled Substances they ordered.

2.  Defendant Joseph Carozza was a medical doctor licensed only in the State of New York. As part of the conspiracy, several doctors, including Carozza, approved customer orders for controlled substances for Safescripts Online that were not for a legitimate medical purpose and when the doctor was not acting in the usual course of his or her professional practice.

3.  The completed on-line questionnaires were made available by Safescripts Online to, among others, defendant Carozza, who purported to review the on-line questionnaires and approve a prescription for the Controlled Substances requested by the customers. The on-line questionnaires asked the customers to briefly describe their medical history. At no time during the questionnaire review process did defendant Carozza or any other approving physician physically examine or obtain a complete medical history from the customers.

> Nor did Carozza or any other approving physician make any effort to confirm the accuracy of the information by the customers in the on-line questionnaire. Rather, after purportedly reviewing only the customers' on-line questionnaires, defendant Carozza or another approving physician authorized a purported prescription for the Controlled Substances requested by the customers.

Dkt 144 at ¶¶ 1-3. In other words, the grand jury's indictment alleged a crime based solely on appellants' issuance of prescriptions, by a licensed doctor, without conducting an in-person examination. Plainly, the agents' false recitation of the state of the federal law affected the grand jury's assessment of this case.

At a minimum, there certainly exists "grave doubt" that the decision to indict was free from the substantial influence of the government's false presentation. Indeed, as shown, the agents' errant testimony certainly influenced the grand jury's decision to indict. It is impossible to comprehend that the grand jury could have ignored the agents' false testimony that prescriptions issued without in-person examinations were *per se* invalid under federal law when assessing whether there existed probable cause to believe that Appellants violated the Controlled Substances Act based upon

Dr. Carozza's issuance of prescriptions based upon his review and assessment of on-line questionnaires. Because it was undisputed that Dr. Carozza was a licensed physician with a valid DEA registration at the time of the prescriptions at issue, to return an indictment against him, the grand jury had to find probable cause to believe that the prescriptions he issued were invalid. There can be no reasonable dispute that the government's agents' sworn, false testimony affected the grand jury's assessment of the case.

Notably, the district court did *not* challenge defendants' contention. Instead, it minimized the significance of the errant testimony, concluding that the grand jury *might* have based its decision on other evidence presented. JER 5-16]. The court stated:

> if [the agents' false testimony were the only thing out there, the only evidence in the record of what happened, then, and that's the only thing the [grand] jury could have considered, then I think you win. . . . But what happened in this case, as I understand it, was that a number of things were said as to what happened in connection with the issuance of prescriptions, and the way the operations worked, a number of things, 10, 20, 50 things were said. Among them certainly was no face-to-face meeting,

> and it was discussed by the agent, that fact, but it
> wasn't the sole fact.

JER  5].  The court misapplied the legal standard:

> the defendants' right to due process [is] violated where
> they had to stand trial on an indictment which the
> Government knew was based *partially* on perjured
> testimony.

*United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (citing

*Basurto*, 497 F.2d at 786) (emphasis added).  Here, the government

misstated the law so significantly that the grand jury had no choice

*but* to indict appellants for their operation of an on-line pharmacy.

The government claimed that it had established a *per se* violation

under applicable federal regulations.  Regrettably, the government's

presentation was untrue.

The government adduced false testimony claiming that

appellants' issuance of prescriptions based on a written

questionnaire, in the absence of a face-to-face examination,

established a *per se* violation of the CSA.  In truth, those facts

presented an open legal question whether a violation had occurred.

 Because that errant testimony most certainly led the grand jury to

indict, the indictment should have been dismissed pretrial, and should be dismissed now.

## VIII. **CONCLUSION**

Based upon the foregoing arguments, this Court should vacate appellants' convictions and remand for a new trial.

Dated: March 4, 2014

Respectfully submitted,


/s/ Karen L. Landau
KAREN L. LANDAU
Attorney for Appellant
Chris Napoli


/s/ Ethan A. Balogh
ETHAN A. BALOGH
Attorney for Appellant
Dr. Joseph A. Carozza

/s/ Martin A. Sabelli
MARTIN A. SABELLI
Attorney for Appellant
Daniel Johnson

## STATEMENT OF RELATED CASES

This case is related to and consolidated with *United States v. Carozza,* 13-10172, and *United States v. Johnson,* 13-10179.

# CERTIFICATE OF COMPLIANCE

I certify that:

_x_  1.  Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Cir. R. 32-1, the attached opening brief is:

_x_ Proportionately spaced, has a typeface of 14 points or more and contains 20,814 words and is filed with a motion for leave to file an oversize brief;

or is

__ Monospaced, has 10.5 or fewer characters per inch and contains _____words or ____ lines of text (opening briefs must not exceed 14,000 words or 1300 lines of text); or

___  2.  The attached brief is not subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

__ This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages. Ninth Cir. R. 32-1.

_/s/ Karen L. Landau
Karen L. Landau

## CERTIFICATE OF SERVICE

I, the undersigned, declare:

I am a citizen of the United States, over the age of 18 years and not a party to the within cause; my business address is  2626 Harrison St., Oakland, California 94612.

I hereby certify that on March 4, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 4, 2014.

/s/Karen L. Landau
Karen L. Landau
