**Nos. 13-10172, 13-10179, 13-10198**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSEPH CAROZZA,
DANIEL JOHNSON,
CHRISTOPHER NAPOLI,

Defendants-Appellants.

———————————————

**BRIEF FOR THE UNITED STATES AS APPELLEE**
———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:10-CR-00642-CRB
———————————————

**MELINDA HAAG**
United States Attorney

**BARBARA J. VALLIERE**
Chief, Appellate Division

**KIRSTIN M. AULT**
**LAURIE KLOSTER GRAY**
Assistant United States Attorneys
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7200

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**July 28, 2014**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................v

JURISDICTION, TIMELINESS, AND BAIL STATUS.........................1

ISSUES PRESENTED.........................................................2

STATEMENT OF THE CASE..................................................3

STATEMENT OF THE FACTS ................................................4

    I.    THE GOVERNMENT'S CASE .......................................4

        A.    Internet Pharmacies: An Overview...........................4

        B.    Napoli Opened An Internet Pharmacy.......................5

        C.    Pharmacy USA Changed Its Name To SafeScripts Online......10

        D.    Napoli Learned That He Was Under Criminal Investigation...13

        E.    Johnson Continued In The Internet Pharmacy Business .........23

        F.    SSO Distributed Controlled Substances Outside The Usual Course Of Medical Practice And Not For A Legitimate Medical Purpose.......................................................24

        G.    Customers Lied On The SSO Questionnaire To Obtain Controlled Substances.............................................26

        H.    The Magnitude Of Harm........................................29

    II.    THE DEFENSE CASE ...............................................30

        A.    Defendants Consulted With Attorneys .......................30

        B.    Defendants Claimed That They Acted In Good Faith.............33

i

1.      Defendants discussed Rannazzisi's Congressional
        testimony............................................................................35

2.      Defendants discussed the Ryan Haight Act ..................36

3.      Defendants discussed a Congressional Research
        Service report....................................................................36

4.      Defendants discussed their civil complaint for
        declaratory relief...............................................................37

SUMMARY OF ARGUMENT .................................................................39

ARGUMENT ..............................................................................................41

I.      THE DISTRICT COURT DID NOT DEPRIVE DEFENDANTS
        OF THEIR DEFENSE BY EXCLUDING INADMISSIBLE
        AND IRRELEVANT EVIDENCE ......................................................41

        A.      Standard Of Review ..................................................................42

        B.      Procedural Background...............................................................42

                1.      Pretrial and trial proceedings regarding Rannazzisi.......42

                2.      Pretrial and trial proceedings regarding the
                        declaratory judgment action ............................................43

                3.      Pretrial proceedings regarding the CRS report..............44

                4.      Defendants' closing arguments ......................................44

        C.      Argument ...................................................................................45

                1.      The Controlled Substances Act has always
                        criminalized defendants' conduct...................................45

                2.      Defendants' good-faith beliefs are irrelevant................51

3.      The court properly excluded hearsay and irrelevant evidence ..............................................................53

4.      Any error was harmless because the government's evidence was overwhelming and, in any event, defendants were allowed to present the substance of each document to the jury ...........................................55

II.     THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON GOOD FAITH ..........................................57

        A.      Standard Of Review .................................................57

        B.      Background ..............................................................57

        C.      Argument ..................................................................61

                1.      Defendants' subjective beliefs about the law are irrelevant ..........................................................63

                2.      The indictment charged general intent crimes and the given instructions did not diminish the government's burden of proof ...............................................65

                3.      The court instructed that the government must prove that Carozza engaged in illicit drug dealing and trafficking ........................................................67

                4.      The court did not abuse its discretion in refusing to instruct on the Ryan Haight Act ...................70

                5.      The court properly instructed the jury on defendants' duties .................................................72

                6.      Any instructional error is harmless..................74

III.    THE DISTRICT COURT PROPERLY INSTRUCTED ON DELIBERATE IGNORANCE...........................................74

iii

A.     Standard Of Review ...................................................................74

B.     Background ...........................................................................75

C.     Argument ..............................................................................77

      1.     The evidence supported the deliberate ignorance instruction ....................................................77

      2.     Any instructional error was harmless ...........................82

IV.     THE GOVERNMENT DID NOT ABUSE THE GRAND JURY PROCESS ...........................................................................84

A.     Standard Of Review ...................................................................84

B.     Background ...........................................................................84

C.     Argument ..............................................................................90

CONCLUSION ...........................................................................93

STATEMENT OF RELATED CASES ...................................................94

CERTIFICATE OF COMPLIANCE ...................................................95

CERTIFICATE OF SERVICE ...........................................................96

APPENDIX 1 ...........................................................................97

ADDENDUM ...........................................................................99

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ...................................53

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) ....................90

*Bryan v. United States*, 524 U.S. 184 (1998) ..............................51, 52, 64

*Cheek v. United States*, 498 U.S. 192 (1991) ..........................................52

*Crane v. Kentucky*, 476 U.S. 683 (1986) .................................................56

*Dixon v. United States*, 548 U.S. 1 (2006) ...............................................52

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ...............................................45

*Hawkins v. United States*, 30 F.3d 1077 (9th Cir. 1994) .........................48

*Ross v. Oklahoma*, 487 U.S. 81 (1988) ....................................................93

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ...........................................83

*Taylor v. Illinois*, 484 U.S. 400 (1988) ...................................................53

*United States v. $11,500.00*, 710 F.3d 1006 (9th Cir. 2013) ...................54

*United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013) ........................55

*United States v. Anguiano-Morfin*, 713 F.3d 1208 (9th Cir. 2013) ..........61

*United States v. Bansal*, 663 F.3d 634 (3d Cir. 2011) ..............................48

*United States v. Bingham*, 653 F.3d 983 (9th Cir. 2011) .........................84

*United States v. Birbragher*, 603 F.3d 478 (8th Cir. 2010) ..............35, 49

*United States v. Boettjer*, 569 F.2d 1078 (9th Cir. 1978) ........................70

v

*United States v. Boulware*, 558 F.3d 971 (9th Cir. 2009) ......................................61

*United States v. Brown*, 347 F.3d 1095 (9th Cir. 2003) ..........................................92

*United State v. Bush*, 626 F.3d 527 (9th Cir. 2010)................................................63

*United States v. Castro*, 736 F.3d 1308 (11th Cir. 2013) ........................................48

*United States v. Claiborne*, 765 F.2d 784 (9th Cir. 1985)................................92, 93

*United States v. de Cruz*, 82 F.3d 856 (9th Cir. 1996) ............................................54

*United States v. De Rosa*, 783 F.2d 1401 (9th Cir. 1986) ................................90, 92

*United States v. Del Muro*, 87 F.3d 1078 (9th Cir. 1996) .......................................72

*United States v. Delgado*, 357 F.3d 1061 (9th Cir. 2004) .......................................63

*United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013) ........................................51, 61

*United States v. Edwards*, 235 F.3d 1173 (9th Cir. 2000)........................................55

*United States v. Evans*, 728 F.3d 953 (9th Cir. 2013) ......................................42, 53

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006)..............................*passim*

*United States v. Ferris*, 719 F.2d 1405 (9th Cir. 1983) ...........................................72

*United States v. Fierros*, 692 F.2d 1293 (9th Cir. 1983) .........................................64

*United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006) .......................................50, 81

*United States v. Green*, 511 F.2d 1062 (7th Cir. 1975)............................................46

*United States v. Hall*, 552 F.2d 273 (9th Cir. 1977)................................................72

*United States v. Hayes*, 794 F.2d 1348 (9th Cir. 1986)...........................................69

*United States v. Haynes*, 216 F.3d 789 (9th Cir. 2000) ...........................................84

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (*en banc*)....................77, 79

*United States v. Hicks*, 529 F.2d 841 (5th Cir. 1976).............................................46

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (*en banc*) ................74, 81

*United States v. Hofus*, 598 F.3d 1171 (9th Cir. 2010) ...........................................57

*United States v. Johnson*, 459 F.3d 990 (9th Cir. 2006)...........................................57

*United States v. Kahre*, 737 F.3d 554 (9th Cir. 2013) ..............................................42

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)...................................................53

*United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009)...........................49, 50, 73

*United States v. Mason*, 902 F.2d 1434 (9th Cir. 1990) ...........................................57

*United States v. Mechanik*, 475 U.S. 66 (1986)........................................................93

*United States v. Moore*, 423 U.S. 122 (1975)..............................................46, 69, 91

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1977)..........................................82

*United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004).........................................50

*United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000).............................................53

*United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010) ...............................56

*United States v. Quinones*, 635 F.3d 590 (2d Cir. 2011)...............................49, 73, 80

*United States v. Ramos-Atondo*, 732 F.3d 1113 (9th Cir. 2013) ................74, 77, 79

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009)................................................51

*United States v. Reed*, 726 F.2d 570 (9th Cir. 1984)................................................92

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009)............................................71

*United States v. Reyes*, 660 F.3d 454 (9th Cir. 2011)................................................71

*United States v. Rhone*, 864 F.2d 832 (D.C. Cir. 1989) ..........................................67

*United States v. Sandoval-Gonzalez*, 642 F.3d 717 (9th Cir. 2011)......................83

*United States v. Sarno*, 73 F.3d 1470 (9th Cir. 1995) ......................................62, 72

*United States v. Smith*, 573 F.3d 639 (8th Cir. 2009).............................................46

*United States v. Stever*, 603 F.3d 747 (9th Cir. 2010).............................................53

*United States v. Tatoyan*, 474 F.3d 1174 (9th Cir. 2007)........................................72

*United States v. Thomas*, 612 F.3d 1107 (9th Cir. 2010) ......................................62

*United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012)............................48, 50, 51

*United States v. Vamos*, 797 F.2d 1146 (2d Cir. 1986) ....................................46, 73

*United States v. Walters*, 309 F.3d 589 (9th Cir. 2002)..........................................42

*United States v. Wright*, 667 F.2d 793 (9th Cir. 1982)...........................................91

*United States v. Yi*, 704 F.3d 800 (9th Cir. 2013)..............................................78, 79

*United States v. Zhou*, 678 F.3d 1110 (9th Cir. 2012)......................................52, 53

## STATUTES, RULES, and GUIDELINES

18 U.S.C. § 1324....................................................................................................64

18 U.S.C. § 1956(h) ................................................................................................3

18 U.S.C. § 3231.....................................................................................................1

18 U.S.C. § 3742......................................................................................................1

21 U.S.C. § 801.......................................................................................................45

21 U.S.C. § 829 .................................................................47, 91

21 U.S.C. § 841(a)(1) ..............................................*passim*

21 U.S.C. § 846 ..........................................................................3

28 U.S.C. § 1291 .......................................................................1

21 C.F.R. § 1306.04(a) .....................................................45, 46

Fed. R. Evid. 801(d)(2)(A) ...................................................53

Fed. R. Evid. 807 ..................................................................54

Nos. 13-10172, 13-10179, 13-10198

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

        v.

JOSEPH CAROZZA,
DANIEL JOHNSON,
CHRISTOPHER NAPOLI

     Defendants-Appellants.

_____

## BRIEF FOR THE UNITED STATES AS APPELLEE

## JURISDICTION, TIMELINESS, AND BAIL STATUS

Defendants appeal their convictions following a two-month jury trial. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. § 3231. The district court sentenced defendants on March 26, 2013, and judgments were entered on March 29, 2013. Clerk's Record ("CR"):1194-1196, 1204, 1206, 1212; Appellant's Joint Excerpts of Record ("JER"):124-130, 131-137, 138-144. Defendants filed timely notices of appeal. CR:1223, 1229, 1239; JER:120-123. Defendants are out of custody on bail pending appeal. CR:1249, 1254, 1272.

## ISSUES PRESENTED

I.    Whether the district court properly excluded documents offered by defendants to support their proffered good-faith belief that they were not violating federal law where the documents were irrelevant, inadmissible hearsay, and confusing, and any erroneous exclusion was harmless because defendants elicited the substance of each document through both government and defense witnesses, and whether the exclusion of the evidence deprived defendants of their defense where there was overwhelming evidence of guilt.

II.    Whether the district court properly rejected defendants' proposed good-faith instruction where it instructed the jury that (a) it could not convict if it found that defendants had a good-faith belief that controlled substances were being distributed for a legitimate medical purpose in the usual course of professional practice or if they found that defendants were simply careless, and (b) the government had the burden to prove beyond a reasonable doubt that defendants did not act in good faith.

III.    Whether the district court properly gave a deliberate ignorance instruction where the evidence supported the inference that defendants knew that there was a high probability that they were distributing drugs outside the scope of professional medical practice and defendants purposefully avoided learning the truth.

2

IV.   Whether the district court erred in failing to dismiss the indictment for

alleged prosecutorial misconduct where (a) the government did not present

perjured testimony to the grand jury, (b) sufficient evidence supported the

indictment without the challenged statements, and (c) the petit jury returned guilty

verdicts against defendants making any error harmless.

## STATEMENT OF THE CASE

On December 7, 2010, a federal grand jury returned a superseding

indictment charging defendants Christopher Napoli, Daniel Johnson, Joseph

Carozza, and eight others with conspiracy to distribute and possess with intent to

distribute Schedule III and IV controlled substances (21 U.S.C. § 846, count one)

distributing and possessing with intent to distribute a Schedule IV controlled

substance (21 U.S.C. § 841(a)(1), count two), and conspiracy to launder money.

(18 U.S.C. § 1956(h), count three).  CR:144; JER:330-339.  Pretrial, the court

granted the government's motion to dismiss the money laundering count against

Carozza.  CR:380, 762.

On October 1, 2012, a jury trial began for Napoli, Johnson, and Carozza, the

Honorable Charles R. Breyer presiding.[1]  CR:909, 920.  On November 15, 2012,

the jury returned guilty verdicts against defendants on all charged counts.

---

[1]  A jury convicted two co-defendants in a severed trial, four co-defendants
pleaded guilty, one co-defendant is a fugitive, and one co-defendant died.  CR:221,
304-305, 645.

3

CR:1068.  The court sentenced Napoli to 48 months' imprisonment on counts one and three, a concurrent 36-month sentence on count two, three years' supervised release, a $300 mandatory special assessment, and a $24,609,611.48 forfeiture judgment.  CR:1204; JER:125, 128, 130.  The court sentenced Johnson to 36 months' imprisonment on counts one through three, all counts to be served concurrently, three years' supervised release, a $300 mandatory special assessment, and an $835,540 forfeiture judgment.  CR:1206; JER:132-137.  The court sentenced Carozza to 30 months' imprisonment on counts one and two to be served concurrently, three years' supervised release, a $200 mandatory special assessment, and a $400,067 forfeiture judgment.  CR:1212; JER:139-144.

## STATEMENT OF THE FACTS

### I.    THE GOVERNMENT'S CASE

#### A.    Internet Pharmacies: An Overview

An internet pharmacy, also known as an online pharmacy, is an e-commerce business that sells pharmaceuticals to people who either do not have a prescription or cannot obtain a prescription.  Government's Supplemental Excerpts of Record ("SER"):115.  Internet pharmacies are structured so that when customers go on line and search for a specific drug to purchase, they see an "affiliate" website.  SER:116-117.  An affiliate is a marketing website that gathers sales leads in exchange for a referral fee and funnels those leads onto an internet pharmacy.

4

SER:116, 153-154. The internet pharmacy ensures that the order is processed, filled, and shipped by a brick-and-mortar fulfillment pharmacy after the customer's credit card is authorized for the purchase. SER:117-119, 183, 913.

### B. Napoli Opened An Internet Pharmacy

In late 2004, Napoli recruited investor Kevin Mullin to provide startup capital to open an internet pharmacy. SER:124-126, 129, 231. On November 11, 2004, Napoli and Mullin incorporated "Pharmacy USA" ("PSA").[2] SER:128-130, 132. The next day, Napoli got "the business up and running" by opening a business checking account and creating a website, which included an ordering process and questionnaire. SER:135, 140-141.

Napoli placed newspaper advertisements seeking doctors to review his company's online questionnaire and to approve or deny prescriptions. SER:136-137, 200. Napoli and Mullin hired Dr. Alvin Oscar from New Jersey, and Dr. John Wilkins from Pennsylvania, the only doctors still interested in the job after Napoli explained the business plan. SER:136-137, 201, 211-213. Napoli signed the contracts between PSA and the doctors. SER:139-140, 143, 145, 511.

Napoli hired D.J. Johnson to provide technical assistance. SER:149, 151, 153, 155, 602. Johnson worked for Internet Commerce Corporation ("ICC"), his family's business in Pekin, Illinois. SER:591, 883, 1385, 1400-1401. Johnson had

---

[2] *See* Appendix 1, attached, a glossary listing of the many businesses and individuals referenced in this brief.

5

his own affiliate website, dietpills.com, and was one of Napoli's early affiliates. SER:154, 633, 720a-b. Johnson soon became PSA's affiliate manager and had "significant" involvement in the company. SER:153-154. He ran the technical side, which included designing the web sites, providing the servers, writing the software, and overseeing anything computer-related. SER:580, 591.

