Nos. 13-10172, 13-10179, 13-10198

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSEPH A. CAROZZA, DANIEL JOHNSON, and CHRIS NAPOLI,

Defendants-Appellants.
_____

**REPLY BRIEF OF APPELLANTS**

Appeal from United States District Court
for the Northern District of California
The Honorable Charles R. Breyer
United States District Judge
USDC No. 10 Cr. 642 CRB

ETHAN A. BALOGH
Coleman, Balogh & Scott LLP
235 Montgomery St., Ste. 1070
San Francisco, CA 94104
Telephone: (415) 391-0440

Attorney for Appellant
JOSEPH A. CAROZZA

KAREN L. LANDAU
Law Office of Karen L. Landau
2626 Harrison Street
Oakland, CA 94612
Telephone: (510) 839-9230

Attorney for Appellant
CHRIS NAPOLI

* Counsel continued on next page

MARTIN A. SABELLI
Law Office of Martin A. Sabelli
Four Embarcadero Center, 17th Fl.
San Francisco, CA 94111

Attorney for Appellant
DANIEL JOHNSON

## **TABLE OF CONTENTS**

ARGUMENT IN REPLY........................................................................................1

I.  The district court violated appellants' rights to present a defense
    by excluding evidence supporting their good-faith belief that
    the CSA did not require in-person medical examinations before
    issuing bona-fide prescriptions for schedule III and IV
    controlled substances............................................................................2

    A.  The Indictment alleged specific intent crimes.  Accordingly,
        the notion that appellants' intent was irrelevant borders on
        the frivolous........................................................................................3

    B.  The excluded evidence was relevant to appellants' intent.........6

    C.  The Government offers irrelevant rebuttals to claims that
        appellants do not present...................................................................7

    D.  The excluded evidence was neither inadmissible hearsay,
        nor properly excluded under Rule 403.....................................12

    E.  Excluding the corroborating evidence of appellants'
        good-faith intent prejudiced the defense..................................15

II. The Jury Instructions on Good Faith Wrongly Allowed Conviction
    Based  upon a Failure to Investigate and Correctly Understand
    the Law......................................................................................................18

    A.  The Refusal to Instruct on the Question Whether an
        In-Person Examination Was Required to Render a
        Prescription Valid Allowed Conviction on An Invalid
        Legal Theory......................................................................................26

i

B.    The District Court's Good Faith Instruction Was Flawed, Because It Applied The Legal Duties of a Licensed Prescribing Physician To the Non-Physician Defendants and Failed to Account for the Concept that a Layperson may Reasonably Rely on a Professional....................................30

C.    The Instructional Errors Were Necessarily Harmful, Because They Allowed Conviction on an Invalid Legal Theory......................................................................................32

III.    The Interaction of the Good Faith and Deliberate Ignorance Instructions Shifted the Burden of Proof on Good Faith to the Defendants........................................................................................36

IV.    The agents' false grand jury testimony requires reversal...................43

CONCLUSION.........................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1998).......................46, 47, 48

*Bryan v. United States,* 524 U.S. 184 (1998)...........................................................20

*Hale v. Henkel*, 201 U.S. 43 (1906)...........................................................................49

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989)...............................48

*National Mutual Ins. Co. v. Darden,* 503 U.S. 318 (1992)...............................21, 22

*Ratzlaf v. United States*, 510 U.S. 135 (1994)..........................................................19

*Russell v. United States*, 369 U.S. 749 (1962)..........................................................49

*Stirone v. United States*, 361 U.S. 212 (1969)..........................................................49

*United States v. Anderson*, 741 F.3d 938 (9th Cir. 2014)......................................22

*United States v. Bansal*, 663 F.3d 634 (3d Cir. 2011).........................................9, 10

*United States v. Baron*, 94 F.3d 1312 (9th Cir. 1996).............................................36

*United States v. Birbragher*, 603 F.3d 478 (8th Cir. 2010)...............................9, 10

*United States v. Bishop*, 291 F.3d 1100 (9th Cir. 2002).................................6, 8, 15

*United States v. Certified Environmental Serv.*, 753 F.3d 72 (2d Cir. 2014).........23

*United States v. Cheek,* 498 U.S. 192 (1991)...........................................................19

*United States v. Delgado*, 357 F.3d 1061 (9th Cir. 2004)......................................19

*United States v. Dowlin*, 408 F.3d 647 (10th Cir. 2005)........................................13

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006)................................*passim*

*United States v. Fierros*, 692 F.2d 1291 (9th Cir. 1983)............................20, 21, 22

*United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006)........................................10, 41

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (*en banc*)..................36, 43

*United States v. James*, 169 F.3d 1210 (9th Cir. 1999) (*en banc*)...................15, 29

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)...........................................19, 20

*United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009)................................10, 32

*United States v. Makhlouta*, 790 F.2d 1400 (9th Cir. 1986)..................................12

*United States v. Mechanik*, 475 U.S. 66 (1986)..............................................47, 48

*United States v. Mitrano*, 658 F.3d 117 (1st Cir. 2011)..................................21, 22

*United States v. Moore*, 423 U.S. 122 (1975).........................................................4

*United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004).....................................10

*United States v. Quinones*, 635 F.3d 590 (2d Cir. 2011)..............................*passim*

*United States v. Rosenberg*, 515 F.2d 190 (9th Cir.1975)..................................4, 18

*United States v. Smith-Baltiher*, 424 F.3d 913 (9th Cir. 2005)..............................22

*United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012)...............................9, 10, 11

*United States v. Urfer*, 287 F.3d 663 (7th Cir. 2002)...........................................29

*United States v. Vamos,* 797 F.2d 1146 (2d Cir. 1986)....................................31, 32

**Statutes**

21 U.S.C. § 841...........................................................................................*passim*

**Rules**

Fed. R. Evid. 401(b)...................................................................................7

Fed. R. Evid. 403...........................................................................12, 13, 14

Fed. R. Evid. 801(c)(2)...........................................................................12

**Regulations**

21 C.F.R. § 1306.04...................................................................19, 25

21 C.F.R. § 1306.07.......................................................................41

21 C.F.R. § 1306.11.......................................................................41

21 C.F.R. § 1306.12.......................................................................41

## ARGUMENT IN REPLY

In their opening brief, appellants contended that the district court wrongly excluded significant defense evidence that would have provided critical corroboration for the defense of good faith. Appellants further argued that they did not receive adequate jury instructions on their defense theory, and instead, that the instructions given undermined the government's burden of proof and eviscerated the good faith defense.

In response, the government contends that all of appellants' arguments are irrelevant, because the standard of criminal *mens rea* was merely "knowing" and therefore, appellants' arguments about good faith are pointless. The government's brief depends entirely on an erroneous understanding of the requisite *mens rea* for conviction. The government's arguments assume that this case is nothing more or less than a garden variety drug case. But it is not: this case involved the prosecution of a licensed physician and others who relied on the *bona fides* of the prescriptions he issued. Moreover, the conduct at issue occurred when the applicable law regarding the requirements of a valid prescription was in flux, and when reasonable people, including high ranking government officials, proclaimed that a change in the law was needed. On the facts of this case, the defendants were

denied their constitutional right to present a defense and the right to adequate jury instructions on their defense theory.

**I.    The district court violated appellants' rights to present a defense by excluding evidence supporting their good-faith belief that the CSA did not require in-person medical examinations before issuing *bona-fide* prescriptions for schedule III and IV controlled substances.**

Appellants defended this case by asserting that at all times, each possessed a good-faith belief that doctors could lawfully issue prescriptions over the internet based on a licensed physician's evaluation of a medical questionnaire and without an in-person examination.  *See* AOB 24-31, 64-65.[1]  On appeal, appellants challenge the district court's exclusion of evidence to support their defense.  *See* AOB 31-32, 35.  Although a good-faith belief would negate the intent element in 21 U.S.C. § 841(a), the district court excluded: (1) testimony from a DEA administrator; (2) a report from the Congressional Research Service; and (3) a declaratory relief action, each of which substantially corroborated the reasonable and genuine nature of appellants' beliefs.  *See* AOB 41-58.