Napoli also located pharmacies to fill PSA's drug orders, a difficult task because, as Napoli told Mullin, it was "risky" for pharmacies to ship drugs ordered over the internet. SER:161-165. Initially, PSA orders were filled by Budget Drugs ("Budget") in Pennsylvania and Superior ("Superior") Drugs in Florida. SER:161, 167.

On April 6, 2005, Napoli created, paid for, and registered the domain name pharmacyusameds.com. SER:878-879, 1636. On April 15, 2005, PSA processed its first online order from Napoli's basement in Pennsylvania. SER:147-148. PSA sold Schedule III and IV controlled substances, including diet, anti-anxiety, and sleep drugs, all of which required a prescription from a doctor with a Drug Enforcement Administration ("DEA") registration and a license in the state in which the doctor practiced. SER:119, 120-121, 320, 442-444. By the end of its second month in business, PSA was processing between $4,000 and $5,000 in orders placed by customers located across the United States. SER:150-151.

6

Napoli initially paid Dr. Oscar $5 per customer request. SER:142, 512-513. In September 2005, Napoli changed the contract terms "to make a lot more money" and tied the doctor's compensation to a sliding scale based on the number of requests reviewed. SER:142-144. Under the new contract, Napoli paid Oscar $2,000 a week for reviewing up to 1,749 prescriptions, $3,000 a week for reviewing 1,750 to 2,799 prescriptions, and $4,000 a week for reviewing 2,800 to 4,199 prescriptions. SER:144-145, 513. The doctor was paid whether or not the order was approved, but PSA made money only when a prescription was approved. SER:147. When Napoli did not think that Oscar was approving enough prescriptions, he threatened to give more orders to a different doctor. SER:145-146.

Meanwhile Mullin was becoming "more and more apprehensive" about the internet pharmacy business. SER:203. For example, when Napoli told Mullin that Superior would not ship to California, and Napoli had Superior ship drugs to him that he then forwarded onto a California customer, Mullin told Napoli that he was jeopardizing the company.[3] SER:167-168.

Napoli and Mullin met with lawyers, including Napoli's father, who referred them to the Philadelphia Stradley Ronon law firm. SER:202, 209, 231. Stradley

---

[3] Investigators later discovered that Napoli had Superior ship 32 orders to him that he then forwarded onto customers in California. SER:990.

attorney Joseph McHale told Napoli and Mullin that their business was in "a gray area" that "the government didn't like." SER:235. He compared the business to drug dealing and advised that "whatever you do, don't get big and stay under the radar." SER:232. McHale suggested that they have the doctors "actually write the prescriptions for Pharmacy USA," advice Napoli did not follow. SER:224-225. McHale referred them to criminal defense attorney Joe Green. SER:236.

On September 12, 2005, the DEA closed Budget for filling large amounts of Schedule IV diet pill prescriptions written by physicians in one state for customers in other states. SER:302-304, 308, 1064. Investigators seized a Budget contact sheet that named "Pharmacy USA" and listed telephone number for Napoli and Johnson. SER:311-313. They also learned the names of the doctors writing prescriptions for PSA, and obtained emails documenting interactions between Budget and Napoli and Johnson. SER:309-310, 1080.

On September 12, 2005, when Napoli told Mullin that the DEA had closed Budget, Mullin viewed it as "a sign," terminated the partnership agreement with Napoli, and directed Napoli to remove his name from company documents. SER:170-175. Mullin explained that going into the business, the two men had agreed that if people started "viewing this as gray or dark gray," or "if anybody gets a letter or visit[ ]," they would close the business and "we're both out." SER:169-173. Mullin expected Napoli to close PSA, but Napoli continued in the

8

business.  SER:169-173, 502-503.  When Mullin quit PSA, it was filling about 1,000 orders a day.  SER:223.

In October 2005, Napoli contracted with Johnson to create "a detailed affiliate computer module for the use of PSA and the PSA affiliates."  SER:845-846.  On October 8, 2005, a DEA investigator visited Dr. Wilkins and told him that what he was doing was illegal.  SER:314-316, 318.[4]  Less than three weeks later, an investigator visited Dr. Oscar at his Pennsylvania home.  SER:509-516.  Using the PSA website, Oscar walked the investigator through his approval process.  SER:509-516.  The investigator noticed that the questionnaire did not ask a patient to explain why he or she needed the requested drugs.  SER:516-517.  Investigators also discovered that Oscar's DEA registration had expired in December 2002.  SER:518.

When Napoli told Mullin that the DEA had visited Dr. Oscar, Mullin gave Napoli a newspaper article from September 2005, detailing arrests at an internet pharmacy, and again encouraged Napoli to "get[ ] out," but Napoli refused because "the money was too great."  SER:175-178, 210, 227-230.  Napoli told Mullin that the government had shut down another internet pharmacy named Jive Network, which caused Mullin further concern.  SER:168-169.

---

[4]  Wilkins testified in defendants' case that he told Napoli what the DEA had told him.  SER:1324.

9

In October 2005, Napoli hired Asset Protection Group ("APG"), a company that shielded client assets from forfeiture and judgment. SER:807, 810-813, 823-824. William Reed, APG's president, hid client identities by naming himself the officer and director of corporations he created for his clients, by being the sole signatory on the corporate bank accounts, and by establishing offshore businesses and accounts. SER:813. Napoli gave APG $500,000 in internet pharmacy proceeds to shield for him. SER:743-748, 816-821.

### C. Pharmacy USA Changed Its Name To SafeScripts Online

On November 7, 2005, Napoli emailed all PSA affiliates apprizing them that he was "temporarily closing down our program while we look into a different business model for this industry." SER:584. On November 8, 2005, Napoli created, paid for, and registered the domain name safescriptsonline.com ("SSO") and named NTS, ICC's parent company, its domain server. SER:880-883, 1385, 1400-1401.

By November 29, 2005, SSO was distributing controlled substances using PSA's business model. SER:582-585, 1031. Napoli continued as "the final decision-maker for everything," and Johnson remained responsible for "all things technical," including writing the software that SSO used. SER:589-591.

Because Wilkins and Oscar quit writing prescriptions for PSA after the DEA visited them, Napoli again advertised for doctors. SER:316-317, 394-395, 518.

10

On December 12, 2005, Napoli hired Dr. Joseph Carozza, who was licensed to practice in New York, and on December 13, 2005, Carozza approved his first order. SER:1036, 1106.[5] On December 16, 2005, Napoli told Johnson that for Christmas he wanted the "DEA off my back and for this business to run for 12 more months." SER:1038.

In January 2006, Napoli elevated Robyn Bloom, a PSA affiliate, to SSO affiliate manager. SER:575-579. Bloom had initially affiliated with PSA because it sold controlled substances, which was "where the money [was]." SER:568-570. Bloom was the liaison between SSO and its approximately 100 worldwide affiliates. SER:575, 604, 608, 616, 783.

When Bloom became affiliate manager, Johnson remained "very" involved in the day-to-day management of SSO, handled "all things technical," and kept the website running. SER:580-582, 618-619. Johnson told Bloom that one doctor approved all SSO orders, more than 500 orders per day. SER:790-791, 799.

---

[5] Dr. Anat Benjamin had earlier responded to the ad and spoken with "Nuno B" (Napoli) who explained that the job involved reviewing on a website a patient's prescription written by the patient's doctor. SER:395-396. To verify her status, Benjamin faxed Nuno B her license and DEA number, but never heard back from him. SER:396-398, 401-402. Nine months later, Benjamin received a letter from a person who had received a diet pill prescription purportedly written by her, and Benjamin discovered that her DEA number had been used without her authorization. SER:407-410. In December 2005, Napoli had named Benjamin as a company doctor and attached her resume and DEA license to his merchant account application without Benjamin's authorization. SER:408-410, 1138-1139, 1655.

11

Napoli's goal was to have SSO process 1,000 orders a day, a goal it achieved. SER:653. Napoli told Bloom he had instructed the doctor to deny 30% of the orders, so that if law enforcement visited, he could claim that "we're not just taking everything." SER:800. He submitted a credit card processing application in December 2005, stating that the company rejected 30% of requests, SER:1138b-1138c, 1650, when, in reality, Dr. Carozza rejected less than 10% of the orders that he reviewed. SER:971-972, 975, 1616-1617.

During the period that Carozza reviewed orders, the process worked as follows: anyone who ordered drugs from SSO or PSA, went online, navigated to the website, selected a drug, its strength and quantity, and clicked "submit." SER:80-81, 90, 592, 1604-1615. The person then created a user name and password, listed his/her customer and shipping information, and provided a payment method. SER:81, 1606-1608. After this, the customer answered an eight-question medical history that asked for date of birth, gender, height, weight, smoking history, and daily alcohol consumption. SER:82-83, 1608-1609. The "general medical information" section that followed had "none" as the preselected answer to the following queries: list "all over-the-counter and prescription drugs" the person was currently taking; list all medical conditions for which the person was "being treated for at this time"; identify "past surgical history"; and provide a "primary care physician's name and address." SER:84-85. "Yes" was the

12

preselected answer to "do you have a valid prescription for the medication you are ordering?" SER:86. The form also preselected "yes" that the customer had read both the "patient responsibility statement" and the "statement of informed consent." SER:88, 92-94, 1612-1613.

Once the customer's credit card was approved, the order went into the doctor's queue, and once approved, into the pharmacy queue for printing, filling, and shipping. SER:593. The questionnaire never asked the customer why he/she needed the particular drug selected or what medical condition the person was treating. SER:90. Customers were not required to submit prescriptions or provide medical records, and SSO did not verify the identity of the person who placed the orders. SER:99, 110, 347-348, 532, 561-562.

### D. Napoli Learned That He Was Under Criminal Investigation And The DEA Closed More Internet Fulfillment Pharmacies

On February 1, 2006, the United States Attorney for the Eastern District of Pennsylvania notified Napoli that he was the target of a grand jury investigation concerning conspiracy to illegally distribute a controlled substance. SER:1073, 1697. Three weeks later, DEA investigator Tasha Brachle and San Jose Police Officer Dwight Saiki logged onto the SSO website and ordered 30, 15-milligram capsules of the Schedule IV weight loss drug phentermine. SER:77-78, 83, 106-107. In filling in the form, Brachle lied about her height and weight. SER:83. Saiki created the user name, email address, and listed his cell phone as

13

the "primary care physician's phone number." SER:107-110. No one from SSO

ever contacted Brachle or Saiki to verify that the information given was correct, to

conduct a medical history, to ask for a physical exam, to perform any medical tests,

to discuss alternatives to phentermine, to ask for medical records or a copy of a

valid prescription, or to discuss the drugs ordered. SER:99-101, 110-112. Nor did

anyone call the physician number that Saiki listed. *Id*. Kwic Fill Pharmacy

("Kwic") in Fayetteville, North Carolina, shipped 60 pills, even though only 30

had been ordered. SER:97-99, 111. Dr. Joseph Carozza was the prescribing

physician named on the pill bottle. SER:99.[6]

About a month later, the DEA closed United Care Pharmacy ("United"), in

Wilmington, North Carolina, and discovered primarily Schedule III and IV drugs

in United's inventory, atypical for a retail pharmacy. SER:239, 269, 280-281, 284.

The DEA seized 250,000 dosage units of diet medications, anti-anxiety, and

antidepressant medications, as well as a list of websites and phone numbers that

had contact information and inventory sheets for SSO and PSA. SER:244-245,

250-253, 284. The inventory sheets showed the volume of pills that United

shipped for SSO. SER:250-251. For the week of January 30, 2006, United

shipped 162,790 pills for SSO, consisting of 79,950 phentermine pills, 6,180

phendimetrazine pills, and 40,500 alprazolam pills. *Id*.

---

[6] This shipment is charged at count two of the superseding indictment. JER:338.

Jeffrey Entel operated an internet call center and used Johnson's software to sell medication. SER:897a-d, 898. When United closed, Johnson recruited Entel as an SSO affiliate. SER:898. Entel sent Johnson a link describing the shut down, and the two men spoke about what they thought was going to happen to the owners and "some of the dangers of the business and how to proceed moving forward." SER:913-914.

Entel soon became one of SSO's biggest affiliates. SER:900-901, 908-911. Johnson provided Entel "backend access" to the SSO website, which allowed Entel to see the number of placed orders and their status in the approval process. SER:583-584, 897. Napoli decided who received backend access, typically affiliates, doctors, pharmacies, and employees, and Johnson provided the access. SER:615, 1104-1105. Johnson communicated daily with Entel about any changes regarding what medications were available from which pharmacies and about any software issues. SER:900, 902. Entel and Johnson also exchanged links to articles about pharmacy shut-downs and arrests by law enforcement. SER:915-916.

Entel, who regularly checked SSO's backend to track doctor approvals, saw hundreds of his orders approved between midnight and 8:00 a.m. SER:960, 966a. Entel estimated that the doctor approved 200 to 250 orders a day from his business, amounting to 99% of the orders that he submitted. SER:916-917. Entel thought it

15

"impossible" for one doctor to read that many online questionnaires in that time period.  SER:917.

In March 2006, SSO filled orders for online pharmacy AffPower, operated by David Glass.  SER:620, 1048-1050.  On March 21, 2006, Johnson congratulated Napoli on "our first 2,000-order day," which included the AffPower orders. SER:1047-1050.  On March 27, 2006, Napoli and Johnson discussed the volume of approved orders, and Napoli wondered whether "we'll ever do 15,000 orders in one day again," before concluding that they "might [do] 20,000 before the end of the night."  SER:1048.  Johnson watched the server's performance in "amazement" as it processed "upward of 60 [orders] a minute from the XML feed from five different affiliates."  SER:1048-1049.

Between March 24 and March 29, 2006, SSO received 25,907 orders from AffPower.  SER:1103.  Carozza approved 99% of the AffPower orders that he reviewed, and his weekly salary jumped from $7,500 to $30,000 during this period. SER:1051-1054.

Prior to the DEA closing United, SSO transitioned to Kwic to fill its orders. SER:97-99, 987-988, 1041, 1080-1086.  On April 5, 2006, the DEA closed Kwic and seized prescription records that named Carozza, a notebook containing Johnson's phone numbers, and documents that listed contacts and numbers for SSO.  SER:253-254, 264-265.  Investigators did not find the "typical" non-

16

controlled pharmacy drugs, such as antibiotics, blood pressure and cholesterol medication, or asthma inhalers.  SER:265-266.  Instead, the DEA seized over 300,000 dosage units of Schedule IV controlled diet medications.  SER:287-288.  That same day, Napoli told Bloom that "two pharms went down today; one was ours," referring to Kwic.  SER:641.  Two days later, Napoli asked Bloom if she would "come visit [him] in jail?"  SER:647.

To solve the problem of continuously scrambling to find fulfillment pharmacies to fill SSO's orders, Napoli negotiated to buy his own brick-and-mortar pharmacy.  SER:642, 644-645, 649-650.  In May 2006, Napoli bought Discount U.S. Drugs ("Discount") in Orlando, Florida, in the name Tarkhenov Trading Company ("Tarkhenov"), using Christopher "Kit" Latham as the straw buyer.  SER:184, 186-187, 207-208, 412-418, 470, 487.  Discount was a community retail pharmacy that served local residents, most within a 50-mile radius, and filled approximately 50 prescriptions a day.  SER:470-476.  Less than 10% of Discount's business involved filling controlled substance prescriptions and phentermine represented less than 1% of those prescriptions.  SER:476-477.  Napoli hired Brandon Winstead to run the pharmacy, telling Mullin that Winstead had worked at both United and Kwic before the DEA closed them.  SER:186-187, 214-215, 272-273, 419-425, 729, 736-737.

17

Latham and Winstead travelled to Orlando for Napoli. SER:490. A few days prior to the purchase closing date, the two men set up fax machines and pharmacy equipment, and started filling orders. SER:490-491. When Howard Smith, one of the selling owners, found out, he "immediately stopped them." SER:491. Napoli contacted Smith to ask if they could continue, and Smith said "no." SER:491.

"Immediately after the sale was final," Latham told Smith that "they were not interested in servicing [Smith's] patients" or in "dispensing the drugs that [Smith] had." SER:491, 495. Over the next two weeks, Smith transitioned his patients to another pharmacy because he questioned whether the new operation was "legal" after he noticed that one doctor was writing all the prescriptions ("not typical"), that the prescriptions were primarily for controlled substances, that all were shipped out of state, and that no walk-in patients were permitted. SER:493-494, 497-498. He also observed that the new owner added reflective tint on the window, closed the pharmacy to the public, and locked the door during business hours. SER:493-494.

Napoli told Johnson that "nobody is to know that Discount U.S. Drugs is us, okay," and Johnson agreed. SER:1058-1059. During this time, Napoli changed

his Skype name from Nuno B to Black Diablo 1[7] and told Johnson that only Johnson and five named others were to "have it."  SER:654-656, 1060.

On June 30, 2006, a DEA investigator from Orlando, Florida, visited Discount and suspended further operations because it was a "suspected" internet pharmacy.[8]  SER:749, 753-754, 765.  Winstead told investigators that Latham of Tarkhenov owned Discount.  SER:762-763.  Latham later told investigators that Tarkhenov owned Discount and that he and Winstead were the only people "associated" with the corporation.  SER:767.  Latham subsequently admitted that Napoli was "associated" with the company, and could be reached through his attorney.  SER:770-771.  Investigators seized 127,677 dosage units of mostly Schedule IV drugs, and prescription records revealed that one doctor – Dr. Joseph Carozza – was primarily responsible for the prescriptions.  SER:756-757, 760-762.