In its opposition, the government offers a shotgun response, presenting five reasons why excluding this evidence was correct, and if not, did not matter.  The

---

[1]As used herein, "AOB" refers to Appellants' Opening Brief (available at Dkt. 12-1), "GAB" to the government's Answering Brief (available at Dkt. 28-1), "JER" to Appellants' Joint Excerpts of Record, and "JSER" to Appellants' Joint Supplemental Excerpts of Record.

government's arguments are easily debunked. Importantly, the government's major premise relies on a pronounced misunderstanding of the intent required under 21 U.S.C. § 841(a).

**A.    The Indictment alleged specific intent crimes. Accordingly, the notion that appellants' intent was irrelevant borders on the frivolous.**

The government's entire brief stands on a clever dodge: it wrongly claims that it charged "general intent crimes" limited to a "knowingly" *mens rea*, and as a result, appellants' "good-faith beliefs are irrelevant." GAB 40, 51. And to be plain, the government repeatedly invokes this claim as the basis for the Court to deny relief. *See* GAB 2, 40, 41, 51-53, 57, 63, 67, 77. But the government is mistaken.

The Controlled Substances Act (the "CSA") and settled law from this Court, prove the government's error. Indeed, the Government's first claim—that section 841(a) "has only a 'knowingly' *mens rea* requirement," GAB 51—ignores the statute. Rather, section 841 makes it "unlawful for any person to *knowingly* or *intentionally*" manufacture, distribute or dispense controlled substances or to create, distribute or dispense counterfeit substances. 21 U.S.C. § 841(a) (emphasis added).

3

The Supreme Court's and this Court's case law hold that section 841(a) is a specific intent crime when applied to medical practitioners. In *United States v. Moore*, 423 U.S. 122 (1975), the Supreme Court held "that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." *Id.* at 124. Building on *Moore*, this Court issued *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) and announced the elements required to be proven in an 841(a) prosecution of a doctor who issued prescriptions; put simply, the government must prove beyond a reasonable doubt that the doctor specifically intended to violate the law. *Feingold*, 454 F.3d at 1007-08. Indeed, *Feingold* could not be clearer:

> We agree with Dr. Feingold's contention that a practitioner who acts outside the usual course of professional practice may be convicted under § 841(a) *only if he does so intentionally*. If a practitioner's distribution of controlled substances becomes illegal only by virtue of the fact that his actions are 'outside the usual course of professional practice,' *Moore*, 423 U.S. at 124, 96 S.Ct. 335, it follows that the practitioner must have deliberately acted in this fashion in order for him to be convicted of a crime. . . . As we emphasized in *United States v. Rosenberg*, 515 F.2d 190 (9th Cir.1975), 'the jury [must] look into [a practitioner's] mind to determine whether he prescribed the pills for what he thought was a medical purpose or whether he was passing out the pills to anyone who asked for them.' *Id.* at 197.

4

*Feingold*, 454 F.3d at 1007-08. Thus, when *Feingold* defined the elements of a section 841 violation purportedly arising from a prescription issued by a licensed physician, the Court instructed:

> [T]o convict a practitioner under § 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs *and with intent to distribute them outside the course of professional practice.*

*Id.* at 1008 (original emphases).

*Feingold* leaves no doubt that the government alleged an intentional crime:

- "[A] practitioner who acts outside the usual course of professional practice may be convicted under § 841(a) only if he does so intentionally." 454 F.3d at 1007;

- The jury must find that the practitioner "intentionally violated" the standard of care. *Id.* at 1009;

- The government must prove that the defendant "*intentionally* prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice." *Id.* at 1009-10 (original emphasis); and

- "[A] jury must find that a doctor has *intentionally* prescribed controlled substances for no legitimate medical purpose." *Id.* at 1011 (emphasis added).

5

In sum, the government's mistaken assertions about the applicable *mens rea* for this section 841(a) prosecution undermines its entire presentation.

### B.    The excluded evidence was relevant to appellants' intent.

Based on its flawed foundation, the government contends that the excluded evidence was irrelevant.  GAB 40, 51, 53-55.  But of course that is not true.

The proffered evidence showed the genuineness and reasonableness of appellants' good-faith beliefs that the CSA did not prohibit their conduct.  Deputy Assistant Administrator Rannazzisi would have testified that before the law changed in 2008, federal law did not expressly require an in-person examination as a predicate for prescribing a controlled substance.  *See* AOB 42.  The Congressional Research Service Report (the "CRS Report") supported a conclusion that appellants' business practices were "not necessarily illegal."  *See* AOB 37.  And the declaratory relief action (the "DRA") provided objective proof of the sincerity of their good-faith belief.  AOB 40-41.  Appellants had the constitutional right to present this evidence, which strongly corroborated their good-faith beliefs that they were acting lawfully, and that their actions were not outside the usual course of professional medical practice.  *See* AOB 41-58; *United States v. Bishop*, 291 F.3d 1100, 1111 (9th Cir. 2002) (stating that a defendant

6

raising a good-faith defense has the right to "offer evidence of what he relied upon").

Further, the jury instructions provided a framework for the jurors to assess the excluded evidence. The court instructed the jury that "[i]t is the sincerity of [appellants'] belief[s] that determines if [they] acted in good faith." *See* AOB 75. The instructions also told the jurors that a reasonable belief is more likely to be sincere. *See id.* The excluded evidence supported the sincerity and reasonableness of appellants' beliefs, because it showed that those beliefs were held by employees of the United States government. Thus, the excluded evidence had a "tendency to make a fact more or less probable—namely, appellants' good-faith belief in the *bona fides* of the prescriptions Dr. Carozza issued—than it would be without the evidence." Fed. R. Evid. 401(a). Additionally, the excluded evidence about appellants' good-faith beliefs presented "fact[s] of consequence in determining the action." Fed. R. Evid. 401(b). In short, the excluded evidence was most certainly relevant.

## C. The Government offers irrelevant rebuttals to claims that appellants do not present.

Given the fundamental flaw in its opposition, the government seeks to distract the Court by changing appellants' argument. The government asserts:

7

> Defendants contend that before the passage of the Ryan Haight
> Act, the CSA did not prohibit their conduct. *See* AOB 37-40.
> This argument fails for four reasons.

GAB 47. But Appellants do *not* make this argument. Appellants do *not* claim that the CSA did not apply to their conduct. Rather, appellants claim that before the passage of the Ryan Haight Act, the CSA did not prohibit *per se* the issuance of prescriptions by a physician based on an on-line medical questionnaire *in lieu* of an in-person examination, and that they maintained, at all times, a sincere belief that Dr. Carozza could properly issue prescriptions based on his evaluation of on-line medical questionnaires. *See e.g.* AOB 40-41.

The government then argues that the appellants did not have the right to present evidence that the federal government "could not" regulate their conduct. GAB 54. This argument is another strawman: no one disputes that the Government *could* regulate internet pharmacies. But the question at trial was: Did appellants hold a good-faith belief that the government *had not* yet prohibited their conduct before the passage of the Ryan Haight Act? Plainly, appellants maintained a constitutional right to present evidence supporting their good-faith beliefs and their defense of the case. *See Bishop*, 291 F.3d at 1111.

8

The government then presents its "four reasons" why the argument it ascribes to appellants "fails." GAB 47. While certainly distracting, none of these arguments matter.

To begin, the government claims that "[f]irst, the CSA's plain language has always made it unlawful for a practitioner to distribute a controlled substance without a valid prescription, regardless of the channel of distribution." GAB 47. So stipulated. But the statute's proscription of "distribution", even through internet sales, does not pertain to appellants' challenge regarding the district court's exclusion of evidence showing that appellants believed at all times—and in good faith—that each distribution in this case was authorized by a valid prescription.