Napoli told Johnson to call "Sal" (Sal Lamorte) and "set up more pharms," but "don't tell him what happened," a reference to the DEA shutting down another pharmacy.  SER:1060-1061.  Lamorte assisted Napoli and Johnson in finding fulfillment pharmacies.  SER:930, 1422-1423.

---

[7] On June 5, 2006, Napoli purchased a 1997 Black Diablo Lamborghini for $169,000.  SER:1123-1125.

[8] Stat Pharmaceuticals, a wholesale distributor, notified the DEA that Discount was ordering mostly anti-anxiety drugs, and that the person placing those orders, Brandon Winstead, was the same person who had placed orders for the closed United and Kwic pharmacies.  SER:726-741.

After Discount closed, DEA supervisor Richard Springer interviewed Carozza about the prescriptions issued in his name at Discount.  SER:772-726. Carozza said that he answered an advertisement in the New York Times to work for an internet pharmacy company owned by Napoli, and that Carozza did not consider what he was doing to be "practicing medicine."  SER:776-777, 780. Carozza admitted that he issued a prescription after evaluating an online questionnaire and without ever examining the person.  SER:777, 779.  Carozza acknowledged that he issued between 300 to 400 prescriptions a day, and when the volume became "too great," he authorized others to use his e-signature.  SER:778. He knew that 90% of the prescriptions he issued were for controlled substances. SER:778.

Carozza also said that he issued prescriptions wherever he had his laptop: in New Jersey, in Manhattan, and while servicing his car in Connecticut.  SER:780. Asked if he had any medical records from the people for whom he had issued prescriptions, Carozza said that he had maybe a half dozen records, but he "couldn't put his finger on where they were located."  SER:780.

After the DEA investigator left, Carozza called Napoli.  SER:1076.  The next day, Napoli told Johnson that Carozza had asked Napoli to "send over as many orders as we have."  SER:1076.  Carozza approved 96% of the orders assigned to him the day that he spoke to DEA investigator Springer (775 out of

20

808); 96% the next day (615 out of 640), and 98% the day after that (973 out of 1,029). SER:983, 1076-1077.

On July 3, 2006, Bloom sent Napoli a link about AffPower being shut down. SER:660-661. In a Skype exchange, Johnson told Napoli that AffPower owner Dave Glass was on house arrest and wearing an ankle bracelet. SER:1061-1062.

On July 12, 2006, New York state investigators closed Woodbury Pharmacy ("Woodbury") in Highland Mills, New York, another SSO fulfillment pharmacy. SER:520-522, 524-526. Two days later, Johnson told Napoli that "Wood[bury] has been trying to log into the pharmacy admin." SER:1074. Napoli told Johnson "to erase the link" because "we think DEA is trying to print." SER:1074-1075. Indeed, the DEA had been given consent by the pharmacy to log into the backend of its system to review the orders in the pharmacy's queue. SER:1074-1075.

While with SSO, Bloom collected and shared online pharmacy indictments with Napoli and Johnson. SER:672. In one Skype with Napoli, Bloom included the link to a DEA document that said that "a patient completing a questionnaire that is then reviewed by a physician hired by or working on behalf of an internet pharmacy does not establish a doctor-patient relationship." SER:801-805.

By August 25, 2006, SSO was scrambling to get pharmacies to fill "lams and pams," which is what Bloom, Napoli, and Johnson called anti-anxiety medication. SER:691-692. On September 1, 2006, Johnson told Napoli that he

21

found another fulfillment pharmacy: Mail Meds in Pennsylvania. SER:695, 1077. Then, in September, 2006, Napoli disappeared for a month. SER:693-694. On October 11, 2006, Johnson told Bloom that he was "moving dietpills.com" and setting up a "new server right now" because he and Napoli had had a falling out and Johnson was making plans to open his own online pharmacy. SER:698-699. Johnson complained to Entel about SSO because "they control the money and I make the deals." SER:934.

On October 13, 2006, the DEA closed Mail Meds, which was filling more than 1,500 prescriptions a day, primarily Schedule III and IV controlled substances, for SSO and other internet pharmacies. SER:293. It seized approximately 228,000 phentermine and phendimetrazine tablets from its shelves and an additional 12,000 tablets packaged and ready for shipping on that day. SER:294. That same day, Bloom and Johnson Skyped about the closure. SER:702.

By November 2006, "everybody was jumping ship." SER:706. Johnson and Bloom watched their incomes drop "to nothing" because SSO was not "shipping any orders at all." SER:704-707. They knew "something was up," but did not know what. SER:709; *see id.* ("we knew we weren't shipping. We knew the writing was on the wall. This was different than any other time where we

22

weren't able to ship for just a week kind of thing"). SER:709. SSO closed on November 13, 2006. SER:711, 782.

### E. Johnson Continued In The Internet Pharmacy Business

After SSO closed, Bloom and Johnson continued in the internet pharmacy business. SER:708. Johnson worked with the doctors, the pharmacies, and the software, while Bloom handled the administrative side and the affiliates. SER:708.

In November 2006, Johnson told Lamorte that he and Bloom were "moving forward with our own stuff," and asked Lamorte to "hook [him] up" with a fulfillment pharmacy. SER:865-866. Johnson and Bloom traveled to the Dominican Republic to meet with Entel. SER:713. Johnson helped Entel acquire pharmacies, doctors, a merchant account, and sold Entel his software. SER:919-920, 924-925, 928-929, 936-937, 941-951.

On January 11, 2007, the DEA seized Napoli's Lamborghini, Porsche, and approximately $1.1 million from his business accounts. SER:867-868, 1062. On January 16, 2007, Johnson sent Entel a link to a press release and indictments of individuals involved with United. SER:953-955. Johnson said United was shipping 8,000 orders daily and that it is "hard to defend the doc-patient relationship with those numbers." SER:955.

On February 8, 2007, the United States Attorney's Office for the Northern District of California informed Johnson that he was the target of a federal

23

investigation into online pharmacies.  SER:1101-1102, 1698.  Three weeks later,

DEA agents made an undercover purchase of phendimetrazine from dietpills.com

to see if Johnson had stopped his involvement with online pharmacies.  SER:1100-

1101.  He had not.  SER:1102.  The only difference between dietpills.com and

SSO was that SSO had the answers to certain questions prefilled, whereas

dietpills.com said "select."  *Id*.

On August 1, 2007, the DEA searched Johnson's family business, SER:839-

840, and on Johnson's computer found orders, medical questionnaires, names of

SSO doctors and pharmacies, SER:969-970, Johnson's interactions with various

pharmacies, SER:969-970, 1088-1091, 1095-1096, and general instructions to

pharmacies about how to use his software.  SER:1094.  The computer also

contained various complaints, indictments, and plea agreements for prosecuted

internet pharmacies.  SER:1066-1068.

### F.  SSO Distributed Controlled Substances Outside The Usual Course Of Medical Practice And Not For A Legitimate Medical Purpose

Two experts who reviewed the SSO ordering process testified that SSO

distributed controlled substances outside the usual course of medical practice.

SER:334-337, 387, 435, 441, 461-462.  Dr. Elinor McCance-Katz, a licensed

psychiatrist, concluded that the undercover video purchase of phentermine from

SSO on February 24, 2006, was not a distribution within the usual course of medical practice based on the following factors. SER:319-324, 329, 334-337, 387.

First, the prescription was issued without a patient evaluation. SER:337, 341-342. The doctor never saw the patient and had no access to the patient's medical records. SER:341-342. Second, no one discussed with the patient other possible courses of treatment that may not include prescription drugs. SER:338. Third, there was no follow-up care. SER:338, 379-380.

Dr. McCance-Katz also found the online medical questionnaire deficient because it did not require the individual's complete medical history, it was impossible to know who actually completed the form and whether that person needed the requested medication, the person self-selected the drug before any diagnosis, and it was "unclear" how the person knew which drug to order and in what dosage. SER:344-346. Moreover, "usual course of professional practice" required a doctor to discuss the risks and benefits of the medication with the patient. SER:345-346.

Carmine Catizone, a pharmacist and the executive director of the National Association of Boards of Pharmacy, testified about professional pharmacy practice standards and the three duties a pharmacist has when given a prescription: (1) to establish that the prescription is valid; (2) to ascertain that the prescribed medicine is clinically appropriate; and (3) to ensure that there is no fraud or abuse.

25

SER:416-427, 431, 444, 446. When a controlled substance is prescribed, the pharmacist has "an extra responsibility" to make sure that the patient is taking the drug as prescribed. SER:447.

Catizone also reviewed video clips of an undercover purchase from SSO and found that the distribution was not in the usual course of professional pharmacy practice because the pharmacist filled the prescription based solely on an online questionnaire. SER:435, 441, 461-462. Moreover, Catizone testified that it is not in the usual course of professional pharmacy practice for patients to act unilaterally to select a drug, the dosage, and quantity for treatment. SER:449-450. In his opinion, an online questionnaire did not meet the professional standards of practice. SER:454-455. Nor was it within the usual course of professional pharmacy practice for a single pharmacist to fill several hundred prescription orders a day. SER:460.

### G. Customers Lied On The SSO Questionnaire To Obtain Controlled Substances

In 2005 and 2006, Joanna Soliman suffered from an eating disorder. SER:527-528, 530. At 5'6", 140 pounds, she believed she was overweight. SER:528-530. Instead of asking her doctor for a phentermine prescription, which she knew he would deny, she found the SSO website, chose the drug she wanted, in the amount she wanted, and ordered a 90-day supply every three months. SER:528-532, 534, 537-538. Soliman lied about her weight on the questionnaire,

26

did not read the customer responsibility statement, on occasion filled in the questionnaire as an overweight man, and paid with her ex-husband's credit card. SER:530, 533-535, 539, 542, 544. Soliman was never contacted by anyone from SSO about her orders, asked to undergo any medical tests, or given any follow-up information. SER:532. The SSO pill bottles she received listed Dr. Joseph Carozza as the prescribing doctor. SER:553.

In 2005 and 2006, John Kaman wanted diazepam, and while his doctor had referred him to a psychiatrist to prescribe medication, Kaman did not like the psychiatrist, so he turned to the internet. SER:553-556, 558-559, 561-565. Kaman found a website (SSO) where he filled in a questionnaire, provided a credit card, and ordered diazepam four times. SER:554-556, 558-559, 561-562. Kaman was not filling a current prescription, he did not read the patient information or customer responsibility statements, and no one ever contacted him after he received the drugs to ask how the drugs affected him. SER:557, 560-564. The pill bottle provided a doctor's last name, but no telephone number. SER:562.

In 2006, Thomas DeMott's doctor prescribed him 10 milligrams of Ambien a night, which "wasn't enough to put me to sleep." SER:825-827. Instead of asking his doctor to prescribe more, DeMott turned to the internet. SER:826-829. DeMott found a website (SSO), filled in the online questionnaire, bought large quantities of Ambien, and took "whatever was needed" to sleep. SER:826, 829.

27

He was never examined by a doctor from the online pharmacy, never asked to undergo tests, never questioned about his medical need for Ambien, and never contacted after receiving the drugs. SER:830-831.

In 2006, Lin Shen was abusing anti-anxiety drugs. SER:832-833. She "needed a higher dosage" than what her doctor prescribed, asked for more, and when the doctor expressed "reluctan[ce]" and asked her to come to the office, Shen turned to the internet. SER:832-835. She found ordering online "very easy," filled out the (SSO) online questionnaire, provided credit card information, and ordered the highest dosage and quantity available. SER:836-837. Shen was never contacted by a doctor for a physical examination or asked to submit any medical tests. SER:837-838.

Defendants themselves abused the ordering process. For example, on November 11, 2005, Napoli told Johnson to "order your wife 90 C phentermine and 30 count Ambien on me. Do you still have my CC?" SER:1030. Napoli's credit card was used on multiple occasions to order lunesta, phentermine, and diazepam for Johnson's wife. SER:1031. On May 3, 2006, Johnson asked Winstead to "hook" him "up with some Vitamin H," which Johnson admitted at trial was hydrocodone. SER:1437-1441. Later, Latham told Johnson he could get Johnson "any Schedule III you personally want as an expression of my gratitude. No one has to know." SER:1442.

28

### H. The Magnitude Of Harm

Between April 2005 and January 2007, Napoli's internet pharmacies made approximately 24.6 million dollars. SER:1148-1149, 1151, 1702. Napoli received approximately $6,154,973.94. SER:1113-1120, 1150, 1702.[9] Johnson received $835,539.94 from SSO. SER:1152, 1702. Carozza received $400,066.90 from SSO. SER:1133-1134, 1152, 1702.

SSO shipped 148,080 drug orders during the year it operated. SER:1040-1041. The most ordered drug was phentermine (97%), followed by alprazolam (generic Xanax, 95%), and diazepam (generic Valium, 95%). SER:1044, 1629. From November 2005 to November 2006, Carozza approved 96% of his assigned orders, resulting in the distribution of 15,485,094 pills. SER:971-972, 975, 1627.

Each day, Carozza approved "hundreds" of orders, which rose to "several thousand" a day during the period that Napoli agreed to fill AffPower orders. SER:979-981, 1618-1626. Of the total approved drug orders, 86% were for Schedule IV controlled substances, 8% were for Schedule III controlled substances, and 6% were for non-controlled substances. SER:971, 976, 1616-1617.

---

[9] Napoli listed his occupation as "music school owner" on his 2004 to 2008 tax returns. SER:1120.

29

Carozza approved orders to customers located across the country. SER:985, 1625-1626. The top ten states that SSO shipped drug orders to were California, Texas, Florida, Georgia, New York, Ohio, Pennsylvania, Illinois, Tennessee, and New Jersey. SER:985. All but Illinois had laws mandating a physical examination before a physician could prescribe medication. SER:985-986.

## II.    THE DEFENSE CASE

Defendants presented evidence that they believed that that their conduct did not violate federal law. Napoli and Johnson testified.

### A.    Defendants Consulted With Attorneys

Napoli testified that before he opened his internet pharmacy, he asked his father (Andrew), an attorney, to "look into" the legality of the internet pharmacy business. SER:1160-1162. Andrew testified that he advised Napoli that the business plan was "fine," and that, "in [his] opinion," it was "legal" for a "proposed patient to go online, fill out a questionnaire, look at a patient responsibility sign-off, send it to the doctor online, have the doctor look at the questionnaire, and then write a prescription based on the questionnaire." SER:1162-1164, 1166. Andrew also advised Napoli that the questionnaire should be "as strict as possible" and include "prior medications, current medications, name of the treating physician," and the drugs should be delivered by "either UPS or FedEx, adult signature only." SER:1167.

Andrew never advised Napoli that it was within the usual course of medical practice for a doctor to review hundreds of prescriptions a day, that a doctor prescribing pills for unseen patients was legitimate, or that one doctor approving 184,000 drug orders in less than one year was acting in the usual course of medical practice. SER:1176-1179. Andrew also did not advise Napoli to lie to secure a credit card processing company,[10] to ship drugs to states with laws expressly forbidding the issuance of prescriptions without a face-to-face doctor visit, or to receive shipped drugs from fulfillment pharmacies and reship those drugs to customers in states where the pharmacy refused to ship controlled substances. SER:1176-1179.

Andrew said that he advised Napoli to get a second opinion from "people who are actually in this particular line of law," so he, Napoli, and Mullin met with McHale. SER:1164, 1167, 1169. Andrew testified that the attorneys agreed that

---

[10] Napoli falsely stated on a January 2006 credit card processing application that "our software requires consumers to provide ID information" and "an adult signature." SER:1444-1445, 1654. In fact, Napoli did not opt for the more expensive adult signature delivery feature until February 10, 2006, after he received a target letter from the United States Attorney's Office for the Eastern District of Pennsylvania. SER:1451-1452, 1458-1463. Prior to that date, both PSA and SSO shipped orders to customers under 18. SER:1458-1462.

Napoli's proposal was legal. SER:1168. Following that meeting, McHale referred Napoli to Green. *Id*.[11]

Green testified that he first met Napoli and Mullin in the spring of 2005, and advised them that if the doctor concluded that a "particular kind of plan or practice" was "legitimate" and "operating in good faith," then the prescription was valid and the internet pharmacy lawful. SER:1187-1189. He emphasized that the validity of the prescription was dependent on the doctor's medical judgment. SER:1190-1192. Green testified that he thought that Napoli's business included "an opportunity for the doctor to contact the patient" by telephone if the "doctor thought it necessary." SER:1234-1240, 1274.

Green next met Napoli in the fall of 2005, after the DEA had closed Budget, and Napoli hired him regarding a "pending criminal investigation." SER:1193, 1202-1203, 1242-1243, 1699-1700. Green testified that he told Napoli that "the validity of the prescription is dependent on the good faith of the physician." SER:1195. Green also told Napoli to "explore having a contract" with a laboratory

---

[11]  During the government's cross-examination of Napoli, it produced evidence that Dr. Oscar asked Napoli for a signed statement from Andrew, on firm letterhead, stating that Andrew had "reviewed Pharmacy USA" and "it is [in] compliance with federal and state laws" and "operating legally in all jurisdictions." SER:1175, 1696.  Napoli never communicated that request to Andrew or Green. SER:1174-1175, 1249.

testing company because "doctors should be able to order laboratory tests," something Napoli never did.  SER:1241.