"Second, [the government claims that] every appellate court to consider this challenge has rejected it." GAB 48-49 *citing United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012), *United States v. Bansal*, 663 F.3d 634 (3d Cir. 2011), & *United States v. Birbragher*, 603 F.3d 478, 484-85 (8th Cir. 2010). But this is not true. None of these cases addressed the good-faith defense or the exclusion of evidence substantially supporting such a defense.

*Tobin* addressed whether, prior to passage of the Ryan Haight Act, the CSA applied to internet distributions or was unconstitutionally vague. 676 F.3d at

9

1270, 1273.  The Eleventh Circuit found the CSA unambiguously applied to distributions through the internet and rejected a finding of vagueness.  *Id.* at 1275-78.

*Bansal* is similarly inapposite.  There, appellants argued that prior to the RHA, the law did not require any prescription to distribute controlled substances over the internet.  *Id.* at 655-57.  Similar to *Tobin*'s analysis, the Court rejected this challenge to the "sufficiency of [the] indictment" and held that even before the RHA, the law proscribed the sale of controlled substances anywhere—including the internet—without a prescription.  *Bansal*, 663 F.3d at 656-57.

And *Birbragher* offers no assistance for the same reason.  That case held that the pre-RHA version of the CSA applied to a non-physician who conspired to distribute controlled substances over the internet, rejecting appellant's void-for-vagueness challenge.  *Id.* at 484-85.

After that detour, the government offers its "third" reason why its strawman falls down: "multiple appellate courts have held that the CSA reaches distribution of controlled substances of the internet."  GAB 49-50 *citing United States v. Quinones*, 635 F.3d 590 (2d Cir. 2011), *United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006)*, United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004), & *United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009).  But this argument is merely a

restatement of its first argument, to which appellants stipulate. Appellants

concede that the CSA has extended at all times to distribution by the internet. And

none of these cases, unsurprisingly, address the constitutional challenge to present

a defense as raised in this case.

The government's "fourth" and final reason for debunking an argument not

raised on appeal repeats its citation to *Tobin*. GAB 50. Curiously, the government

suggests that *Tobin* determined that the CRS Report was not relevant to

appellants' intent. To the contrary, *Tobin* noted that the CRS Report reflected

Congress's recognition that it was "not necessarily illegal" for physicians to

prescribe drugs without seeing a patient in person "simply reflect[ed] the fact that

at the time, the CSA incorporated the state standards at issue, and as Congress

recognized, the states had different approaches on this subject." *Tobin*, 676 F.3d

at 1277. In other words, *Tobin* confirmed that at the time appellants acted, their

pharmacy model "was not necessarily illegal" as established by the CRS report,

*viz*., this evidence was relevant to appellants' good-faith beliefs in the propriety of

their actions.

Finally, *Tobin* cannot assist the government here for another reason: it

conflicts with *Feingold*. The Eleventh Circuit ruled, contrary to this Court's

holding, that the CSA requires proof only of a knowingly *mens rea*, even as

11

applied to licensed doctors. 676 F.3d at 1279-80. Because *Feingold* requires a higher standard of intent and is the law of this Circuit, *Feingold*, not *Tobin*, controls.

### D. The excluded evidence was neither inadmissible hearsay, nor properly excluded under Rule 403.

Apart from its "relevance" challenge, which appellants have addressed, the government offers only two other evidentiary bases to support the district court's exclusion of portions of the Declaratory Relief Action, *i.e.* it contends that the redacted portions of the DRA were properly excluded as appellants' own hearsay statements and under Rule 403. GAB 53-54.

Before demonstrating why the government is incorrect, it is important to note that its hearsay and Rule 403 arguments focus solely on the DRA. *See* GAB 53-55. Thus, the government concedes that apart from its "relevance" challenge, no other evidentiary rule could have barred the other defense evidence excluded by the district court, *i.e.*, Rannazzisi's live testimony and the CRS Report.

As to the exclusion of critical parts of the DRA, the redacted portions did not qualify as hearsay because appellants offered this evidence to prove their states of mind. Fed. R. Evid. 801(c)(2); *United States v. Makhlouta*, 790 F.2d 1400, 1402 (9th Cir. 1986). For example, the district court excluded from the

DRA appellants' claim that "[p]laintiffs' model of electronic commerce in pharmaceuticals as set forth above is compliant with a lawful construction of federal law." JER 305, 324. This statement is relevant not as proof that the conduct complied with federal law, but as corroborating evidence that appellants genuinely and reasonably believed that their conduct was lawful, and believed it strongly enough to litigate the issue in federal court. *See* AOB 54.

Similarly, the district court redacted the DRA's references to Rannazzisi's congressional testimony and his assertions that then-current law did *not* require an in-person examination before prescribing controlled substances. JER 308, 327. This evidence is relevant regardless of its accuracy, because it strongly corroborated the genuineness and reasonableness of appellants' beliefs and intent. AOB 58. Indeed, the DRA's reference to Rannazzisi's testimony proves that appellants were aware of and relied on his testimony. *See United States v. Dowlin*, 408 F.3d 647, 660 (10th Cir. 2005) (holding that statement was not hearsay when offered as proof of listener's good-faith belief in the matter asserted).

The government also mistakenly contends that the district court properly excluded the DRA under Rule 403 because its probative value was low, and because admitting the DRA would have confused the issue and wasted time. *See* GAB 54-55. As demonstrated already, appellants' good-faith beliefs are highly

13

relevant under *Feingold*, 454 F.3d at 1008, contrary to the government's incorrect claim that their intent presented a "collateral issue." GAB 54.

Furthermore, the government completely ignores that the excluded portions of the DRA contained the evidence necessary to rebut the government's theory of prosecution. *See* AOB 55-57. Indeed, in summation, the prosecutor argued at length that appellants lacked a good-faith belief that their conduct was lawful, *because* they knew the government had shut down similar businesses. AOB 55-57. But appellants possessed good reasons to proceed in the face of those shutdowns, and those reasons appeared in the excluded portions of the DRA: appellants reasonably believed that Congress had not yet provided the authority to shut down the pharmacies, and reasonably relied on Rannazzisi's testimony that no statute defined a valid doctor/patient relationship. *See* JER 307-08. Nonetheless, the district court refused to let the jury hear this corroborating evidence.

Last, the government exaggerates the Rule 403 implications resulting from the district court's exclusion. In sum, it argues that admitting the DRA would require a "mini-trial" about the full history of the DRA litigation, namely, that the first complaint was dismissed on the government's motion and then the plaintiffs filed an amended complaint. GAB 54-55. The basis for these claimed

14

implications is doubtful. The Government certainly offers no reason why the jury
needed to know that the first complaint was dismissed. Nor does the government
explain how that incident eliminated (1) the value of this evidence to corroborate
appellants sincere, good-faith beliefs or (2) to rebut that claim. In other words,
this *ipse dixit* claim makes no sense. Nor was the DRA litigation history
confusing or misleading; as the government concedes, the first DRA was
dismissed on the government's motion "because it would impact an ongoing
criminal investigation." GAB 38-39. And, obviously, the government does not
explain why the *redacted* DRA, which the court admitted, did not require a "mini-
trial" but the *full* DRA would have. The district court certainly didn't. This Court
should reject the government's strained analysis.

### E. Excluding the corroborating evidence of appellants' good-faith intent prejudiced the defense.

Finally, the Government contends that the exclusion of defendant's
evidence was harmless beyond a reasonable doubt because appellants elicited
testimony about the excluded evidence and presented evidence supporting their
good-faith defense. *See* GAB 55. This contention requires a studious disregard of
the nature and significance of the excluded evidence.