In October 2005, Napoli asked Green for a legal opinion letter for his credit card merchant account application.  SER:1246, 1701.  Green gave Napoli an "advice letter" stating that Napoli could "rely on the doctor's assessment that a legitimate doctor-patient relationship is created through online communication" and that the "safeguards" in the software, "including blocks on multiple orders from a single IP address and restrictions on multiple physical deliveries, should satisfy any regulators."  SER:1224-1227, 1250.[12]

### B.      Defendants Claimed That They Acted In Good Faith

Napoli testified that at the time he operated his internet pharmacy, he did not believe that a doctor was required to meet face to face with a person before issuing a prescription because of the legal advice he received from Andrew, SER:1327-1328, from McHale, SER:1335-1337, and from Green.  SER:1339, 1393-1394. Napoli said he relied on the judgment of the doctors, SER:1356, 1372-1382, but admitted that he never checked whether Dr. Oscar was "in good standing" with the

---

[12]  This was a false statement because there were no "safeguards" in the software at this time.  Johnson did not implement a "too soon" feature, used to identify customers ineligible to reorder based on the dosage schedule of their previous drug orders, until May 2006.  SER:679-680, 683.  Even when the "safeguard" was put in place, it did not work because customers, like Joanna Soliman, who were blocked got around the restriction by using a different name, address, or credit card.  SER:533, 684, 1433.

medical board, and so failed to learn that Oscar's DEA registration had expired. SER:1356. Napoli also relied on pharmacies "for their professional judgment," but admitted that he did not investigate Superior, one of the first pharmacies that filled his orders, and so failed to learn that Superior had been sanctioned by the California Board of Pharmacy for filling prescriptions based on online questionnaires. SER:1357.

Napoli's business plan looked to minors as customers "for weight loss drugs" by stating that it targeted the "91 million females between the ages of 13 and 65," a marketing statement made four times in the business plan that he wrote. SER:1329-1330, 1351-1352. Napoli conceded that his questionnaire did not require customers to provide identification to order drugs and that an adult signature was not required until February 2006. SER:1352-1353. He also conceded that while his business plan said that "currently, Florida and Nevada have passed laws that make it illegal to dispense drugs from an online pharmacy without a face-to-face doctor visit," and SSO routinely shipped to both states, he believed "it was up to the corresponding pharmacy to decide where they wanted to ship." SER:985-986, 1354-1356.

Johnson testified that he believed the internet pharmacy business was lawful because he had talked to Napoli, Andrew, read letters from Green, and did research. SER:1412-1413. He thought it was up to the doctor to use his good-faith

34

judgment when approving orders, and Johnson relied on the professional judgment

of pharmacists and pharmacies. SER:1421a-c. Johnson acknowledged that he

knew that the SSO questionnaire did not ask for the "reason" that the customer was

ordering controlled substances, that he knew the daily number of orders approved

by Carozza, and that his software did not require customers to provide copies of

recent physical examinations. SER:1429-1432.

### 1. Defendants discussed Rannazzisi's Congressional testimony

To further support their claims that they acted in good faith, defendants

presented evidence that they were aware of proposed changes to legislation to

clarify the face-to-face requirement between a doctor and a patient before a

prescription issued. During his direct examination, Green testified at length about

his discussions with Napoli about Joseph Rannazzisi's ("Rannazzisi")

Congressional testimony. JER:106-107; SER:1198-1202. Rannazzisi, a DEA

Deputy Assistant Administrator, testified before Congress about the illegal sale of

pharmaceuticals over the internet and the problem of internet drug trafficking, in

December 2005. *See* CR:831 at exhibit 2.[13] Green testified that Rannazzisi "told

---

[13] Pretrial, the government explained that Rannazzisi testified before Congress "because kids were dying" from drugs ordered over the internet, and "the full context of [Rannazzisi's] statement . . . include[ed] the death of Ryan Haight." JER:112-113. Ryan Haight died at age 18 in 2001 from an overdose of hydrocodone that he obtained over the internet from an unlawfully issued prescription. *See United States v. Birbragher*, 603 F.3d 478, 485 n.9 (8th Cir. 2010) (quotations, alteration, and citation omitted).

Congress under oath that there exists no statutory definition specifically outlining

what constitutes a valid doctor-patient relationship." SER:1200-1201. Napoli

testified that he discussed Rannazzisi's congressional testimony with both Green

and Carozza, and he testified about his understanding of Rannazzisi's testimony.

SER:1340-1343.

### 2. *Defendants discussed the Ryan Haight Act*

Green testified that the Ryan Haight bill had been introduced in Congress in

December 2005 and, if passed, it would require a face-to-face meeting between

doctor and patient for a valid prescription to issue. SER:1201-1203. Napoli

testified about his understanding of that pending legislation and said that, if it

passed, he intended to quit the business. SER:1344-1345. Napoli also talked to

Carozza about "the current state [of the law] . . . [and] the legislation that was

pending." JER:96-97. Johnson testified that he understood that until that bill

passed, there was "no solid" definition of the doctor-patient relationship.

SER:1416-1417.

### 3. *Defendants discussed a Congressional Research Service report*

Napoli testified about his discussions with Green and Carozza concerning a

2004 Congressional Research Service ("CRS") report, "Prescription Drug

Importation and Internet Sales: A Legal Overview," and his understanding of its

impact on the face-to-face requirement.[14]  CR:890; JER:245; SER:1340.  Napoli

and Carozza discussed "the lack of the requirement of a face-to-face model for a

doctor to see the patient before prescribing certain medications."  JER:97.

### 4. Defendants discussed their civil complaint for declaratory relief

On February 1, 2006, after Napoli received a target letter from the United

States Attorney's Office for the Eastern District of Pennsylvania, Green explained

to Napoli that one response was to file a complaint for a declaratory judgment and

"get a judicial determination of the legitimacy of the proposed conduct."

SER: 1203-1204, 1209.  Each defendant extensively questioned Green at trial

about the declaratory relief action.  Napoli: SER:1209-1223, 1285-1305; Carozza:

SER:1229-1232, 1306-1310; Johnson: SER:1311-1315.

Green testified that Napoli was interested in pursuing the declaratory relief

option, so at a April 2006 meeting, Green told Napoli, Carozza, McHale, and

others that existing federal law did not require a face-to-face examination for a

valid prescription, and that it was for the doctor to decide whether a prescription

was valid, not the DEA.  SER:1209-1210, 1229-1230.  Green made clear that the

DEA did not agree with that position and that one way to resolve their

disagreement was to seek a declaratory judgment from a federal court.  SER:1231-

---

[14] The court excluded the report, but allowed each defendant "to testify as to what
he said about the document or what he understood about the document."  JER:96.

1232.  Green said that he told participants at the meeting that issuing prescriptions based solely on an online questionnaire was contrary to what the medical establishment recommends, that the doctor had to issue the prescription for a legitimate medical purpose, and that if the doctor was not acting in the usual course of medical practice that would violate the regulations.  SER:1258-1260.  He also recommended that Napoli have customers upload a photograph with their order for the physician to review.  SER:1263-1264.  Green thought that Napoli had safeguards in place to prevent inappropriate multiple deliveries and restricting delivery to an identified adult.  SER:1265-1266.

Following the meeting, Green assisted in drafting the complaint.  SER:1208-1210.  He circulated various drafts to Napoli by email and the two men were "in constant communication" about the declaratory relief action.  SER:1213-1223.  Carozza agreed to be a plaintiff in the action.  SER:1232.

The declaratory action was filed in July 2006.  SER:1257a-b.  Green testified about specific paragraphs of the filed complaint and that the action was about the business that the plaintiffs "wanted to conduct," so "the details [did not] matter[ ]."  JER:99-102; SER:1269.  The government moved to dismiss the complaint because it would impact an ongoing criminal investigation.  SER:1275-

1276. The action was dismissed in November 2006. SER:1311-1313.[15] Napoli

testified that when that happened, he "closed the business for good" and

"immediately called" Johnson. SER:1347, 1350.

Johnson testified that Napoli told him that he had filed "a declaratory relief

action against the DEA to make a decision on if what he was doing was . . . legal."

SER:1415a. When it was dismissed, Napoli told Johnson he was appealing.

SER:1416. Johnson received a target letter from the United States Attorney's

office in February 2007, advising him that he was under criminal investigation.

SER:1101-1102, 1698. He continued in the online pharmacy business, contrary to

advice from his two attorneys and the chief financial officer at NTS and ICC.

SER:1385, 1387-1399, 1402-1405, 1421.

## SUMMARY OF ARGUMENT

1.     Defendants claim that the district court's ruling excluding or limiting

evidence deprived them of their defense because they acted at a time when "federal

law did not specifically address the issue of valid prescriptions based on a licensed

physician's assessment of on-line medical questionnaires," and the 2004 CRS

report, Rannazzisi's Congressional testimony, and the Ryan Haight Act, all support

their defense that their conduct was legal. The district court properly exercised its

---

[15]   Napoli appealed, which the court dismissed. SER:1312. He filed a
second declaratory relief action in January 2007, which the court dismissed in May
2009. SER:1312-1313.

discretion to exclude or limit this evidence for several reasons. First, long-standing law established that prescriptions must be issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice. Because defendants' proffered evidence did not address that question, it was irrelevant. Second, defendants' good-faith belief in the legality of their conduct was likewise irrelevant because they were charged with general intent crimes. Third, the district court properly concluded that the evidence offered was, for the most part, inadmissible hearsay. Fourth, the overall strength of the government's case rendered any error harmless. Finally, the exclusion of this evidence did not deprive defendants of their defense because defendants testified about the excluded evidence, the court allowed defendants to make their good-faith argument to the jury, and the court instructed on good faith.

2. The district court correctly instructed the jury on good faith and that the burden was on the government to prove, beyond a reasonable doubt, that the defendants did not act in good faith. The court properly included in the given instruction Carozza's alternative language that ensured that the jury would not convict him for malpractice, and properly rejected Johnson's proposed nonpractitioner instruction as "misleading" and an "incorrect" statement of the law. Relying on Circuit precedent, the court also properly determined that the instructions as a whole encompassed defendants' defense theory.

40

3.     The district court properly instructed on deliberate ignorance because there was abundant evidence that defendants had a subjective belief of a high probability that what they were doing was illegal and yet deliberately avoided learning the truth.

4.     The government did not present perjured testimony to the grand jury because the agents truthfully testified about the law as it existed in 2010 when they appeared before the grand jury.  Even if the portions of the transcript that defendants challenge as perjurious or misleading are excised, the remaining testimony establishes probable cause to support that defendants distributed drugs outside the scope of professional medical practice and not for a legitimate medical purpose.  Moreover, the petit jury found defendants guilty beyond a reasonable doubt after trial making any error harmless.

## ARGUMENT

### I.     THE DISTRICT COURT DID NOT DEPRIVE DEFENDANTS OF THEIR DEFENSE BY EXCLUDING INADMISSIBLE AND IRRELEVANT EVIDENCE

Defendants claim the district court precluded their defense by improperly excluding "three critical pieces of evidence."  AOB:41.  This contention is meritless.

41

### A.     Standard Of Review

This Court reviews evidentiary rulings for abuse of discretion, *United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013), and whether an evidentiary error rises to the level of a constitutional violation de novo.  *United States v. Evans*, 728 F.3d 953, 959 (9th Cir. 2013).  A constitutional error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *United States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002) (internal quotation marks omitted).

### B.     Procedural Background

#### 1.     *Pretrial and trial proceedings regarding Rannazzisi*

Pretrial, the government moved to quash defendants' subpoena to DEA Deputy Assistant Administrator Rannazzisi because he lacked "personal knowledge relevant to [the] case."  CR:831; JER:110-111.  In response, the court required defendants to make "a further showing" to establish Rannazzisi's relevance.  JER:113, 115; SER:46, 48, 54.  After defendants filed a motion under seal, CR:837-838; JER:295-299, the court quashed the subpoena without prejudice to defendants revisiting the issue at trial.  JER:118.  When defendants first raised the issue again at trial, SER:996-997, the court found Rannazzisi's testimony not "remotely relevant" unless defendants testified that they relied on it.  SER:999-1003.  Later, the court excluded it under Federal Rule of Evidence 403.  SER:1343a, 1360a-e.

42

### 2.    Pretrial and trial proceedings regarding the declaratory judgment action

Pretrial, when defendants sought admission of the declaratory judgment action, the district court deemed their argument "bootstrapping" ("you are making the declaratory relief action relevant by virtue of the fact that your client has said it's relevant"). SER:64. The court found the action was inadmissible hearsay and should not come in unless introduced by the government. SER:68-69; *see id*. ("[w]hat was said in the declaratory relief action would, absent other circumstances, would not be admissible [because] they are simply self-serving statements on [defendants'] part").

At trial, defendants maintained that the declaratory judgment was "strong evidence" of their good faith. SER:1004. The court disagreed because it could be viewed as both inculpatory (a "strategy" to provide "cover" for defendants' past actions, SER:1006-1008), or exculpatory (that Napoli believed his conduct "perfectly legal" and "filed a declaratory relief action to demonstrate that"). SER:1008. Either way, it was "extraordinarily collateral" under Rule 403. SER:1008. This was particularly true because, if admitted, the government would present evidence that Carozza and Napoli lied in their first complaint when they said that they were not engaged in the conduct described in the declaratory judgment action, and based on that lie, the court dismissed. SER:1012-1014, 1019-1020. The court excluded the evidence to prevent embarking on "the most

43

confusing, contentious, incomplete, and time-consuming exercise that I can imagine." SER:1023. In the end, the court allowed defendants to testify about the declaratory relief action, *see* pages 36-38, *supra*, and admitted a redacted copy of the declaratory judgment action into evidence. JER:92-93, 159, 319-329.

### 3. Pretrial proceedings regarding the CRS report

Pretrial, defendant Johnson claimed the CRS report was admissible as "factual findings of a legally-authorized investigation offered against the government in a criminal case." CR:890 at 2; JER:245. The government disagreed, said the report was a legal conclusion, and argued it was inadmissible under any hearsay exception. CR:899 at 2-4; JER:245. The court excluded the report because it had "a very hard time seeing under what theory [it] would possibly come in." SER:70.

### 4. Defendants' closing arguments

In closing, defendants all argued at length that they did not think what they were doing was illegal. SER:1511. Napoli argued that his good-faith belief was grounded in Rannazzisi's testimony, the pending Ryan Haight bill, and the declaratory relief action he filed. SER:1515-1516, 1524-1525, 1532, 1535, 1555-1557. Johnson argued that his good-faith belief was based on advice of counsel and the declaratory relief action. SER:1558-1559, 1561, 1563-1564. Carozza

argued that his good-faith belief came from Green's opinion letter, Rannazzisi's

testimony, the CRS report, and the pending Ryan Haight bill. SER:1582-1584.

### C. Argument

#### 1. The Controlled Substances Act has always criminalized defendants' conduct

The Controlled Substances Act ("CSA") governs the distribution of

controlled substances in the United States. *See* 21 U.S.C. §§ 801-971. "Enacted in

1970 with the main objectives of combating drug abuse and controlling the

legitimate and illegitimate traffic in controlled substances, the CSA creates a

comprehensive, closed regulatory regime criminalizing the unauthorized

manufacture, distribution, dispensing, and possession of substances classified in

any of the Act's five schedules." *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006).

Section 841(a)(1) of the Act provides that "[e]xcept as authorized by [the CSA], it

shall be unlawful for any person knowingly or intentionally to . . . distribute [] or

dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). Section 829, in turn,

authorizes "practitioner[s]" to dispense Schedule III and Schedule IV substances

with a "prescription." *Id*. § 829(b). Practitioners who seek to dispense controlled

substances must register with the Attorney General. *Id*. § 822(a)(2). The key

statutory terms -- "controlled substance," "dispense," "distribute," "practitioner,"

and "prescription" – are defined either by statute, *see id*. § 802(6), (10), (11), (21),

or by regulation, *see* 21 C.F.R. § 1306.04(a).

45

In 1971, the Attorney General promulgated a regulation that specified that a "prescription" must be "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Four years later, the Supreme Court held that a doctor can be convicted of unlawful distribution and dispensation of a controlled substance if his "activities fall outside the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 124, 143 (1975); *see id.* at 143 (a physician becomes criminally liable when he ceases to distribute or dispense controlled substances as a medical professional, and acts instead as a "pusher"). This Court too has upheld the conviction of a physician for illegally distributing controlled substances based on prescriptions issued in "disregard for proper prescribing practices." *See United States v. Feingold*, 454 F.3d 1001, 1004 (9th Cir. 2006).