15

First, appellants' testimony about their good-faith beliefs permitted them to offer corroboration on that issue. *See United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999) (*en banc*) (finding prejudicial error in excluding documentary evidence corroborating the defendant's testimony); *Bishop*, 291 F.3d at 1111 (holding that defendants have the right to corroborate their testimony regarding intent). The government ignores the importance of corroboration, and addresses neither case. GAB 55-56. Moreover, the excluded evidence was uniquely corroborative, because it came from the government, rather than from witnesses closely associated with the defense, such as Mr. Napoli's father or his former attorney. Rannazzisi was a high-ranking government official, whose public pronouncements and in-person testimony would have bolstered significantly appellants' good-faith defense. And some of the excluded evidence was documentary, including particularly Congress's assessment of the key issue in the CRS Report. But jurors were left just to take appellants' word on it, and that was unfair and watered down their defense.

The government similarly ignores the damaging effect of the evidentiary exclusion, especially in light of its summation. The government argued in closing that because appellants knew about the shutdowns of other online pharmacies, they could not have believed in good faith that their conduct was lawful. *See* AOB

16

70.  The excluded documents and testimony would have given the defense a reasonable rebuttal, and given the jurors strong grounds to disagree with the government's contentions.

The government's final harmlessness argument—that its evidence was overwhelming—yet again ignores the intent required under *Feingold* and focuses entirely on appellants' conduct of distributing controlled substances without an in-person examination.  *See* GAB 56-57.  The government ignores that appellants consulted with three attorneys, each of whom advised that their business did not violate the law.  *See* AOB 8-9.  Nor does the government explain how the CRS Report would not have affected the outcome, given its finding that it was "not necessarily illegal" to do what appellants did.  And the government does not explain how testimony by DEA Administrator Rannazzisi that, at the time appellants' acted, the CSA did not require *per se* an in-person examination could have had no effect on the jury's evaluation of appellants' good-faith defense.  In other words, the Government's entire harmlessness analysis ignores the critical issue on appeal: the appellants' good-faith defense.  *See* GAB 56-57.

17

## II.    The Jury Instructions on Good Faith Wrongly Allowed Conviction Based  upon a Failure to Investigate and Correctly Understand the Law.

The government contends that the instructions adequately advised the jury of the good faith defense because the defendants' good faith belief in the legality of their actions was not a defense at all.  GAB at 57, 62-63.  The government asserts that the court properly instructed the jury that good faith was limited to the "good faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of professional practice."  GAB at 62.  The government reiterates its mistaken claim that the above formulation represents the outer limits of the good faith defense and asserts that the defendants' "subjective beliefs" about the law are irrelevant, because they were charged with general intent crimes.  GAB at 63.  Not so.

21 U.S.C. § 841 has two *mens rea* elements: it makes it "unlawful for any person to *knowingly* or *intentionally*" to manufacture, distribute, or dispense controlled substances or to create, distribute or dispense counterfeit substances. 21 U.S.C. § 841.  While it is true that generally, a violation of the CSA—which usually involves the sale of street drugs—is a general intent crime, that is not always the case.  When a doctor issues a prescription, the government must prove

18

his specific intent to violate the law. *Feingold*, 454 F.3d at 1007-08. As explained above, *see supra.*, at 4-5, *Feingold* could not be clearer: to be convicted, a practitioner must intentionally act outside the usual course of professional practice. *Id*.; *Rosenberg*, 515 F.2d at 197.

The government accordingly errs when it claims that appellants' good-faith defense had no basis in law. *Feingold* requires not only that the defendant knowingly prescribe controlled substances outside the course of usual professional practice and without a legitimate medical purpose, it further requires that he *intend* to so prescribe. 454 F.3d at 1008. Such a *mens rea*, whether termed as "knowledge" or "purpose" is nothing more or less than a species of wilfulness. *See United States v. Liu*, 731 F.3d 982, 989-90 (9th Cir. 2013). The *mens rea* to distribute controlled substances outside the course of professional practice and without a legitimate medical reason is synonymous with an intent to violate the law. *See id.; see also United States v. Cheek,* 498 U.S. 192, 202 (1991); *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994).

Therefore, the government's repeated assertion that the crimes charged here are general intent offenses is mistaken. Likewise, its reliance on cases such as *United States v. Delgado*, 357 F.3d 1061, 1066-68 (9th Cir. 2004), is misplaced. *Delgado* involved a garden variety drug case, in which this Court concluded that

conspiracy to distribute street drugs is a general intent crime. *Id.* at 1067.

*Delgado* did not concern the factual scenario present here, in which culpability is

defined by an exemption for physicians acting within the scope of a federal

regulation. *See* 21 C.F.R. § 1306.04.

The regulatory environment in which doctors practice provides further

support for the conclusion that a conviction requires specific intent or wilfulness.

Crimes which turn largely on the interpretation of regulations require specific

intent for conviction. *See e.g., Ratzlaf,* 510 U.S. at 141; *Liu,* 731 F.3d at 989-90.

This Court's decision in *Liu* is instructive, holding that a criminal violation of the

copyright statute required the specific intent that the defendant must commit the

infringement, *knowing that he is infringing*. *Id.* at 990. In this way, the defendant

can be said to have the specific intent to violate someone else's copyright. *Id.*; *see

also Bryan v. United States,* 524 U.S. 184, 190 (1998) (approving instruction that

"defendant acts willfully if he acts intentionally and purposely and with the intent

to do something the law forbids, that is, with the bad purpose to disobey or

disregard the law. Now, the person need not be aware of the specific law or rule

that his conduct may be violating. But he must act with the intent to do something

that the law forbids."). It is not sufficient that the defendant knowingly commit

the act.

The specific intent required by *Liu* is akin to that required by *Feingold* and here. As with copyright law, the defendant's liability turns on his understanding of a regulatory scheme, supporting a conclusion that a CSA violation committed by writing a prescription requires specific intent. Thus, a higher level of culpable *mens rea*—amounting to at least specific intent—is required of a defendant who violates the CSA through a physician who writes what he believes to be a prescription.

The government argues the authority cited in the Brief of Appellants, particularly *United States v. Fierros*, 692 F.2d 1291, 1294 (9th Cir. 1983), is inapposite. GAB at 64. The government is mistaken; its own discussion of *Fierros* proves the point. Title 18, section 1324(a), which criminalizes the harboring of aliens present in the United States in violation of the law, provides for liability based upon a knowing or wilful intention. The statute exempted from its definition of harboring, the conduct of employment, including the usual and normal practices incident thereto. This Court concluded that harboring did not require that the defendant know he was violating the law, but nonetheless required

specific intent, which necessitated that the defendant know the employees were unlawfully present in the United States. *Id.*[2]

Similarly, the distribution of controlled substances by means of a prescription, requires specific intent. As in *Fierros*, the statute provides an exemption for physicians who distribute controlled substances pursuant to a valid prescription. The Code of Federal Regulations, in turn, defines a valid prescription as one issued in the usual course of professional practice and for a legitimate medical reason. Unlike the concept of employment, however, the definition of a valid prescription is controlled by regulation. *See generally National Mutual Ins. Co. v. Darden,* 503 U.S. 318, 323-24 (1992) (concept of employment is defined by the common law of agency). The determination whether a prescription is valid, because it was issued in the usual course of professional practice and for a legitimate medical reason, presents a complicated question that depends on specialized knowledge of medicine and law. The need

---

[2] In *Fierros*, the defendant had contended that his *ignorance* of the law provided a defense, which contention this Court rejected. 692 F.2d at 1293-94. He did not contend that he had a good-faith misunderstanding as to the requirements of the law. *Cf. United States v. Mitrano*, 658 F.3d 117, 120 (1st Cir. 2011). Moreover, *Fierros* acknowledged that the *mens rea* of willfulness is required when a crime is dependent on complex regulatory schemes. *Fierros*, 694 F.2d at 1294. This latter exception applies here.

for such specialized knowledge mandates the conclusion that specific intent to violate the statute is required for conviction. *See Feingold*, 454 F.3d at 1006-07, 1010.