Likewise, a lay person who conspires with or aids and abets a practitioner's unlawful distribution of drugs can be convicted under the CSA and its regulations where the layperson relies on a prescription that he knows or reasonably should have known was not valid. *See, e.g., United States v. Smith*, 573 F.3d 639, 646-649 (8th Cir. 2009) (businessman); *United States v. Hicks*, 529 F.2d 841, 844 (5th Cir. 1976) (security guard); *United States v. Green*, 511 F.2d 1062, 1070-1071 (7th Cir. 1975) (pharmacy owner); *see also United States v. Vamos*, 797 F.2d 1146, 1153 (2d Cir. 1986) ("while those who assist practitioners in distributing controlled

46

drugs clearly cannot be held to the standard of a reasonable practitioner, they are not free to unreasonably rely on the judgment of their employers").

Two years after the offense conduct in this case, Congress passed the Ryan Haight Act, which amended the CSA to explicitly prohibit the distribution of controlled substances over the internet. Ryan Haight Online Pharmacy Consumer Protection Act, Pub.L.No. 110-425, 122 Stat. 4820 (2008); *see also* 21 U.S.C. §§ 829(e)(1), 841(h). In so doing, it defined the term "valid prescription" in the context of the internet as one made by "a practitioner who has conducted at least 1 in-person medical evaluation of the patient." *Id*. § 829(e)(2)(A)(i).

Defendants contend that before passage of the Ryan Haight Act, the CSA did not prohibit their conduct. *See* AOB:37-40. This argument fails for four reasons.

First, the CSA's plain language has always made it unlawful for a practitioner to distribute a controlled substance without a valid prescription, regardless of the channel of distribution. *See* 21 U.S.C. § 841(a)(1). The CSA did not at the time of defendants' illegal conduct (and still does not) explicitly mention in-person, mail, or phone transactions, *see id*., which all are clearly encompassed by the statute. Defendants were indicted not because they used the internet to distribute controlled substances, but because they distributed controlled substances in a manner that was outside the usual course of professional practice. In any

47

event, as this Court has held, Congress may amend a statute to clarify existing law. *See Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994) ("an amendment to a statute does not necessarily indicate that the unamended statute meant the opposite"). The Ryan Haight Act did nothing but clarify that defendants' conduct violated the CSA.

Second, every appellate court to consider this challenge has rejected it. *See United States v. Tobin*, 676 F.3d 1264, 1275-1278 (11th Cir. 2012) (after an exhaustive review of the CSA's legislative history, the Court held that "the CSA was *not* ambiguous as to whether an in-person consultation was required for a prescription over the internet to be valid pre-[Ryan Haight] Act" and "consistent with the statute's recognition of the state regulation of the medical profession," the "CSA incorporated the applicable state standard on this issue," and "simply reflected a conscious choice by Congress to displace the different state standards in favor of a single, national one on the specific question of whether an in-person patient visit is required for an internet prescription to be valid"), *abrogation on other grounds recognized by United States v. Castro*, 736 F.3d 1308, 1313 (11th Cir. 2013); *United States v. Bansal*, 663 F.3d 634, 657 (3d Cir. 2011) (rejecting defendants' claim that their conduct did not violate Section 841 until passage of Ryan Haight Act: "we find this text abundantly clear: it was illegal in 2006 to sell controlled substances without a valid prescription," and "[t]hat the Ryan Haight

48

Act later criminalized the precise machinery by which they effected their illegal transactions does not alter the basic fact that they were selling controlled substances without prescriptions"); *Birbragher*, 603 F.3d at 489-490 (finding defendant's reliance on the Ryan Haight Act "misplaced": "it may well be that Congress intended the [Ryan Haight Act] to proscribe, by a clear-cut, *per se* rule, the distribution of controlled substances over the internet without a face-to-face meeting between patient and doctor; it does not follow that the same conduct is not within the embrace of the current prohibition of distribution outside the usual scope of professional practice," and the fact that "the Senate has passed a bill which would amend the CSA to explicitly prohibit the conduct at issue in this case does not invalidate the government's prosecution of defendants under the existing provisions of the CSA") (internal quotations and citations omitted; emphasis in original).

Third, multiple appellate courts have held that the CSA reaches the distribution of controlled substances over the internet. *See, e.g.*, *United States v. Quinones*, 635 F.3d 590, 593-597 (2d Cir. 2011) (upholding CSA conviction of father, who bought internet pharmacy business, and son who assisted, where overwhelming evidence established that defendants knew or reasonably should have known that the doctors and pharmacist upon whom they purportedly relied were acting in bad faith); *United States v. Lovern*, 590 F.3d 1095, 1100-1104 (10th

Cir. 2009) (upholding CSA conviction of pharmacist for issuing prescriptions outside the scope of professional practice where prescriptions issued based on an on-line questionnaire without any existing doctor-patient relationship, without a physical exam, without any confirmation of the questionnaire's contents, without any further contact of any kind); *United States v. Fuchs*, 467 F.3d 889, 900-903 (5th Cir. 2006) (finding sufficient evidence showed prescriptions were outside usual course of medical practice where prescriptions were initiated by orders sent to pharmacy through its website; customers were located throughout the United States; pharmacy forwarded prescription forms to physicians for approval; physicians were paid per prescription; pharmacy's prices were higher than average; and pharmacy did not accept insurance); *United States v. Nelson*, 383 F.3d 1227, 1228-1230 (10th Cir. 2004) (upholding conviction of physician under CSA where he approved 90-95% of requests for prescriptions submitted over internet website, without conducting physical examinations).

Fourth, the Eleventh Circuit has explicitly rejected the claim that the 2004 CRS report, on which defendants rely here (AOB:47-53), supports that the CSA was previously ambiguous as to whether an in-person consultation was required for a prescription over the internet to be valid. *Tobin*, 676 F.3d at 1277. After reviewing the legislative history of the CSA and its "overall structure and operation," *Tobin* found the defendants "misunderst[oo]d the meaning" of the

50

report. 676 F.3d 1275-1277. The report's statement "that it was 'not necessarily illegal' for physicians to prescribe drugs without seeing a patient in person" reflected "the fact that at the time, the CSA incorporated the state standard at issue, and as Congress recognized, the states had different approaches on this subject." *Id*. at 1277.

### 2. *Defendants' good-faith beliefs are irrelevant*

Defendants' claim that the district court's rulings on the admission of their proffered evidence somehow limited their defense is also without merit because they rely on the incorrect premise that their good-faith reliance on the legality of their conduct was a valid defense to the crimes charged. In fact, defendants' contention that they did not know they were violating the law is irrelevant because defendants were charged with violating 21 U.S.C. § 841(a)(1), which has only a "knowingly" mens rea requirement. *See Tobin*, 676 F.3d at 1279 ("[t]he district court's conclusion that the mens rea under Section 841(a)(1) is knowledge rather than willfulness is correct").

When a crime requires that a defendant act "knowingly," all that the government must prove is that the defendant had "knowledge of the facts constituting the charges." *See Bryan v. United States*, 524 U.S. 184, 192-193 (1998); *United States v. Doe*, 705 F.3d 1134, 1145-1146 (9th Cir. 2013); *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (to prove a drug conspiracy, the

government must prove "the intent to commit the underlying offense") (internal quotation marks omitted). It is only when a statute requires proof of a "willful" violation that the government must prove that a defendant acted with knowledge that his conduct was unlawful and with specific intent to violate the law. *Cheek v. United States*, 498 U.S. 192, 200 (1991) (holding that in specific intent crimes, the statutory term 'willfully' is "an exception to the traditional rule" that ignorance of the law or a mistake of law is not a defense to criminal prosecution); *see Bryan*, 524 U.S. at 192 (Court distinguishes "knowingly" and "willfully," concluding that "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law"); *see also Dixon v. United States*, 548 U.S. 1, 5 (2006) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense, not a culpable state of mind or knowledge of the law") (internal quotation marks and citations omitted).

As this Court has noted, if "Congress intended to require a higher level of intent, it would have included 'willfully' in [the statute]." *United States v. Zhou*, 678 F.3d 1110, 1113-1114 (9th Cir. 2012); *see id*. at 1114 (the plain language of the statute at issue required that Zhou acted "knowingly," and so the government did not have to prove that Zhou knew that his actions were illegal). Unless the text of a statute dictates a different result, the term "knowingly" merely requires proof

of knowledge of the facts that constitute the offense, and not a culpable state of mind or knowledge of the law. *Id*. at 1114 (citation omitted). Here, the statute requires proof that defendants acted "knowingly or intentionally." The statute does not include willfully. Thus, the general rule that "ignorance of the law or a mistake of law is no defense to criminal prosecution" applies in this case. *See United States v. Liu*, 731 F.3d 982, 989 (9th Cir. 2013).

### 3. *The court properly excluded hearsay and irrelevant evidence*

While the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010), this right is not "absolute." *Alcala v. Woodford*, 334 F.3d 862, 977 (9th Cir. 2003). The "adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments." *Taylor v. Illinois*, 484 U.S. 400, 410-411 (1988). The rules of evidence must be followed. *United States v. Evans*, 728 F.3d 953, 959-960 (9th Cir. 2013).

The Federal Rules of Evidence prohibit a defendant from eliciting his own prior statements. *See* Fed. R. Evid. 801(d)(2)(A); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). Here, the court properly excluded the declaratory judgment action as inadmissible hearsay because it contained defendants' self-serving statements. Moreover, Napoli filed that action only after he received a

target letter and thus knew that he was under federal investigation. This further undermined the action's credibility and made it inadmissible under the Fed. R. Evid. 807 (the residual exception) because the hearsay statement lacked any guarantee of trustworthiness. *See United States v. $11,500.00*, 710 F.3d 1006, 1013-1014 (9th Cir. 2013).

The court also properly excluded the declaratory judgment, Rannazzisi's testimony, and the CRS report on relevance grounds because this evidence did not have "any tendency to make a fact more or less probable than it would be without the evidence." As explained *supra*, even if this evidence supported that defendants had a mistaken belief that the federal government could not regulate their conduct, a mistake of law, like ignorance of the law, is not a defense. *See, e.g., United States v. de Cruz*, 82 F.3d 856, 867 (9th Cir. 1996) ("[d]efendant sought to introduce facts which established that she did not know that her conduct violated federal law," but "[t]his is a classic mistake or ignorance of the law argument, and as such, it is not a valid defense").

Finally, the court also properly excluded the declaratory relief action under Rule 403 because, on balance, it would have confused the issues, misled the jury, and resulted in undue delay and wasted time on a collateral issue. A district court has discretion to exclude otherwise relevant evidence under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice,

54

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See United States v. Anderson*, 741 F.3d 938, 950 (9th Cir. 2013). To put the action in context, the court would have had to admit the government's motion to dismiss, the court's order dismissing the complaint, and the subsequently-filed amended complaints. Admitting the declaratory judgment thus would have necessitated a mini-trial on that issue and caused the court to "embark upon the most confusing, contentious, incomplete, and time-consuming exercise that [it] [could] imagine." SER:1023. The district court properly exercised its gate-keeping function to exclude irrelevant documents.

> ### 4. *Any error was harmless because the government's evidence was overwhelming and, in any event, defendants were allowed to present the substance of each document to the jury*

An erroneous decision to exclude evidence – even if it amounted to an abuse of discretion – will be reversed only if it is "more likely than not that the error affected the verdict." *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000). That is impossible here where the record demonstrates that defendants elicited testimony about each document they now complain was excluded. And, they presented considerable evidence to support their good-faith defense. Thus, their constitutional complaint fails, AOB:63-68, because they were not deprived of "a meaningful opportunity to present a complete defense" under the Fifth

55

Amendment's guarantee of due process or under the Sixth Amendment's guarantee of compulsory process. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (the trial court improperly prevented the defendant "from introducing any testimony bearing on the circumstances under which the confession was obtained"); *United States v. Pineda-Doval*, 614 F.3d 1019, 1032-1034 (9th Cir. 2010) (the trial court improperly excluded "all evidence" in defendant's favor, but the violation was harmless beyond a reasonable doubt).

Finally, the exclusion of some of this evidence did not affect the verdict because the overall strength of the government's case against all three defendants was overwhelming. Napoli and Johnson created an online questionnaire that did not ask what medical complaint the customer was seeking to treat, did not ask for any medical records, did not provide for follow-up contact, did not permit customer consultation with a doctor, and required no verification. The two men watched as the software successfully processed a staggering number of orders in record time, while they scrambled to stay ahead of law enforcement officer who closed their fulfillment pharmacies one after another and told defendants' doctors that their conduct was illegal. Carozza prescribed drugs to people he never examined, never met, and who did little more than tell him they wanted drugs. He dispensed drugs at a rapid rate, after the most superficial review of the questionnaire, and even while servicing his car. There was simply no defense that

56

what defendants were doing complied with the law, or that they believed in good faith that it did.

## II. THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON GOOD FAITH

### A. Standard Of Review

This Court reviews for abuse of discretion whether a factual foundation for a proposed instruction exists and de novo whether a proposed instruction was "supported by law." *See, e.g., United States v. Johnson*, 459 F.3d 990, 992 n.3, 995 n.8 (9th Cir. 2006). It is not reversible error for the trial court to reject a defendant's proposed instruction on his theory of the case if the other instructions adequately cover the defense theory. *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990). The "relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010) (citation omitted).

### B. Background

Defendants' defense was that they had a good-faith belief that they were distributing drugs within the confines of the law. Pretrial, the government sought to exclude that defense as irrelevant under Rule 403, since defendants were charged with "knowingly" offenses. CR:780, 1012. When the court allowed the defense, the government, Johnson, and Carozza each filed proposed "good faith" jury instructions. CR:974, 1025, 1050; JER:188-189, 214; SER:1703-1704. Prior

to the instruction conference, the court filed its proposed good-faith instruction, which stated:

> The defendants in this case maintain that at all times their actions were done with a good[-]faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of professional practice.

> Good faith means an honest belief that the physicians issued the prescriptions for a patient's condition in accordance with the standard of medical practice generally recognized in the country. In other words, the government must prove that the defendants did not have an honest belief that prescriptions were issued by a physician for a legitimate medical purpose and in the usual course of professional practice.

> When you consider this "good[-]faith" defense, it is the defendant's belief that is important. It is the sincerity of his belief that determines if he acted in good faith. If the defendant's belief is unreasonable, you may consider that in determining his sincerity of belief, but an unreasonable belief sincerely held is good faith.

> The burden is upon the government to prove, beyond a reasonable doubt, that the defendants did not act in good faith. Unless you find beyond a reasonable doubt that the conduct charged against the defendants was not done in good faith, you must find the defendants not guilty of these charges.

> The government does not have to prove that a defendant knew he was violating the law. A defendant's belief, even in good faith, that his conduct did not violate the law or that the government lacked the authority to enforce the law in a particular way is not a defense. It is a defendant's good[-]faith belief regarding whether

> physicians were issuing prescriptions in the usual course
> of professional practice and for a legitimate medical
> purpose that you must consider.
>
> In determining whether or not a defendant acted in good
> faith you may consider all the evidence in the case which
> relates to that conduct.

CR:1037; SER:1706.

The court explained that it included that "a defendant's belief, even in good faith, that his conduct did not violate the law . . ." because defendants had presented evidence "in the declaratory relief action that brought into question the authority of the government to enforce the law in a particular way" and "that's not a defense." SER:1491-1492. The court rejected Johnson's proposed good-faith instruction as an incorrect statement of the law, *see* SER:1502-1506, or covered by the other instructions. SER:1501-1504, 1506-1507.

The court also rejected Johnson's proposed instruction regarding the professional standards that apply to non-professionals because "hornbook law" established that "the rules and regulations governing the conduct" of physicians and pharmacists applied to non-practitioners under "an aider and abettor theory" where "all the other things are proven." SER:1482-1483. Consistent with its ruling, the court instructed the jury that:

> Nonpractitioners may also be held accountable for
> violations of the Controlled Substances Act if they
> conspire with practitioners such as doctors or pharmacists
> to unlawfully distribute controlled substances, or aid and

59

> abet practitioners in the unlawful distribution of
> controlled substances, or engage in distribution activities
> when they have no authority to do so.

JER:169-170.

Relying on *Feingold*, the court added that "it is not enough for the U[nited] S[tates] to prove that a practitioner committed malpractice, intentional or otherwise,"[16] SER:1483-1485, but rejected defendants' request for the additional language that "a physician must have so wantonly ignored the basic protocols of the medical profession that he acted as a large scale drug-pusher, not as a physician" because the "drug-pusher" language was "too evocative of all sorts of other . . . clandestine, secretive, elicit conduct" that did not fit with the facts here. SER:1485, 1488-1489. The court accepted defendants' proposed alternative language that the government must prove "that a doctor used his prescription writing powers as a means to engage in illicit drug dealing and trafficking," but rejected defendants' request that the jury be instructed that the illicit drug dealing and trafficking be "conventionally understood." SER:1485-1489. Ultimately, the court instructed that:

> It is not enough for the United States to prove that a
> practitioner committed malpractice, intentional or
> otherwise. Rather, the United States must prove that the

---

[16] *Feingold* held that the government was required to prove that "the practitioner acted with intent to distribute the drugs *and with intent to distribute them outside the course of professional practice*." 454 F.3d at 1008 (emphasis in original).

60

> physician used his prescription writing powers as a
> means to engage in illicit drug dealing and trafficking.

JER:170.