Of course, when specific intent is an element of the offense, the defendants' "subjective beliefs" about the law and legality are highly relevant evidence. *United States v. Anderson*, 741 F.3d 938, 946-47 (9th Cir. 2014); *Fierros*, 692 F.2d at 1294 (defendants accused of alien smuggling could have asserted defense that they reasonably believed workers were not aliens or that they had been legally admitted to the United States); *accord United States v. Smith-Baltiher*, 424 F.3d 913, 924 (9th Cir. 2005). It is not a crime to "to fail to comply with a statute based on a good faith misunderstanding of its requirements." *United States v. Mitrano*, 658 F.3d at 120.

The government's assertion that the defendants' "subjective beliefs" about the law are irrelevant fails for another reason: good faith is fundamentally a subjective determination. Subjective good faith can be proven by a variety of evidence, including evidence that the defendants subjectively believed in the lawfulness of their conduct. *See United States v. Certified Environmental Serv.*, 753 F.3d 72, 88-91 (2d Cir. 2014). Such good faith negates specific intent, even if

23

the government proves that the defendant knowingly distributed a controlled substance.

The district court's instructions were prejudicially inadequate because they were confusing as to the relationship between the government's burden of proof, the defense of good faith, and evidence that the defendants thought they were complying with the law.

The court's instruction that "[t]he government does not have to prove that the defendant knew he was violating the law," necessarily confused the jury, because of the close relationship between the state of the law at the time of the offense and good faith. The instruction effectively eliminated the good-faith defense, by negating the concept that a good faith belief in legality was equivalent to the good faith belief that was fundamentally inconsistent with the *mens rea* required for conviction.

The good faith defense depended on the evidence that the defendants thought they were acting lawfully and, with respect to Messrs. Napoli and Johnson, that they relied on the good faith of Dr. Carozza and other physicians. Contrary to the government's answering brief, the defendants offered considerable evidence that would have allowed a properly instructed jury to infer that the defendants believed the prescriptions were being issued for a legitimate medical

24

reason and/or in the usual course of professional practice. For example, Dr. Wilkins, who worked for PSA, testified that he believed he was acting in the usual course of medical practice. RT 3388-91. Chris Napoli testified that attorney McHale told him his business model did not violate federal law. RT 3425-26. Mr. Napoli further testified that attorney Green told him that the DEA was lobbying to add a requirement of a face-to-face meeting before prescribing. RT 3427-28. Mr. Napoli also testified that he believed the doctors were acting in good faith and relied upon them to exercise good medical judgment. RT 3634-35. Moreover, Mr. Napoli testified that he believed that a legitimate doctor-patient relationship could be established through PSA's business model which used an online medical questionnaire. RT 3538. All of this evidence supported a conclusion that the defendants believed that they were participating in the distribution of controlled substances legally and within the scope of usual professional practice.

There was an independent factual basis for the defendants' good faith as well: the pendency of the Ryan Haight Act, which suggested that the federal government had not yet criminalized the sale through prescription of Schedule III and IV controlled substances in the absence of an face-to-face consultation with a licensed physician. This defense was not a claim that the government lacked the power to forbid distribution without a face-to-face consultation, but that the

government had not, at the time of the events charged in the indictment, yet enacted such a requirement. *See* JER 75-77.

The government concedes that a conviction required the jury to find that the prescriptions be issued outside the usual course of professional practice and not for a legitimate medical purpose. *See* 21 C.F.R. § 1306.04. A doctor's good faith belief that he is complying with the law is tantamount to the belief that he is acting in the usual course of professional practice and for a legitimate purpose. This belief, if found by the jury, precludes a finding of culpable intent. *See Feingold*, 454 F.3d at 1007-08.

On this record, the instruction that "the government does not have to prove that the defendant knew he was violating the law" was necessarily confusing, because there was no meaningful distinction between knowingly violating the law and knowingly issuing prescriptions outside the usual course of professional practice and not for a legitimate medical purpose. JER 72-73. The question of good faith turned on what the defendants thought was legal and thus within the usual scope of professional medical practice. These questions are inextricably intertwined.

The instruction particularly harmed defendants Napoli and Johnson. As lay people, they would logically focus on the legality of their conduct rather than on

the "course of usual professional practice" or a "legitimate medical reason," determinations which depend on the possession of highly specialized knowledge. Mr. Napoli understood that legality turned on the conduct and good faith of the physicians involved, but was himself concerned with whether he was violating the CSA. He and co-defendant Johnson relied on the legal advice they received and on the good faith of physicians. The court's instructions created a false dichotomy between good faith and Napoli and Johnson's beliefs that they were acting within the bounds of the law.

In sum, the court's instructions on good faith were necessarily confusing, because they rejected the equivalence of a good faith belief that the defendants were acting within the law and the good faith belief that prescriptions were issued within the usual scope of professional practice. Reversal is required.

A. **The Refusal to Instruct on the Question Whether an In-Person Examination Was Required to Render a Prescription Valid Allowed Conviction on An Invalid Legal Theory.**

In the court below and now, the government asserts that the lack of an in-person examination rendered the defendants' sale of controlled substances unlawful *per se*. *See e.g.* GAB at 63-66, RT 4602, 4644, 4647, 4800. In the court below, however, the government also insisted that the defendants were being prosecuted for a wholesale course of conduct, not merely the sale of controlled

27

substances based on an online medical questionnaire.  *See e.g.*, 9/24/12 RT 54-55, RT 2763, 4652.  Thus, the government vigorously opposed an instruction on either the Ryan Haight Act or on the question whether an in-person consultation was required to render a prescription valid.

The government now argues that the defendants were guilty based merely on the absence of an in-person examination.  Indeed, for this reason, the government now contends that any instructional error is harmless.  *See e.g.* GAB at 74.  This contention lacks merit.

The government's arguments in the trial court and here demonstrate the necessity for an instruction on the Ryan Haight Act.  The government avers that the district court was "well within its discretion to deny an instruction on the Ryan Haight Act."  GAB at 71.  The government contends that because it showed that the prescriptions "were issued outside the course of professional practice," the court did not err.  *Id.*; *see also* GAB at 70-72.  But this begs the question whether a defendant could reach a contrary conclusion in good faith.

The government's argument depends wholly on its claim that the case for guilt was overwhelming, given the structure of the defendants' business.  *See* GAB at 71.  The government's repeated claim that the mere failure to conduct an in-person examination rendered the distribution of medication illegal, regardless of

28

the defendants' good-faith beliefs that the law at the time did not prohibit such distribution, demonstrates the need for an instruction on the law at the time of the charged conduct. The government is mistaken as to the intent required for conviction. And, the defense presented substantial evidence that, at the time of the offense conduct, the defendants in good faith thought that a valid prescription did not require a face-to-face examination. Once the Ryan Haight Act took effect, federal law clearly required a face-to-face meeting before prescribing a controlled substance. At the time of the charged conduct, however, the Ryan Haight Act had been proposed, but not passed. The Act, about which the defendants attempted to testify was central to the question of the their *mens rea*.

An instruction addressing the Ryan Haight Act and/or the requirement of an in-person consultation was critical to the defense. The pendency of the Ryan Haight Act was not merely a piece of evidence, but provided the legal background to the defense that the defendants in good faith believed that the prescriptions were issued by a physician, in the usual course of professional practice and for a legitimate medical reason. The pendency of the Ryan Haight Act provided what many would view as empirical corroboration for the notion that the defendants believed in good faith that a face-to-face consultation was not required to render a prescription valid. The more reasonable a belief, the more likely it was held in

29

good faith. See *United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999)(*en banc*); *United States v. Urfer*, 287 F.3d 663, 665 (7th Cir. 2002). The lack of an instruction on the question whether the law required a face-to-face meeting before prescribing a Schedule III or IV controlled substance allowed the government to contend that the defendants' business model was *per se* illegal and that the defendants must have known this.