Defendants also asked for an instruction regarding "the significance or insignificance of the lack of an in-person examination" and that the court "advise the jury" that "the absence of an in-person examination" is "not, per se, a violation of the law." SER:1489-1490. The court refused defendants' proposed instruction because it would not "pick out a piece of evidence and comment on it." SER:1490.

### C.    Argument

A criminal defendant has a constitutional right to have the jury instructed according to his theory of the case provided that the requested instruction is supported by law and has some foundation in the evidence. *United States v. Anguiano-Morfin*, 713 F.3d 1208, 1209 (9th Cir. 2013). This entitlement is not unlimited, however, and any given instruction must be supported by law. *United States v. Doe*, 705 F.3d 1134, 1144 (9th Cir. 2013). A trial court may properly preclude a defense theory where "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (citations omitted). And this Court may affirm a district court's refusal to give an otherwise proper "theory of the defense" instruction if the instructions actually given, taken as a

61

whole, adequately encompass the defendant's theory.  *See United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995).

The record refutes defendants' contention that the instructions undermined the defense theory or improperly shifted the burden of proof.  AOB:72, 76-78.  The court properly presented defendants' theory when it instructed the jury that "the defendants in this case maintain that at all times their actions were done with a good-faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of professional practice."  JER:182-183; *see Feingold*, 454 F.3d at 1001 (holding that although the district court did not explicitly use the word "'intent' in instructing" that the defendant "'prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice'," the instructions "as a whole made clear that the jury had to make a finding about Dr. Feingold's state of mind"); *see also United States v. Thomas*, 612 F.3d 1107, 1122-1123 (9th Cir. 2010) (holding no "reversible error" where the district court rejected defendant's theory of the defense instruction because it was adequately encompassed by the model jury instruction given, and

defense counsel specifically argued in closing his theory of defense such that the jury "reasonably understood" the instructions to include his contention).[17]

Nor did the instructions shift the burden of proof. The court instructed that the burden was on the government to prove, beyond a reasonable doubt, that the defendants did not act in good faith. SER:1706. Each of defendants' individual claims of instructional error are addressed below.

### 1. Defendants' subjective beliefs about the law are irrelevant

Defendants complain that "the lawfulness of their conduct" was "the heart of the defense" and "a legitimate basis of good faith." AOB:78-83. Not so. Defendants' subjective beliefs that they were not violating the law are irrelevant because the defendants were charged with general intent crimes. *See United States v. Delgado*, 357 F.3d 1061, 1066-1068 (9th Cir. 2004) (crimes of possession with intent to distribute, aiding and abetting, and conspiracy to possess with intent to distribute a controlled substance do not require that the government prove that the defendant knew that his acts were unlawful). Because the charged drug offenses require that the defendant acted "knowingly" rather than willfully, the applicable

---

[17] The court also gave defendants' requested advice-of-counsel instruction despite their failure to establish the required factual foundation for the instruction. An advice-of-counsel instruction requires the defendant show that he made a full disclosure of all material facts to his attorney and that he then relied "in good faith on the specific course of conduct recommended by the attorney." *United State v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010). Here, the record shows that defendants failed to fully disclose all material facts to the attorneys they consulted, and also failed to follow the attorneys' specific suggestions going forward.

state of mind "merely requires proof of knowledge of the facts that constitute the offense," not knowledge of the unlawfulness of the action. *Bryan,* 524 U.S. at 193. Because of this, the district court properly refused to instruct that if defendants believed their conduct did not violate the law the jury must acquit.

Defendants cite *United States v. Fierros*, 692 F.2d 1293 (9th Cir. 1983), to claim that here there was "no meaningful distinction between knowingly violating the law and knowingly issuing prescriptions outside the usual course of professional practice and not for a legitimate medical purpose." AOB:78-79. Defendants' reliance is misplaced. Fierros was charged with violating 18 U.S.C. § 1324(a), a specific intent crime that imposed criminal liability on anyone who "knowingly or willfully conceals or harbors any alien not legally in the United States." *Id*. at 1293. The statute further stated that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." *Id*. at 1293 n.2. At trial, Fierros claimed that he paid for the illegal aliens' transport to the fields to work within the "usual and normal practices incident to employment" and thus his mistaken belief that he was not violating the law negated the required "specific intent." *Id*. This Court rejected Fierros's claim because "[a] moment's thought is enough to refuse the general proposition that ignorance of law is a proper defense to any crime requiring specific intent." *Id*. at 1294. The Court noted that an ignorance of the law defense is permitted for

64

specific intent crimes where "the defendant is ignorant of an independently determined legal status or condition that is one of the operative facts of the crime." *Id*. In that instance, a "mistake of law is for practical purposes a mistake of fact." *Id*. That is not the case here.

Here, the court adequately stated the standard for criminal liability when it instructed the jury that it could not find "that a defendant acted knowingly . . . if you find that a defendant had a good[-]faith belief that controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose in the usual course of professional practice, or if you find that defendant was simply careless." JER:184; *see Feingold*, 454 F.3d at 1009-1012. The district court also properly instructed that the government must prove beyond a reasonable doubt that defendants agreed to distribute the drugs "by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of professional practice, and knowing and intending that the distribution was by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of professional practice." JER:171; *see Feingold*, 454 F.3d at 1007-1008. No more is required.

### 2. *The indictment charged general intent crimes and the given instructions did not diminish the government's burden of proof*

Defendants contend that the district court "fundamentally" misapplied precedent when it instructed that "defendants' good-faith belief in the lawfulness

of their actions was not a defense." AOB:80-82. Again, defendants rely on the legally unsupportable premise that "Congress had not yet legislated" on the legality of on-line prescriptions to argue that "Dr. Carozza believed his issuance of prescriptions . . . fell within the usual course of professional practice and for legitimate medical purposes." AOB:81-82.

First, as already discussed, long-established law criminalized defendants' conduct at the time they acted.

Second, contrary to defendants' claim otherwise, Napoli and Johnson did not testify that "they relied on Dr. Carozza to act within the scope of the law and the usual course of medical practice." AOB:82. Instead, Napoli testified at length that at the time he operated his internet pharmacy, he did not believe that the law required a face-to-face consult between a patient and doctor for a doctor to issue a valid prescription. SER:1252-1253, 1344. Johnson also testified that no face-to-face meeting was required and that it was up to the doctor to make a "good-faith decision" based on the medical questionnaire. SER:1417. Because neither Napoli nor Johnson testified that he thought doctors were issuing prescriptions within the usual course of medical practice, the district court had no factual basis to instruct on that theory. Carozza did not testify.

Third, the record shows that the court did not "per se ban" the good-faith defense as defendants claim. AOB:82. To the contrary, the court allowed, over

66

objection, defendants to present evidence that their good-faith beliefs were based on Rannazzisi's testimony, the CRS report, and the Ryan Haight bill. Moreover, even though the CSA does not require proof of a willful violation, the court instructed the jury that the government "must prove that the defendants did not have an honest belief that prescriptions were issued by a physician for a legitimate medical purpose and in the usual course of professional practice." JER:183. Again, defendants wrongly rely on specific intent crime cases that have no applicability to the general intent crimes charges here. AOB:82; *see United States v. Rhone*, 864 F.2d 832, 834-835 (D.C. Cir. 1989) (the "government's burden is to prove the requisite *mens rea* of the offense charged").

Finally, the court instructed on good faith despite the fact that substantial evidence undercut defendants' good-faith claims, such as defendants' constant need to secure fulfillment pharmacies as the DEA closed one after another, Napoli's acquisition of a fulfillment pharmacy in a nominee name with instructions to not let others know he owned it, and Napoli's search for new doctors after his first doctors quit when DEA investigators that told them what they were doing was illegal.

> ### 3. *The court instructed that the government must prove that Carozza engaged in illicit drug dealing and trafficking*

Defendants complain that "the instructions allowed conviction based on malpractice." AOB:83. This argument ignores the given instructions. The district

67

court instructed that "[i]t is not enough for the United States to prove that a
practitioner committed malpractice, intentional or otherwise," that the government
must prove that defendants "did not have an honest belief that prescriptions were
issued by a physician for a legitimate medical purpose and in the usual course of
professional practice," and the jury could not find that defendants acted knowingly
if they found defendants were "simply careless." JER:170, 183-184. Contrary to
defendant's claim, there was no "conflict between the instructions," AOB:84, and
the given jury instructions satisfied *Feingold*.

Feingold, a licensed naturopathic physician, was convicted on 185 counts of
illegally distributing controlled substances, in violation of 21 U.S.C. § 841(a).
*Feingold*, 454 F.3d at 1003. At trial, the government presented evidence that
Feingold distributed controlled substances outside the course of professional
practice, which included testimony from patients who received prescriptions from
Feingold even though he had never physically examined them, from patients who
received prescriptions from Feingold even though they had never met him, from
undercover DEA agents who received prescriptions from Feingold without an
examination, and from medical experts. *Id*. at 1004-1005.

On appeal, Feingold claimed that the instructions permitted the jury to
convict him if it found that he was merely an incompetent doctor rather than
finding that his conduct was so egregious as to render him criminally liable. *Id*. at

1003, 1007. This Court disagreed and held that the instructions, viewed in their entirety, "compelled the jury to consider" whether Feingold "intended to distribute the controlled substances for a legitimate medical purpose" and "whether he intended to act within the usual course of professional practice." *Id*. at 1009. It held that the district court correctly articulated the standard for criminal liability under Section 841(a) when it instructed that "the government must prove beyond a reasonable doubt that the defendant prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice." *Id*. at 1012. Here, as noted *supra*, the district court charged the jury using that very language. *See* JER:171-181. As a result, the instructions properly stated the standard for criminal liability.

*Feingold* also observed that both the Supreme Court and this Court have approved jury instructions that refer to a national standard of care. 454 F.3d at 1009 (citing *Moore*, 423 U.S. at 139 (implicitly approving instructions that required the jury to find that the practitioner had prescribed controlled substances "other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States")); *see United States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir. 1986) (the district court defined good faith to mean that the practitioner had made "an honest effort to prescribe for a patient's condition in

69

accordance with the standard of medical practice generally recognized and accepted in this country"); *United States v. Boettjer*, 569 F.2d 1078, 1081 (9th Cir. 1978) (the district court required the jury to find that the practitioner had acted "other than in good faith for a legitimate medical purpose and in accordance with the medical standards generally recognized and accepted in the medical profession").

Here, the court added the alternative language that defendants asked for – that the government "must prove that the physician used his prescription writing powers as a means to engage in illicit drug dealing and trafficking." JER:170. Thus, the jury could not convict solely on a finding that the doctor committed malpractice. Viewed in their entirety, the instructions compelled the jury to decide whether defendants intended to distribute the controlled substances for a legitimate medical purpose and whether they intended to act within the usual course of professional practice. The verdict represents the jury's conclusion that they did not.

### 4. *The court did not abuse its discretion in refusing to instruct on the Ryan Haight Act*

Defendants argue that the law was unclear prior to the Ryan Haight Act, and the court should have instructed that that "mere failure to conduct an in-person examination did not render distribution of medication outside the usual course of professional practice and not for a legitimate medical purpose." AOB:85-87. As

70

previously detailed, defendants' conduct has been illegal since the passage of the CSA. The instructional challenge in *United States v. Reyes*, 577 F.3d 1069, 1073 (9th Cir. 2009), is not "strikingly similar," AOB:87, because that case involved crimes requiring "willful" conduct, which does not apply to the CSA. *Id*. at 1079. Moreover, Reyes's conviction was reversed, not because it was "the first criminal conviction for a backdating practice that was widespread in the late 1990s," but because of prosecutorial misconduct in closing argument.[18] And, the Court upheld co-defendant Jensen's conviction for participation in a scheme to reward employees with grants of backdated stock options and rejected her complaint that the trial court should have instructed that she falsified documents "with the purpose of violating a known legal duty." *Id*. at 1073, 1074.

In refusing defendants' in-person examination instruction, the district court was well within its discretion. The trial evidence showed that the prescriptions here were outside the course of professional practice and not for a legitimate medical purpose based on a host of factors, which included no in-person examination, no follow-up examination, no opportunity for laboratory work or medical tests, no contact with the doctor, and no independent verification of the identity of the person placing the order or the information entered on the

---

[18] The government retried Reyes, the jury convicted, and this Court affirmed the conviction. *See United States v. Reyes*, 660 F.3d 454 (9th Cir. 2011).

questionnaire. *See United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (holding that Del Muro's proposed instruction was not a theory of the defense instruction: "it merely highlighted the particular evidence Del Muro believed supported his claim of innocence" and the "remaining instructions adequately covered Del Muro's theory of defense"). Given the state of the record, the district court properly refused to instruct on a single piece of evidence.

### 5. The court properly instructed the jury on defendants' duties

The instructions given were not infirm because they did not include a "distinction between laypeople and medical professionals." AOB:89-94. A defendant is not entitled to an instruction with wording of his choosing. *United States v. Ferris*, 719 F.2d 1405, 1408 (9th Cir. 1983). The question is not whether the instruction that defendants proposed was correct, but whether the instruction actually given was misleading or inadequate to guide the jury's decision. *United States v. Tatoyan*, 474 F.3d 1174, 1179 (9th Cir. 2007) (citation omitted). "[A] court is not required to accept a proposed instruction which is manifestly intended to influence the jury toward accepting the evidence of the defendant as against that of the prosecution." *United States v. Hall*, 552 F.2d 273, 275 (9th Cir. 1977); *see also United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995) ("[a] defendant many not draw upon the right to present a 'theory of the case' to compel a certain resolution to a disputed question of fact").

72

The cases defendants cite actually support the instructions given. *United States v. Vamos* approved an objective "reasonableness" instruction because "[w]hile those who assist practitioners in distributing controlled drugs clearly cannot be held to the standard of a reasonable practitioner, they are not free to unreasonably rely on the judgment of their employers." 797 F.2d 1146, 1153 (2d Cir. 1986); *see id.* ("we fail to find anything unfair, improper or prejudicial about application of an objective standard to her conduct" because "ample evidence" allowed the jury to "infer beyond a reasonable doubt that [Vamos] could not reasonably fail to know that [the doctor] was engaged in unlawful activity and that she intended to help him do so, which is the test"). Likewise, *Quinones* instructed that "you must find the defendant not guilty unless the government proves beyond a reasonable doubt that the defendant knew or reasonably should have known that the doctors and pharmacists were not acting in good faith." 635 F.3d at 595.

In *United States v. Lovern*, the jury instructions were not at issue, and the Tenth Circuit affirmed Lovern's conviction for filling prescriptions outside the usual course of medical practice, but reversed co-defendant Baron's conviction because it "tells a different story." 590 F.3d 1095, 1104, 1111 (10th Cir. 2009). Baron had "a learning disability," "performed only menial computer tasks," and did not know that the doctors issued prescriptions based exclusively on online questionnaires. *Id.* at 1105-1106. Here, Napoli oversaw the program that Johnson

73

wrote, and both men knew that Carozza was issuing prescriptions based solely on the questionnaire.

### 6.    *Any instructional error is harmless*

*Feingold* held that "any imprecision in the jury instruction as to the standard for criminal liability was harmless beyond a reasonable doubt" because of the overwhelming evidence against each defendant.  454 F.3d at 1012.  The same holds true here.  As already discussed, the government presented overwhelming evidence that each defendant distributed drugs outside the usual course of professional practice, and that none did so under a mistaken good-faith belief that his conduct was lawful.

## III.  THE DISTRICT COURT PROPERLY INSTRUCTED ON DELIBERATE IGNORANCE

### A.    Standard Of Review

This Court reviews for an abuse of discretion the trial court's decision to give a deliberate ignorance instruction.  *United States v. Ramos-Atondo*, 732 F.3d 1113, 1118 (9th Cir. 2013).  The Court first considers "whether the district court identified the correct legal standard," then determines "whether the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record."  *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).

74

## B.     Background

The government requested this Court's Model "Deliberate Ignorance" Jury Instruction, Number 5.7, which the court adopted in its proposed instructions. CR:979, 1037; SER:1473, 1707.  When defendants challenged the instruction, the court asked whether it was "a straight face argument" because "abundant evidence of deliberate ignorance," including "evidence of a failure to make inquiries," and "reasonable inferences from the evidence" supported giving it.  SER:1497-1498.

In their closing arguments, each defendant's counsel argued that defendants did not know that they were violating the law and each acted in good faith.  *See* SER:1511 ("there are a lot of good reasons why [Napoli] didn't think [the sale of drugs on the internet] was illegal"); SER:1577-1578 ("What I'm saying is that [Johnson] is not a drug dealer.  That he had a sincere, honest belief that he was trying to connect doctors with people who had a medical need . . . that he believed he could do it without a face-to-face doctor-patient relationship . . . what matters is whether or not he sincerely believed it.  That's what the good[-]faith instruction tells you"); SER:1584 ("up until that day, November 10, 2006, Dr. Carozza believed in good faith that he could prescribe controlled substances based on medical questionnaires using his medical judgment without a face-to-face exam").

In rebuttal, the government responded that neither Johnson nor Napoli "testified that he believed" that "Carozza or any other doctor was acting in the

usual course of medical practice." SER:1585-1586. In response to defendants'

argument "that there was no way for Chris Napoli and Johnson to know that Dr.