A particularized instruction on the Ryan Haight Act was needed because of the precise nature of the defense presented: that at the time of the conduct, the defendants believed in good faith that the government had not yet required a face-to-face meeting before writing a prescription. The concepts involved were complex: *mens rea,* good faith, a defendant's belief in the legality of his conduct, and the relationship between these three matters. Of course, the jury could have considered evidence of the Act and still concluded that the government had proved that the defendants purposefully distributed controlled substances outside the course of professional practice and without a legitimate medical reason. Without an instruction on the Ryan Haight Act, however, the jury was left without guidance on the essential basis for defendants' good faith belief.

**B.** **The District Court's Good Faith Instruction Was Flawed, Because It Applied The Legal Duties of a Licensed Prescribing Physician To the Non-Physician Defendants And Failed to Account for the Concept that a Layperson may Reasonably Rely on a Professional.**

The government contends incorrectly that the district court's instructions accurately summarized the good-faith defense as applied to lay people charged with conspiring with a physician to violate the CSA. GAB at 72. Not so. The good-faith instruction was prejudicially flawed because it imposed the same affirmative legal duty to investigate and ensure the medical validity of a prescription to the physician and non-physician defendants. *See* JER 182 ("*The defendants* in this case maintain that . . . their actions were done with a good faith belief that the controlled substances were being distributed by means of a prescription issued by a physician for a legitimate medical purpose and in the usual course of a professional medical practice.) The instructions nowhere indicated to the jury that lay people might reasonably rely on a good-faith judgment exercised by physicians and pharmacists.

While lay people may be criminally liable for conspiring with physicians to violate the Controlled Substances Act, their duty to ensure that a prescription is issued for a legitimate medical purpose and in the usual course of professional practice is not (and could not be) identical to that of a licensed physician. *See*

31

*Quinones*, 635 F.3d at 594-95, 604.  The duty to ensure that medications are distributed in the usual course of a professional medical practice and for a legitimate medical purpose necessarily applies only to licensed prescribing practitioners because the defendant is assumed to have sufficient medical knowledge and training to make those determinations.  *Feingold*, 454 F.3d at 1008.  As a practical matter, Napoli and Johnson could not have formed the good faith *Feingold* belief described by the district court's instruction because they could not have obtained patient information to support it.  Thus, in critical part, the good-faith of Napoli and Johnson depended on that of the physicians on whom they relied, as well as on their belief in the lawfulness of distributing medication based on an online medical questionnaire.

The district court's good faith instruction essentially required Napoli and Johnson to investigate Dr. Carozza's medical practices—something they could not legally do—and intrude on the privacy of his patients in order to demonstrate good faith.

The government's analysis of *United States v. Vamos,* 797 F.2d 1146 (2d Cir. 1986) and *Quinones* is a *non sequitur*.  The government argues that under those cases, lay people may not *unreasonably* rely on the medical judgment of their physician employers.  GAB at 73.  But that argument begs the point here

32

because the district court refused to instruct the jury that the lay defendants could rely on the judgment of physicians or pharmacists at all.

The district court should have given Johnson's proposed instruction which would have correctly advised the jury that he and Napoli were entitled to rely in good faith on the medical and professional judgment of physicians and pharmacists. *Vamos*, 797 F.2d at 1153; *Quinones,* 635 F.3d at 604. Because the district court's instructions erroneously assigned the same good faith *Feingold* duty to the non-physician defendants as that applied to Dr. Carozza, they were deprived of a fair opportunity to present and argue their good faith defense. *See United States v. Lovern*, 590 F.3d 1095, 1104-05 (10th Cir. 2009). Accordingly, Napoli and Johnson should receive a new trial.

### C. The Instructional Errors Were Necessarily Harmful, Because They Allowed Conviction on an Invalid Legal Theory.

The government contends that all errors are harmless, because it showed that distribution took place without an in-person examination and therefore, outside the usual course of professional practice. GAB at 74. Again, this contention turns on the government's erroneous premise that it was required only to prove general criminal intent to secure a conviction. The government also suggests that evidence that the defendants earned large sums of money, discussed

33

prosecutions of internet pharmacies and sold software that would enable others to conduct those businesses satisfied their burden to prove mens rea. That argument distorts the record and fails to acknowledge the specific mental state required under Feingold.

Whether the instructional errors were harmless must be evaluated in light of the defendants' substantial evidence of good faith. Seen in this light, the government's evidence of a lack of good faith was far from overwhelming. And, the court's instructions limiting the definition of good faith to the standard of medical practice likely caused the jury to disregard entirely the substantial defense testimony regarding the defendants' attempt to comply with the law, evidence that strongly showed good faith. Indeed, the jury likely heeded the government's exhortation to view this evidence as irrelevant. Moreover, the instructions deprived the non-physician defendants of the benefit of their good faith reliance on the actions of licensed physicians and pharmacists. The denial of the reliance instruction alone requires vacatur of the convictions.

The defendants presented substantial evidence of good faith. Defendant Napoli made considerable efforts to determine whether he was acting within the bounds of the law. He investigated whether it was legal for doctors to prescribe based on an online questionnaire. He talked to several lawyers, who informed him

that it was not illegal. He found doctors who were willing to prescribe based on an online questionnaire. He was advised that the legality of his conduct turned on whether the doctor was acting in good faith. All of these facts all supported a conclusion that the defendants in good faith believed that they were not distributing controlled substances outside of usual professional practice and without a legitimate medical reason.

As to Johnson, the government's contention that he received $835,540 from Safescripts Online and its suggestion that the defendants all enjoyed lavish lifestyles is simply untrue. GAB at 29. $835,540 is the sum that was paid to Johnson's employer, Internet Commerce Corp. JER 1152, 1702. Johnson's total earnings for his internet pharmacy work, which spanned several years, totaled $145,000. RT 3986. Johnson drives a 1995 Toyota T100 and he, his wife, and five children live in a modest house that was purchased for $159,00. RT 3986. Johnson's salary from ICC for the three year period charged in the indictment was $63,770.96 in 2004, $41,883.39 in 2005 and $40,434.56 in 2006. RT 3773; JSER 1. Accordingly, the government's claim that Johnson was paid $835,540 for his work for SSO is specious.

Moreover, the government claims that Johnson's post-SSO conduct where, in connection with his job at ICC, he leased or sold software to internet pharmacy

35

operators and assisted them with their operations is proof of a guilty mind.  The

government fails to acknowledge the lack of evidence that Johnson undertook

those actions with knowledge of the usual course of professional practice.  Indeed,

the government does not even contend that there was proof that he harbored any

intent to distribute controlled substances without a legitimate medical reason and

outside the scope of usual professional practice.  It argues instead, and incorrectly,

that "general intent" i.e., mere knowledge that the medications were being

distributed is sufficient in and of itself for conviction, regardless of the

defendant's good faith.

Given the defense evidence, the instructional error cannot be dismissed as

harmless because the instruction allowed conviction on the sole basis of the lack

of an in-person consultation before prescribing Schedule III and IV controlled

substances.  The instructions permitted the government to contend in closing  that

the evidence of good faith was a "giant red herring," because it included testimony

that the defendants believed they were acting within the bounds of the law.  RT

4801, 4812, 4838.

In the unique circumstances of this case, the court's jury instructions on

good faith undermined the government's burden to prove the specific mental states

required for conspiracy and money laundering.  The instructions allowed

36

conviction on the invalid legal theory that the government proved a lack of good faith solely by showing that the defendants knowingly distributed prescription medication without a face-to-face consultation with a medical provider. This Court should vacate the defendants' convictions for conspiracy and money laundering.

### III. The Interaction of the Good Faith and Deliberate Ignorance Instructions Shifted the Burden of Proof on Good Faith to the Defendants.