Carozza was not acting in the usual course of professional practice," the

government argued that defendants "were responsible for knowing what the rules

were . . . especially . . . when it became clear to them that they weren't following

the rules . . . because the pharmacies they were working with kept getting shut

down over and over and over again." SER:1587-1588. The prosecutor directed

the jury to the given deliberate ignorance instruction. SER:1588.

Post-argument, defendants claimed that the prosecutor shifted the burden

when she "suggested that the defense has not produced evidence that would

suggest there was good faith." SER:1591. The prosecutor noted that she had

argued that "there was no evidence, not that the defendants didn't produce

evidence or that the defendants were required to produce evidence, but simply that

there is no evidence." SER:1593. The court agreed and "didn't hear [the

government's] argument to be one addressed to the burden," but rather to "what

was the evidence in the case." SER:1594.

The court also found that because the government had to prove that

defendants were was not acting in good faith and disprove an affirmative defense

of advice of counsel, it was "fair for the government to comment on the absence of

good faith in terms of the defendant's proffer with respect to the advice of counsel"

76

and had not "suggested that there is a shifting of burdens." SER:1594-1595.

Moreover, the court instructed that "the burden is on the government to prove

beyond a reasonable doubt that the defendants did not act in good faith." JER:183.

### C. Argument

#### 1. The evidence supported the deliberate ignorance instruction

To prove that defendants violated the CSA, the government had to establish,

beyond a reasonable doubt, that they acted knowingly. Defendants' defense was

premised on their claim that they did not know that their actions were outside the

scope of professional medical practice. Because defendants disputed their actual

knowledge, the government was "entitled to instructions supporting all rational

inferences the jury might draw from the evidence." *United States v. Heredia*, 483

F.3d 913, 923 (9th Cir. 2007) (en banc). If the jury believed defendants did not

have actual knowledge, the evidence could still support the inference that

defendants knew that there was a high probability that they were distributing drugs

outside the scope of professional medical practice, but deliberately chose not to

confirm that suspicion.

This Court has held that a trial court can give a deliberate ignorance

instruction if it finds that the jury could reject the government's evidence of actual

knowledge, and rationally find deliberate ignorance where evidence supports the

instruction. *Heredia*, 483 F.3d at 922; *see Ramos-Atondo*, 732 F.3d at 1120 ("if

the factual predicates of a deliberate ignorance instruction are present, it is not error to give such an instruction"). Deliberate ignorance involves "(1) a subjective belief that there is a high probability a fact exists and (2) deliberate actions taken to avoid learning the truth." *United States v. Yi*, 704 F.3d 800, 804 (9th Cir. 2013). In deciding whether the government has established the factual predicate, "the district court must view the evidence in the light most favorable to the party requesting [the instruction]." *Id.* Here, abundant evidence supported the instruction.

First, the evidence supported the inference that defendants were aware of a high probability that their distribution of drugs was outside professional medical practice and illegal. Early on, McHale told Napoli that this business was akin to drug dealing. SER:232. Almost immediately after Napoli opened his internet pharmacy, the DEA closed his fulfillment pharmacy, and Mullin urged Napoli to get out of the business and even shared a newspaper article detailing arrests at another internet pharmacy. Napoli also shared information about another internet pharmacy owner's arrest, and Dr. Wilkins called Napoli, telling him that the DEA had visited him and had said that what he was doing was illegal. SER:168-169, 176-177, 210, 227-230, 302-304, 1324. Napoli and Johnson were constantly looking for pharmacies to fill their orders because the DEA was continuously closing their fulfillment pharmacies. The men discussed the arrests of other

78

individuals in the internet pharmacy business and the need to the keep secret their ownership of their own pharmacy.  After they both received target letters, both men continued to distribute drugs the same way.  Carozza knew that the questionnaires that he reviewed permitted no interaction between him and the customer.  He often reviewed hundreds of applications a day and approved over 90% of those after a cursory review.

Second, the record supports that defendants engaged in a deliberate act to avoid learning the truth.  *See Yi*, 704 F.3d at 805.  "A deliberate action is one that is intentional; premeditated; fully considered."  *Heredia*, 483 F.3d at 920 (internal quotation marks and citation omitted).  A failure to investigate can be deliberate.  *Id*.  The jury could have inferred that defendants' lack of knowledge, if it existed, came from their failure to ask why the DEA closed every fulfillment pharmacy that they used.  *See Ramos-Atondo*, 732 F.3d at 1120.  Napoli continued distributing drugs after Wilkins told him about the DEA's visit.  Napoli's response to the DEA and local pharmacy boards closing over 10 pharmacies that he used to fulfill orders was to buy his own pharmacy and hire Winstead, who had worked at two of the pharmacies that the DEA closed for operating illegally.  Napoli and Johnson's Skype conversations show their awareness of closures, arrests, and indictments of others operating internet pharmacies, yet they continued to perfect the software to handle an ever-increasing number of orders.  Carozza's response to the DEA

79

visiting him was simply to increase the number of orders that he approved in a minimal amount of time.

The facts here are like those in *Quinones*, 635 F.3d at 594-597.  Quinones owned an internet pharmacy, and customers on his website filled out a brief medical questionnaire requesting medication.  *Id*. at 592.  Doctors, who had no interaction with the customers, reviewed and approved the orders.  *Id*. at 593.  The first fulfillment pharmacy that Quinones used to fill orders was closed and he continually changed pharmacies thereafter as law enforcement raided or shut down his fulfilling pharmacies.  *Id*.  At trial, over defense counsel's objection, the court instructed the jury on a conscious avoidance theory in connection with the knowledge requirement of the unlawful distribution of controlled substances counts.  *Id*. at 594; *see id*. ("[a] conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact").  On appeal, the Second Circuit found "the government had adduced overwhelming evidence that the defendants knew or reasonably should have known that the doctors and pharmacists upon whom they purportedly relied were acting in bad faith.  Any actual belief to the contrary would have been unreasonable."  *Id*. at 597.

Defendants' claim that the deliberate ignorance instruction permitted a conviction if they were "careless or reckless," AOB:103, ignores that the jury was

80

instructed it could not convict "if you find the defendant was simply careless." JER:184. The Fifth Circuit rejected a similar defense challenge that a deliberate ignorance instruction allowed the jury to convict on the basis of negligence rather than knowledge where the evidence was sufficient to support an inference that the defendants "were subjectively aware of a high probability" that the internet pharmacy was dispensing controlled substances "outside the usual course of professional practice" and, "despite this awareness," sufficient evidence supported "an inference that [the defendants] purposely contrived to avoid learning of the illegal conduct." *Fuchs*, 467 F.3d at 902.

Here, the court instructed that "the burden is upon the government to prove beyond a reasonable doubt that defendants did not act in good faith" and that it "must find the defendant not guilty" of the charges "unless you find beyond a reasonable doubt that the conduct charged against the defendants was not done in good faith." JER:183. Viewing the evidence to support the deliberate ignorance instruction in the light most favorable to the government, the district court's decision to give the instruction was not "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *See Hinkson*, 585 F.3d at 1251.

### 2. *Any instructional error was harmless*

Even if the Court should find that the district court's decision to instruct on deliberate ignorance was infirm, it should not reverse. Any error would be non-constitutional and "it is more probable than not that the error did not materially affect the verdict." *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1977) (en banc).

To support their contention that any error here was not harmless, defendants complain about a portion of the government's rebuttal argument. AOB:106-107. Those complaints are without merit. First, the prosecutor's argument did not "conflate[ ] the civil concept of assumption of the risk with criminal liability, based upon an alleged failure to investigate or educate oneself" nor "shift [ ] the burden of proof." AOB:107-108. The argument that "*if* they were aware that there was a high probability that what they were doing was illegal," and "they didn't do anything to figure it out, that's the same thing as knowing that what they were doing was wrong" was consistent with the deliberate ignorance instruction because it linked defendants' failure to act to discover the legality of their conduct with criminal, not civil, liability. SER:1587 (emphasis added). In any event, the district court instructed the jury that "argument is not evidence." JER:161.

The facts here are not like those in *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 726 (9th Cir. 2011), where alienage was the sole contested issue at trial, and the prosecutor erroneously told the jury that it could "'presume' the presence of that element because Sandoval was born in Mexico." AOB:108. In reversing, the Court's doubt "that the errors were harmless is heightened by the length of the jury's deliberations (the jury deliberated longer than the case took to try -- twice as long in fact"). *Id*. at 726. The Court found that "[l]onger jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case." *Id* (citation and internal quotations omitted).[19]

Here, after six weeks of trial, the jury deliberated for less than a day before it returned guilty verdicts on all counts against all defendants. SER:1589, 1602. The brevity of the deliberations, as in *Sandoval-Gonzalez*, support that the jury was not hung up on the deliberate ignorance instruction. In any event, any error did not materially affect the verdict because overwhelming evidence established defendants' actual knowledge that they were distributing drugs outside the usual course of medical practice and not for a legitimate medical purpose. Mullin shared with Napoli information about internet pharmacy arrests and quit the business.

---

[19] *Sandstrom v. Montana*, 442 U.S. 510, 517 (1979), is equally inapplicable because there the jury was instructed that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The Supreme Court found this instruction shifted "not only the burden of production, but also the ultimate burden of persuasion on the issue of intent." *Id*. at 518. The instructions here are not at all similar.

Wilkin told Napoli that the DEA said what they were doing was illegal and quit the business. Napoli and Johnson gathered and kept indictments of others prosecuted for operating internet pharmacies. Johnson wrote the software that did not permit customer interaction with the doctor or ask why the person needed the drugs. Carozza's response to the DEA visit to him was to increase the number of prescriptions he issued. All of this evidence showed defendants knew what they were doing was illegal as well as outside the usual course of medical practice and not for a legitimate medical purpose.

## IV. THE GOVERNMENT DID NOT ABUSE THE GRAND JURY PROCESS

### A. Standard Of Review

This Court reviews de novo a challenge to dismiss an indictment. *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000). The "scope of [ ] review is quite narrow" where the "petite jury convicted [defendant] on all charges" and "any error in the grand jury proceeding connected with the charging decision is deemed harmless beyond a reasonable doubt." *United States v. Bingham*, 653 F.3d 983, 998-999 (9th Cir. 2011). Post-conviction, "only a structural error that renders the grand jury proceedings 'fundamentally unfair' may be corrected." *Id*. at 998.

### B. Background

Pretrial, defendants filed a motion to dismiss the indictment for prosecutorial misconduct. JER:3. Defendants argued that the government had improperly

presented a single theory of liability: that defendants failed to conduct a physical examination before issuing prescriptions for controlled substances, even though the law at that time did not prescribe a face-to-face consult. JER:11-12; CR:852-854. Reviewing the grand jury testimony, the district court rejected that contention and found that (1) a face-to-face meeting was one of "a number of things" testified to by the agents regarding a valid prescription, (2) the prosecutors did not engage in misconduct or intentionally misstate the law, and (3) defendants' arguments did not "come[ ] close" to "render[ing] the indictment constitutionally suspect." JER:5-7.

On appeal, defendants contend that the agents perjured themselves because when asked "what makes a prescription valid," they said a face-to-face consult with a doctor and added that the Code of Federal Regulations states that requirement. AOB:112-114. The agents' relevant grand jury testimony follows.

Special Agent Jason Chin testified before the grand jury on March 9, 2010, and March 16, 2010. JER:377; SER:1. At his first appearance, Chin cited several factors that made "a prescription valid," including that it

> issued for a legitimate medical purpose, and then there has to be a good-faith medical exam conducted by a physician of the patient, so there has to be . . . a physical patient-doctor relationship. The doctor has to have reviewed the patient's condition and determined that the patient did in fact need the drug that's prescribed.

JER:379. In response to the question whether the doctor has "to see the patient physically every time they prescribe a drug to a particular patient," Chin responded, "No. That's not the case. Just at least once," and explained that "these requirements" came "from the Code of Federal Regulations . . . state pharmacy boards, state medical boards, and also the American Medical Association Guidelines." JER:379-380. Chin was also asked the following:

> Q: And so a valid doctor-patient relationship requires at least one face-to-face visit. Is that correct?
>
> A: Yes. That's correct.
>
> Q: All right. And an evaluation of the patient?
>
> A: Yes.
>
> Q: And providing drugs to address a patient's legitimate medical needs.
>
> A: Yes.
>
> Q: Okay. And you can't provide drugs to somebody just 'cause they want them. Is that correct?
>
> Q: That's correct

JER:379-380.

When later asked whether prescriptions issued by internet pharmacies were valid, Chin provided several reasons why they were not, including: (1) lack of a valid doctor-patient relationship between the customer and the doctor; (2) lack of a face-to-face meeting between the customer and the doctor; (3) no patient

evaluation by anyone; (4) the average doctor review "lasted not more than a few seconds"; and (5) the doctors and pharmacies were not licensed in the states where they were sending drugs to the customers. JER:380-381.

Special Agent Brandon Bridgers testified before the grand jury on August 24, and August 31, 2010. On August 24, 2010, he said that a valid prescription "requires a face-to-face relationship with your physician" as required by "the Drug Enforcement Administration as well as the state boards of . . . medical boards." JER:389. He responded "yes," to the questions of whether "the DEA has published regulations that require that you have at least one face-to-face visit with your doctor before he can prescribe a controlled substance," and whether "the state medical boards have also prescribed similar regulations." JER:389. Bridgers further explained that a valid prescription "has to be issued for a legitimate medical purpose in the normal and usual course of a physician's practice" and "usually that's met by establishing the doctor-patient relationship, which would include a physical exam, which would be in a face-to-to face setting." SER:11.

Bridgers testified about Carozza's review of customer questionnaires once hired as the sole SSO doctor. SER:7, 10. The only information Carozza had before authorizing an order was the customer questionnaire. SER:9. Despite that he was licensed to practice only in New York, Carozza authorized drug orders for

87

customers located in all 50 states.  SER:7-8.  Bridgers further detailed the review

process:

Q:  Did Dr. Carozza ever meet any of the Safescripts['] customers for whom he approved drug orders?

A:  No, ma'am.  He did not.

Q:  All right.  Did he conduct any physical examinations?

A:  No, ma'am.  He did not.

Q:  Did he contact any of the customers by telephone or by e-mail?

A:  No, ma'am.  He did not.

Q:  Did he obtain medical records for any of the customers?

A:  No, ma'am.  He did not.

Q:  Did he do anything other than review their online questionnaires?

A:  No.  That's the only thing he did.

Q:  And did he evaluate the customers' medical complaints and prescribe medication to address those complaints?

A:  No, ma'am.  He did not.

Q:  Did he just give them whatever drug they wanted in whatever quantity they ordered?

A:  Yes, ma'am.  That is correct.

SER:8-9.

When Bridgers testified before the grand jury on August 31, 2010, he was

asked three times whether internet pharmacy doctors "make any medical

judgments" about the prescribed drugs and each time he answered "no." SER:14, 16. He affirmed that the doctor simply prescribed whatever drug the customer ordered. SER:16. Bridgers summarized the evidence that showed that Napoli "intended" for the drugs to be distributed "outside the scope of professional practice and not for a legitimate medical purpose," to include (1) that the first two doctors that Napoli hired were visited by the DEA in October 2005, told they were involved in an illegal business, and quit; (2) that the DEA closed Napoli's fulfillment pharmacy Budget in September 2005, and Napoli's then-business partner quit the business; (3) that despite the DEA shutting down other fulfillment pharmacies one by one, Napoli continued his business; (4) that Napoli purchased his own fulfillment pharmacy in a nominee name; and (5) Skype communications with Johnson in which (a) Napoli says that he wants the "DEA off [his] back" and the "business to run for 12 more months," (b) Napoli and Johnson discuss the arrest of another internet pharmacy owner, and (c) Napoli tells Johnson to "erase" a link to "prevent [the] DEA from gathering evidence." SER:17-23.

Bridgers testified that the evidence that Carozza "knew that what he was doing was outside the scope of professional practice and not for a legitimate purpose" included that (1) Carozza was registered to practice only in New York, yet approved orders from "customers throughout the United States," and (2) the DEA visited him, told him what he was doing was illegal, and he continued in the

89

business. SER:26. Bridgers described Johnson's "role in the conspiracy" as the software writer, referenced particular Skype communications that demonstrated Johnson's knowledge, and described how Johnson helped to secure new pharmacies as the DEA shut down other pharmacies. SER:21-25.

### C.     Argument

Alleged errors in grand jury proceedings are analyzed under both a constitutional theory and a supervisory powers theory. *United States v. De Rosa*, 783 F.2d 1401, 1404 (9th Cir. 1986). Constitutional error occurs where the "structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice" to the defendant. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988). The only structural grand jury errors the Supreme Court has recognized are racial and gender discrimination in the selection of the grand jurors. *See id.*

A Court can dismiss a grand jury indictment under its supervisory powers only when the violation "substantially influenced the grand jury's decision to indict" or there is a "grave doubt" that the decision to indict was free from the substantial influence of such violations. *Id.* at 256. Under this theory, an indictment may be dismissed for prosecutorial misconduct upon a showing of "flagrant error that significantly infringes on the ability of the grand jury to exercise independent judgment and actually prejudices the defendant." *Id.* at 259;

90

*see United States v. Wright*, 667 F.2d 793, 796 (9th Cir. 1982). The record plainly shows that defendants have failed to satisfy either ground for dismissal.