The government contends that the deliberate ignorance instruction was supported by the evidence, and therefore the district court did not abuse its discretion. GAB at 77-78. The government claims that the evidence supported an inference that "defendants were aware of a high probability that their distribution of drugs was outside professional medical practice." GAB at 78. The government's evidence, however, supported either a conclusion of *actual knowledge* that the controlled substances were being distributed outside the course of professional medical practice *or a good faith belief in the propriety of defendants' own actions*. A deliberate ignorance instruction requires evidence that the defendant *purposely avoided* learning the critical fact or facts which if known would impose criminal culpability. *See United States v. Baron*, 94 F.3d 1312, 1317 (9th Cir. 1996), *overruled in part by United States v. Heredia*, 483 F.3d 913,

37

920 (9th Cir. 2007) (*en banc*).  Because such evidence was lacking, the district

court abused its discretion.  Indeed, the government's argument boils down to this:

appellants' refusal to accept the government's interpretation of the pre-Ryan

Haight regime, and their decision to contest that interpretation made them

"deliberately ignorant."  It is undisputed that appellants learned the facts; the issue

is whether they agreed with the legal conclusions arising from those facts.  At

bottom, the government, while successfully challenging its need to prove

appellants' intent to violate the law, secured an instruction that permitted

conviction based on a theory that they were deliberately ignorant of it.  This was

error.

The government points to evidence about the closure of Mr. Napoli's

fulfillment pharmacy, his awareness that another internet pharmacy owner had

been arrested, and the DEA's visit to Dr. Wilkins, as showing deliberate

ignorance.  GAB at 78.  The defendants did not dispute that they knew about these

events.  Indeed, Mr. Napoli—and attorney Joseph Green—testified that they

discussed the pharmacy shutdowns.  RT 3170, 3172-75, 3177, 3179-82, 3753.

Moreover, Chris Napoli, attorney Green, and Andrew Napoli all testified that they

knew the DEA did not approve of Mr. Napoli's business model.  RT 3116-19,

3125-26.

38

Without citation to the record, the government also argues that after Johnson and Napoli "received target letters, both men continued to distribute drugs the same way." GAB at 79. The government mischaracterizes the facts.

First, as to Mr. Napoli, he undertook additional actions designed to determine whether his conduct was legal or not, by filing a Declaratory Relief Action. Further, he continued to make improvements to the business by attempting to restrict the distribution of controlled substances. As explained in the opening brief, Mr. Napoli had the ordering software changed to prevent customers from ordering more than a 30-day supply of medication every 30 days. RT 385, 4135, 4154-55. The system was modified to catch variations of the same name. RT 4124. SSO then purchased third-party software to prevent multiple shipments to the same address. Finally, SSO developed a blacklist of customers who were potential abusers. RT 3463-64, 4130.

Second, after DJ Johnson received the target letter, he and his father, Dan Johnson, the owner of ICC, consulted with attorneys Robert Tarun and Michael Costa, who advised them that the safest course was to cease providing software to internet pharmacies. RT 3872, 3930-31, 4223, 4227, 4230. Dan Johnson, not DJ Johnson, decided that ICC would instead continue distributing software to internet pharmacies using a modified fee structure suggested by Tarun. RT 3930-31, 4065,

39

4232.  Tarun advised them not to offer services on a per transaction basis and so ICC converted its fee structure to a flat rate.  RT 4065-4067.  Accordingly, the government's contention that DJ Johnson continued to "distribute drugs the same way" after the target letter is inaccurate.  It was Johnson's father, Dan Johnson, who decided that ICC would continue offering software to internet pharmacies after the target letter was issued against his son, DJ.  Moreover, ICC distributed software to those pharmacies under a modified fee structure consistent with the advice of counsel.

This evidence does not tend to show deliberate ignorance; rather, the evidence of pharmacy closures and DEA activity tended to show either actual knowledge and intent, on the one hand, or good faith on the other.  Either way, it is the opposite of willful blindness.  *See Quinones*, 635 F.3d at 603 (Straub, J., dissenting).

The government also asserts that attorney McHale, who Messrs. Napoli and Mullin consulted about the legality of the business, told them that their business was "akin to drug dealing," and suggests that such evidence supported the deliberate ignorance instruction.  GAB at 78.  The government has misstated the record, taking one sentence out of context.  McHale told Napoli and Mullin that the proposed business was a "gray area," and the government did not like it.  RT

40

392; *see also* RT 397.  Mr. Napoli testified, however, that McHale also said that his proposed business did not violate federal law.  RT 3425-26.  McHale made various recommendations Mr. Napoli's partner, Kevin Mullin, believed that Mr. Napoli followed them.  RT 385.  There also was evidence that Mr. Napoli learned from attorneys that the DEA was lobbying Congress for passage of the Ryan Haight Act, which would have required an in-person meeting between doctor and patient before a prescription was written.  RT 3428.  This evidence tended to show that the defendants were quite aware of the facts and circumstances and did not try to remain ignorant about anything.

The government further contends the jury could have inferred willful blindness based on the defendants' deliberate failure to consult with the DEA about why it closed "every fulfillment pharmacy that they used."  GAB at 79.  But the defendants did not fail to investigate; they consulted with attorneys.  The defendants knew that the DEA did not approve of their activities: there was no ignorance involved.  The fact that the defendants did not consult with the DEA does not support a conclusion that they remained willfully blind.

The government argues that any error was harmless, relying on *Quinones*. The evidence found overwhelming by split decision there was substantially stronger than the evidence presented here.  For example, in *Quinones*, patients had

no way to contact the prescribing doctor, and the defendants knew they were violating Florida law. *Id*. In contrast, here, the defendants presented evidence that orders were shipped with Dr. Carozza's phone number and patients could contact the doctor. RT 113-14, 3446. While the government presented evidence to contrary, at best, the record was equivocal on this point. And, unlike the evidence in *Quinones*, the defendants presented evidence that they believed they were operating within the parameters of federal law.

The government's reliance on *United States v. Fuchs*, 467 F.3d 889, 902 (5th Cir. 2006) also is misplaced, because there, the defendants merely argued a lack of guilty knowledge rather than good faith. They did not contend that they had a good-faith belief that the federal government had not yet rendered prescribing in the absence of an in-person meeting unlawful. *Id*. Nor did the *Fuchs* defendants present evidence that they affirmatively inquired into the legality of the internet pharmacy model. Finally, the defendants here did not, unlike the Fuchs defendants, dispense Schedule II controlled substances, with their greater potential for addiction and abuse. *Cf.* RT 3451. 3634; 21 C.F.R. §§ 1306.07, 1306.11, 1306.12.

The government's argument regarding harmless error is specious. The government contends that there was overwhelming evidence that the defendants

42

participated in distributing Schedule III and IV controlled substances in the absence of a valid prescription. But, a correct inquiry into harmless error requires consideration of defendants' evidence of good faith. Nearly every error is harmless if you ignore the defendants' defense. As explained in the opening brief, and above, the defendants presented considerable evidence that they inquired into the lawfulness of their business model and undertook to prevent drug abusers from gaining access to controlled substances. They also presented evidence (albeit limited by the court), that they had a good-faith misunderstanding as to the requirements of the law. All of this evidence supported a conclusion that the defendants believed in good faith that the medications at issue were being distributed within the usual course of professional practice.

Given the substantial evidence of the defendants' good faith, the deliberate ignorance instruction damaged the defense by allowing the government to contend that the defendants had to prove not only good faith, but also that they had accurately educated themselves about the proper scope of medical practice and the law applicable thereto. Indeed, the government argued that by choosing to sell controlled substances, the defendants were strictly liable: that they had assumed the risk of violating the law. RT 4814-15. This argument falls afoul of the concern—as expressed by Judge Kleinfeld in concurrence in the *en banc* case

43

*Heredia*—that a failure to investigate can constitute willful blindness. 483 F.3d at 928-29 (Kleinfeld, CJ., concurring).

The government finally suggests that a premeditated failure to investigate can constitute willful blindness. This argument fails for two reasons. First, there is no evidence of a "premeditated failure to investigate." Second, premising a finding of willful blindness on a failure to investigate injects the civil concepts of assumption of the risk and/or strict into the determination of criminal *mens rea*. For both reasons, the district court abused its discretion in instructing on deliberate ignorance. The error was not harmless and requires vacatur of the convictions.