First, both Chin and Bridgers testified truthfully. Both agents were asked what made a prescription valid in 2010 and both truthfully responded that the Federal Code required at least one face-to-face consult between doctor and patient. In 2010, 21 U.S.C. § 829(e)(2)(B)(i) defined a "valid prescription" as one issued by a practitioner "who has conducted at least 1 in-person medical evaluation of the patient." Both agents also truthfully testified that when defendants acted (in 2005 and 2006), they knowingly prescribed drugs outside the scope of professional medical practice and not for a legitimate medical purpose at the time defendants' acted, based on the lack of a physical examination, the lack of contact with the customer, and the failure to obtain medical records, among other factors. *See* JER:379-381; SER:7-9, 11, 14, 17-23, 26.

Second, even if the agents had testified that the Federal Code in 2005 and 2006 stated that the failure to conduct a face-to-face consult was alone enough to establish that defendants prescribed drugs outside the scope of professional medical practice and not for a legitimate medical purpose, such testimony was not "materially false testimony." AOB:114. As discussed *supra*, courts have consistently found prescriptions invalid where the doctor had not met or examined the patient prior to dispensing drugs. *See, e.g., Moore,* 423 U.S. at 142-143

91

("doctor violated CSA by issuing prescriptions where "he gave inadequate physical examinations or none at all"); *Feingold*, 454 F.3d at 1004 (doctor violated CSA where patients received prescriptions "even though he had never physically examined them" and "even though Dr. Feingold had never met with them").

Third, "[d]ismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way," which is not the case here. Here, as the district court found, the agents' statements regarding face-to-face meetings do not "come close" to satisfying this high standard. Each agent testified to many factors showing that defendants acted contrary to professional medical practice. *See United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (finding an agent's erroneous statement to the grand jury that a defendant's probation violation was a felony conviction harmless) (citation omitted).

Fourth, the alleged false testimony must have "substantially influence[d] the grand jury's decision to indict." *United States v. Brown*, 347 F.3d 1095, 1098 (9th Cir. 2003). Here, excising the challenged testimony about the face-to-face consults shows that the government presented sufficient evidence to the grand jury to make a probable cause finding that each defendant violated the CSA without the challenged statements. *See De Rosa*, 783 F.2d at 1405 (dismissal of indictment not warranted even though prosecutor elicited misleading and prejudicial testimony

92

where "there was more than sufficient evidence to indict"); *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985) ("if sufficient non-perjurious testimony exists to support the indictment, the courts will not dismiss the indictment due to the presence of perjured testimony"), *abrogated on other grounds*, *Ross v. Oklahoma*, 487 U.S. 81 (1988).

Finally, any error is harmless because defendants were ultimately convicted of the offenses charged. *See United States v. Mechanik*, 475 U.S. 66, 73 (1986) (a petit jury's guilty verdict established probable cause to charge defendants with the specific offenses and thus rendered harmless any error before the grand jury).

## CONCLUSION

For the reasons set forth above, this Court should affirm the judgment of the district court.

Dated: July 28, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

BARBARA J. VALLIERE
Chief, Appellate Division

s/ Laurie Kloster Gray
LAURIE KLOSTER GRAY
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the

Ninth Circuit, counsel for the United States of America states that she is not aware

of related cases to this appeal.

Dated: July 28, 2014         s/ Laurie Kloster Gray
                                         LAURIE KLOSTER GRAY
                                         Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because :

_X_  the brief contains 20,775 words, excluding the parts of the brief exempted by Fed. R. APP. P. 32(a)(7)(B)(iii); or

____  this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. (32)(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

X__  the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 program, with 14-font size Times New Roman style; or

____  the brief has been prepared in a monospaced spaced typeface using _____program with ____characters per inch and _____style.

Dated: July 28, 2014           s/ Laurie Kloster Gray_____
                               LAURIE KLOSTER GRAY
                               Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Tyle L. Doerr, certify that I am an employee of the Office of the United

States Attorney, Northern District of California, a person over 18 years of age and

not a party to the within action. I certify that on July 28, 2014, I electronically

submitted the

- **Brief for the United States as Appellee**
- **Government's Supplemental Excerpts of Record (Volumes II through VIII)**

in case no(s). 13-10172, 13-10179, 13-10198, case(s) *United States v. Joseph*

*Carozza, Daniel Johnson, and Christopher Napoli*, with the Clerk of the Court for

the United States Court of Appeals for the Ninth Circuit, by using the appellate

CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

Dated: July 28, 2014          s/ Tyle L. Doerr
                                   TYLE L. DOERR
                                   Appellate Paralegal Specialist

# APPENDIX 1

Glossary of Individuals and Businesses referenced at trial

A.    Online Internet Pharmacies

   1.    Pharmacy USA
   2.    Safescripts Online
   3.    AffPower - Dave Glass, owner
   4.    Jive Network - Jude LaCour, owner

B.    Brick-and-Mortar Fulfillment Pharmacies

   1.    Budget Drugs
   2.    Superior Drugs
   3.    United Care Pharmacy
   4.    Kwic Fill, Inc.
   5.    Discount U.S. Drugs - Howard Smith, owner
   6.    Woodbury Pharmacy
   7.    Mail Meds

C.    Individuals associated with Pharmacy USA/Safescripts Online

   1.    Christopher Napoli (Nuno B, Black Diablo 1) - defendant
   2.    Daniel Johnson (DJ, dietpills.com) - defendant
   3.    Joseph Carozza - defendant, doctor
   4.    Kevin Mullin - investor
   5.    Alvin Oscar - doctor
   6.    John Wilkins - doctor
   7.    Anat Benjamin - doctor
   8.    Robyn Bloom - PSA affiliate, SSO affiliate manager
   9.    Jeffrey Entel - SSO affiliate
   10.   Sal Lamorte - pharmacy broker
   11.   Brandon Winstead - pharmacy employee
   12.   Christopher Latham - Tarkhenov Trading Company, Discount U.S. Drugs
   13.   Joanna Soliman - customer
   14:   John Kaman - customer
   15:   Thomas DeMott - customer
   16:   Lin Shen - customer

97

17:     Joseph Green - attorney
18:     Joseph McHale - attorney, Stradley Ronan law firm
19:     Andrew Napoli - defendant Napoli's father, attorney

# ADDENDUM

## TABLE OF CONTENTS

21 U.S.C. § 841 ..................................................................................101

21 U.S.C.A. § 841

United States Code Annotated Currentness
Title 21. Food and Drugs (Refs & Annos)
Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
 Subchapter I. Control and Enforcement
 Part D. Offenses and Penalties
§ 841. Prohibited acts A

(a) Unlawful acts

Except as authorized by this subchapter, it shall be unlawful for any person
knowingly or intentionally--

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture,
distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense,
a counterfeit substance.

(b) Penalties

Except as otherwise provided in section 849, 859, 860, or 861 of this title, any
person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of a violation of subsection (a) of this section involving--

(i) 1 kilogram or more of a mixture or substance containing a detectable amount of
heroin;

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount
of--

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine,
ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

101

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 280 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

(iv) 100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(v) 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(vi) 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide or 100 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(vii) 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 1,000 or more marihuana plants regardless of weight; or

(viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $20,000,000 if the defendant is an individual or $75,000,000 if the defendant is other than an individual, or both. If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in

102

accordance with the preceding sentence. Notwithstanding section 3583 of Title 18, any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(B) In the case of a violation of subsection (a) of this section involving--

(i) 100 grams or more of a mixture or substance containing a detectable amount of heroin;

(ii) 500 grams or more of a mixture or substance containing a detectable amount of--

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 28 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

(iv) 10 grams or more of phencyclidine (PCP) or 100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(v) 1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(vi) 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide or 10 grams or more of

a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(vii) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 100 or more marihuana plants regardless of weight; or

(viii) 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $5,000,000 if the defendant is an individual or $25,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $8,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(C) In the case of a controlled substance in schedule I or II, gamma hydroxybutyric acid (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of

104

that authorized in accordance with the provisions of Title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

(D) In the case of less than 50 kilograms of marihuana, except in the case of 50 or more marihuana plants regardless of weight, 10 kilograms of hashish, or one kilogram of hashish oil, such person shall, except as provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of Title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment.

(E)(i) Except as provided in subparagraphs (C) and (D), in the case of any controlled substance in schedule III, such person shall be sentenced to a term of

imprisonment of not more than 10 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not more than 15 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $500,000 if the defendant is an individual or $2,500,000 if the defendant is other than an individual, or both.

(ii) If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not more than 30 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both.

(iii) Any sentence imposing a term of imprisonment under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment.

(2) In the case of a controlled substance in schedule IV, such person shall be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least one year in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment.

(3) In the case of a controlled substance in schedule V, such person shall be sentenced to a term of imprisonment of not more than one year, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $100,000 if the defendant is an individual or $250,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior

106

conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 4 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of Title 18 or $200,000 if the defendant is an individual or $500,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph may, if there was a prior conviction, impose a term of supervised release of not more than 1 year, in addition to such term of imprisonment.

(4) Notwithstanding paragraph (1)(D) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of Title 18.

(5) Any person who violates subsection (a) of this section by cultivating or manufacturing a controlled substance on Federal property shall be imprisoned as provided in this subsection and shall be fined any amount not to exceed--

(A) the amount authorized in accordance with this section;

(B) the amount authorized in accordance with the provisions of Title 18;

(C) $500,000 if the defendant is an individual; or

(D) $1,000,000 if the defendant is other than an individual;

or both.

(6) Any person who violates subsection (a), or attempts to do so, and knowingly or intentionally uses a poison, chemical, or other hazardous substance on Federal land, and, by such use--

(A) creates a serious hazard to humans, wildlife, or domestic animals,

(B) degrades or harms the environment or natural resources, or

(C) pollutes an aquifer, spring, stream, river, or body of water,

shall be fined in accordance with Title 18 or imprisoned not more than five years, or both.

(7) Penalties for distribution

(A) In general

Whoever, with intent to commit a crime of violence, as defined in section 16 of Title 18 (including rape), against an individual, violates subsection (a) of this section by distributing a controlled substance or controlled substance analogue to that individual without that individual's knowledge, shall be imprisoned not more than 20 years and fined in accordance with Title 18.

(B) Definition

For purposes of this paragraph, the term "without that individual's knowledge" means that the individual is unaware that a substance with the ability to alter that individual's ability to appraise conduct or to decline participation in or communicate unwillingness to participate in conduct is administered to the individual.

(c) Offenses involving listed chemicals

Any person who knowingly or intentionally--

(1) possesses a listed chemical with intent to manufacture a controlled substance except as authorized by this subchapter;

(2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter; or

(3) with the intent of causing the evasion of the recordkeeping or reporting requirements of section 830 of this title, or the regulations issued under that section, receives or distributes a reportable amount of any listed chemical in units small enough so that the making of records or filing of reports under that section is not required;

shall be fined in accordance with Title 18 or imprisoned not more than 20 years in the case of a violation of paragraph (1) or (2) involving a list I chemical or not more than 10 years in the case of a violation of this subsection other than a violation of paragraph (1) or (2) involving a list I chemical, or both.

(d) Boobytraps on Federal property; penalties; "boobytrap" defined

(1) Any person who assembles, maintains, places, or causes to be placed a boobytrap on Federal property where a controlled substance is being manufactured, distributed, or dispensed shall be sentenced to a term of imprisonment for not more than 10 years or fined under Title 18, or both.

(2) If any person commits such a violation after 1 or more prior convictions for an offense punishable under this subsection, such person shall be sentenced to a term of imprisonment of not more than 20 years or fined under Title 18, or both.

(3) For the purposes of this subsection, the term "boobytrap" means any concealed or camouflaged device designed to cause bodily injury when triggered by any action of any unsuspecting person making contact with the device. Such term includes guns, ammunition, or explosive devices attached to trip wires or other triggering mechanisms, sharpened stakes, and lines or wires with hooks attached.

(e) Ten-year injunction as additional penalty

In addition to any other applicable penalty, any person convicted of a felony violation of this section relating to the receipt, distribution, manufacture, exportation, or importation of a listed chemical may be enjoined from engaging in any transaction involving a listed chemical for not more than ten years.

(f) Wrongful distribution or possession of listed chemicals

(1) Whoever knowingly distributes a listed chemical in violation of this subchapter (other than in violation of a recordkeeping or reporting requirement of section 830 of this title) shall, except to the extent that paragraph (12), (13), or (14) of section 842(a) of this title applies, be fined under Title 18 or imprisoned not more than 5 years, or both.

(2) Whoever possesses any listed chemical, with knowledge that the recordkeeping or reporting requirements of section 830 of this title have not been adhered to, if, after such knowledge is acquired, such person does not take immediate steps to remedy the violation shall be fined under Title 18 or imprisoned not more than one year, or both.

(g) Internet sales of date rape drugs

109

(1) Whoever knowingly uses the Internet to distribute a date rape drug to any person, knowing or with reasonable cause to believe that--

(A) the drug would be used in the commission of criminal sexual conduct; or

(B) the person is not an authorized purchaser;

shall be fined under this subchapter or imprisoned not more than 20 years, or both.

(2) As used in this subsection:

(A) The term "date rape drug" means--

(i) gamma hydroxybutyric acid (GHB) or any controlled substance analogue of GHB, including gamma butyrolactone (GBL) or 1,4-butanediol;

(ii) ketamine;

(iii) flunitrazepam; or

(iv) any substance which the Attorney General designates, pursuant to the rulemaking procedures prescribed by section 553 of Title 5, to be used in committing rape or sexual assault.

The Attorney General is authorized to remove any substance from the list of date rape drugs pursuant to the same rulemaking authority.

(B) The term "authorized purchaser" means any of the following persons, provided such person has acquired the controlled substance in accordance with this chapter: (i) A person with a valid prescription that is issued for a legitimate medical purpose in the usual course of professional practice that is based upon a qualifying medical relationship by a practitioner registered by the Attorney General. A "qualifying medical relationship" means a medical relationship that exists when the practitioner has conducted at least 1 medical evaluation with the authorized purchaser in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other heath [FN1] professionals. The preceding sentence shall not be construed to imply that 1 medical evaluation demonstrates that a prescription has been issued for a legitimate medical purpose within the usual course of professional practice.

(ii) Any practitioner or other registrant who is otherwise authorized by their registration to dispense, procure, purchase, manufacture, transfer, distribute, import, or export the substance under this chapter.

(iii) A person or entity providing documentation that establishes the name, address, and business of the person or entity and which provides a legitimate purpose for using any "date rape drug" for which a prescription is not required.

(3) The Attorney General is authorized to promulgate regulations for record-keeping and reporting by persons handling 1,4-butanediol in order to implement and enforce the provisions of this section. Any record or report required by such regulations shall be considered a record or report required under this chapter.

(h) Offenses involving dispensing of controlled substances by means of the Internet

(1) In general

It shall be unlawful for any person to knowingly or intentionally--

(A) deliver, distribute, or dispense a controlled substance by means of the Internet, except as authorized by this subchapter; or

(B) aid or abet (as such terms are used in section 2 of Title 18) any activity described in subparagraph (A) that is not authorized by this subchapter.

(2) Examples

Examples of activities that violate paragraph (1) include, but are not limited to, knowingly or intentionally--

(A) delivering, distributing, or dispensing a controlled substance by means of the Internet by an online pharmacy that is not validly registered with a modification authorizing such activity as required by section 823(f) of this title (unless exempt from such registration);

(B) writing a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of section 829(e) of this title;

(C) serving as an agent, intermediary, or other entity that causes the Internet to be used to bring together a buyer and seller to engage in the dispensing of a controlled substance in a manner not authorized by sections [FN2] 823(f) or 829(e) of this title;

(D) offering to fill a prescription for a controlled substance based solely on a consumer's completion of an online medical questionnaire; and

(E) making a material false, fictitious, or fraudulent statement or representation in a notification or declaration under subsection (d) or (e), respectively, of section 831 of this title.

(3) Inapplicability

(A) This subsection does not apply to--

(i) the delivery, distribution, or dispensation of controlled substances by nonpractitioners to the extent authorized by their registration under this subchapter;

(ii) the placement on the Internet of material that merely advocates the use of a controlled substance or includes pricing information without attempting to propose or facilitate an actual transaction involving a controlled substance; or

(iii) except as provided in subparagraph (B), any activity that is limited to--

(I) the provision of a telecommunications service, or of an Internet access service or Internet information location tool (as those terms are defined in section 231 of Title 47); or
(II) the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication, without selection or alteration of the content of the communication, except that deletion of a particular communication or material made by another person in a manner consistent with section 230(c) of Title 47 shall not constitute such selection or alteration of the content of the communication.

(B) The exceptions under subclauses (I) and (II) of subparagraph (A)(iii) shall not apply to a person acting in concert with a person who violates paragraph (1).

(4) Knowing or intentional violation

Any person who knowingly or intentionally violates this subsection shall be sentenced in accordance with subsection (b).