## IV. The agents' false grand jury testimony requires reversal.

The district court erred in refusing to dismiss the indictment based on false testimony that the government offered to the grand jury. See AOB 109. Two special agents testified that a prescription is *per se* invalid unless the doctor conducted at least one in-person examination. *See* AOB 112-114. But at the time of the offense conduct, federal law did not *per se* require an in-person examination; Congress added that requirement in 2008. See AOB 109-112.

The government offers three responses to avoid dismissal now. None have merit.

44

The government first claims the agents offered truthful testimony when they were asked "what made a prescription valid in 2010," because the law in 2010 did require an in-person examination. GAB 91. But that claim—just like the errant testimony at issue—is not true.

The prosecutor never asked the agents, "what makes a prescription valid in 2010?" *See e.g.*, JER 379-80. Indeed, the government never differentiated between the pre-RHA state of the law and the change in law effected by the passage of the RHA. For instance, the prosecutor asked Special Agent Chin, "so a valid doctor-patient relationship *requires* at least one face-to-face visit. Is that correct?" JER 379-80 (emphasis added). The agent answered yes. JER 380. The prosecutor asked Special Agent Bridgers, "what *is required* in order for a prescription to be valid?" JER 388-89 (emphasis added). The agent replied that a valid prescription "requires a face-to-face relationship with [a] physician . . . ." JER 388-89. The grand jury had no way of knowing that the agents were making a distinction between the CSA pre-Ryan Haight and the CSA at the time of the grand jury proceedings. In essence, the government claims that the agents were not dishonest, just deceptive. This is not defense to the agents' misconduct.

The government next argues that the agents' testimony was not false, because even in 2005 and 2006, courts had found prescriptions invalid where the

doctor had not met or examined the patient. *See* GAB 91-92. This argument

misses the mark. During 2005 and 2006, federal law did *not* expressly *require* an

in-person examination. Whether other people on other facts in other cases were

convicted of violating the CSA does not render truthful agents' false testimony.

On this point, there is no dispute: DEA Administrator Rannazzisi testified in 2005

that there was "no statutory definition specifically outlining what constitutes a

valid 'doctor/patient' relationship." JER 293. And the CRS Report found that

issuing a prescription without an in-person examination was "not necessarily

illegal." JER 245. And the CSA said *nothing* about in-person examinations prior

to the enactment of the Ryan Haight Act. The agents' testimony that an in-person

examination was *always* required was thus false because that was not the law until

after the appellants' offense conduct. The agents could have presented truthful

testimony, and said, for example, that some state laws required in-person

examinations. But they did not.

Last, the government argues that the agents' testimony about the in-person

examination does not warrant reversal because the testimony was meaningless.

See GAB 92-93. But the indictment, which focused nearly entirely on Dr.

Carozza's issuance of prescriptions in the absence of an in-person examination,

*see* AOB 117 (citing Dkt. 144 at ¶¶ 1-3), itself refutes this contention. Most

46

plainly, the agents testimony *required* an indictment regardless of appellants' intent because the false testimony asserted the government had established *per se* violations of the CSA. In other words, there can be no question that the false testimony "substantially influenced the grand jury's decision to indict." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1998).

Notably, the government studiously fails to mention the allegations that actually appear in the indictment. See GAB 90-93. The government then claims that even without the false testimony, there was "sufficient evidence" for the grand jury to indict. GAB 92. But it offers no supporting evidence. *See* GAB 92. Elsewhere in its brief, the government notes that agent Chin testified to five reasons why the prescriptions were not valid: (1) the lack of a valid doctor-patient relationship; (2) the lack of a face-to-face meeting between the doctor and patient; (3) no patient evaluation by anyone; (4) the average doctor review was brief; and (5) the doctors and pharmacies sent prescriptions to states in which they were not licensed. See GAB 86-87. The first three reasons depend on the absence of an in-person examination and the false testimony that the CSA required such examinations. The indictment did not allege that Dr. Carozza reviewed the questionnaires too quickly. *See* AOB 117-18. As for sending prescriptions out of state, the indictment states that Dr. Carozza was licensed only in the State of New

47

York, but then alleges that Dr. Carozza "or another approving physician" authorized prescriptions that went out of state. Dkt. 144 at ¶ 4. The government does not identify which evidence, other than the false evidence, supported the indictment, *see* GAB 92-93, and the indictment does not provide the answer. *See* AOB 117-18.

In sum, there can be no doubt that the false testimony affected the decision to indict. The grand jurors had no choice but to indict based on the false testimony that asserted *per se* violations of the CSA. The grand jurors knew—and it was never disputed—that Dr. Carozza did not conduct in-person examinations. The agents then falsely testified that federal law *required* an in-person examination.

Under *Bank of Nova Scotia*, courts should dismiss an indictment when a "violation substantially influenced the grand jury's decision to indict or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (citation omitted). The false testimony necessarily substantially influenced the decision to indict, because it left the grand jury with no reasonable alternative.

Finally, the government tries to save its misconduct by asserting that the petit jury's guilty verdict washes away the tainted indictment. *See* GAB 93 (citing *United States v. Mechanik*, 475 U.S. 66, 73 (1986)). The government overstates

48

*Mechanik*. *Mechanik* addressed a "technical violation" of Federal Rule of Criminal Procedure 6(d), and declined to "express [an] opinion as to what remedy may be appropriate for a violation of Rule 6(d) that has affected the grand jury's charging decision and is brought to the attention of the trial court before the commencement of trial." *Mechanik*, 475 U.S. at 72. The Supreme Court then answered that question in *Bank of Nova Scotia*, as set forth above.

In *Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989), the Supreme Court thus distinguished between "technical violations" of Rule 6, i.e., errors subject to *Mechanik*'s harmlessness analysis, and fundamental grand jury errors that render the indictment a nullity in violation of the Fifth Amendment, *i.e.*, *Bank of Nova Scotia* errors:

> only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried.

*Midland Asphalt Corp.*, 489 U.S. at 802.

This is the type of error appellants present here: the government's perjurious presentation *required* the return of an indictment, and thus violated the Grand Jury Clause of the Fifth Amendment, which mandates that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." At common law, "the most valuable function of the

49

grand jury was . . . to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony[.]" *Hale v. Henkel*, 201 U.S. 43, 59 (1906). Indeed, as the Supreme Court instructed in *Russell v. United States*, 369 U.S. 749, 770-71 (1962), it is not "within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been or what the grand jury would probably have made it if their attention had been called to suggested changes," for to do so would "fritter[] away" the Grand Jury clause of the Fifth Amendment "until its value is almost destroyed." *See also Stirone v. United States*, 361 U.S. 212, 218 (1969) ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge.")

The indictment in this case—directed by the Government through false testimony—was no indictment at all. The district court erred in refusing to dismiss it, and this Court should correct that error now.

## CONCLUSION

Based upon the foregoing arguments, this Court should vacate appellants' convictions and remand for a new trial.

Dated:   September 29, 2014

Respectfully submitted,


/s/ Karen L. Landau
KAREN L. LANDAU
Attorney for Appellant
Chris Napoli


/s/ Ethan A. Balogh
ETHAN A. BALOGH
Attorney for Appellant
Dr. Joseph A. Carozza


/s/ Martin A. Sabelli
MARTIN A. SABELLI
Attorney for Appellant
Daniel Johnson

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32 and Ninth Circuit Rule 32-1, the attached

~~Opening/Answering~~/Reply Brief is:

Proportionately spaced, has a typeface of 14 points or more, and contains

10,854 words.

*/s/ E A Balogh*

Dated: September 29, 2014                    ETHAN A. BALOGH

## **PROOF OF SERVICE**

I, Ethan A. Balogh, certify that on September 29, 2014, I caused to filed electronically a copy of this Reply Brief of Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and that all parties to whom I am required to provide service are registered CM/ECF users, and that service of the reply brief shall be accomplished by the appellate CM/ECF system.


*/s/ E A Balogh*

Dated: September 29, 2014              ETHAN A. BALOGH